UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | Case No. 25-81226 |
| HANSEN-MUELLER CO.,[1] | Chapter 11 |
| Debtor. | |

# DECLARATION OF MICHAEL COMPTON, CHIEF RESTRUCTURING OFFICER OF DEBTOR HANSEN-MUELLER CO., IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY MOTIONS

I, Michael Compton, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer of Hansen-Mueller Co, the debtor and debtor-in-possession ("HM" or the "Debtor") in the above-captioned case. HM owns all of Hansen-Mueller Trucking Co. ("HM Trucking") KCT-II, LLC ("KC MO Owner"), 1321 Lewis Blvd. Sioux City Iowa, LLC ("Sioux City Owner"), 300 Southwest Boulevard, LLC ("KC KS Owner"), and HMC Houston LLC ("JV Owner"). I initially joined the Debtor on or about October 20, 2025, and I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. I generally oversee the entirety of Debtor's business. I am above 19 years of age, and I am competent to testify to the matters set forth herein.

2. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information that I have received from other members of the

---

[1] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is: Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

Debtor's management or the Debtor's advisors. If I were called to testify, I could and would testify competently to the facts set forth herein.

3. I am authorized to submit this declaration (this "Declaration") on behalf of the Debtor and do so to assist the Bankruptcy Court for the District of Nebraska (the "Court") and parties in interest in understanding the circumstances compelling the commencement of this chapter 11 case and in support of the Debtor's chapter 11 petition and certain motions and applications filed today.

4. The Debtor has requested a variety of relief in its "first day" motions and applications (collectively, the "First Day Motions") filed concurrently herewith to minimize the adverse effects of the commencement of this chapter 11 case. I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. I further believe the relief requested in the First Day Motions will aid in the implementation of timely and efficient chapter 11 case that will preserve and maximize the value of Debtor's estates.

## Introduction

5. HM is a nationwide merchandiser and processor of grain with a diversified agribusiness platform with locations throughout the central United States. More specifically, HM operates nine elevators, five across the Midwest along Interstate 29, with grain storage capacity of 30 million bushels. HM also operates four port terminals: Duluth, Minnesota; Houston, Texas; Superior, Wisconsin; and Toledo, Ohio. HM further owns an oats processing facility in Toledo, Ohio that produces pet food and animal feeds ("Oats Processing Facility"). Additionally, HM leases and operates grain trading offices located in Toledo, Ohio; Omaha, Nebraska; Salina, Kansas; Kansas City, Missouri; Tallulah, Louisiana; Grand Island, Nebraska;

and Alabaster, Alabama. HM has four distinct and complementary business units described in more detail in Paragraphs 9-12 *infra*: (1) Oat Trading; (2) Wheat Merchandising; (3) Cross-Country Trading; and (4) a Houston Joint Venture. HM leases a private railcar fleet of 387 that provides it flexibility and national reach, traversing every major class I rail in North America and operates across all major transportation modes – truck, rail (manifest, shuttle, unit), barge, vessel, and container – to support both import and export flows of grain, optimizing cost and timing performance. HM is headquartered in Omaha, Nebraska and employs approximately 120 individuals in a number of different states in which it operates, including Nebraska, Iowa, Missouri, Kansas, Minnesota, North Dakota, Louisiana, Wisconsin, Ohio, Texas, and Alabama. HM Trucking is a trucking company that was engaged principally in the transportation of grain. KC MO Owner, Sioux City Owner, and KC KS Owner own or lease certain real estate and lease that to HM.

**The Debtor's Corporate History and Business Operations**

6.     Founded in 1979, HM has spent the last 45 years building business units, adapting and executing with changing market dynamics. HM strategically built its core business around oats and other niche crops in the Midwest, focusing on international trade, independent mills, and vertically integrating into processing. Known for its personalized services and solutions to buyers and sellers of grain and feed, HM has grown to operate in 44 states and 24 countries.

7.     On November 16, 1979, Jack Hansen (the "Founder") formed HM by directing the filing of Articles of Incorporation of Hansen-Mueller Co. the office of the Secretary of State of the State of Nebraska.

8.      On March 26, 2021, HM filed the Amended and Restated Articles of Incorporation of Hansen-Mueller Co. with the office of the Secretary of State of the State of Nebraska.

### Four Business Units

9.      Today, HM is one of the largest traders of oats, accounting for 30% to 70% of the futures market, which represents one of its business units.  An industry leading oats merchandiser with a strong presence throughout the Upper Midwest and Canada, HM handles approximately 18 million of the roughly 60 million bushels produced annually through its facilities in Toledo, OH (1800 North Water St.), Grand Forks, ND (4256 54th Av. N), Duluth, MN (24 N. 21st Ave. West Duluth), and Superior, WI (21st Ave. E).

10.     Additionally, HM handles over 77 million bushels of wheat annually, mainly through its Interstate 29 facilities in Grand Forks, ND, Sioux City, IA, Council Bluffs, IA, Kansas City, KS, and Kansas City, MO, which represents another of its business units.  HM's major clients for wheat include independent and non-vertically integrated mills along with major grain trading groups including multi-national and domestic processors.   HM's wheat merchandising business is flexible enough to cover all major regions within the US through trucks and class I rail in large part due its leased private railcar fleet.

11.     HM also offers a dedicated cross-country trading team, which accounts for another of its business units, that is focused on back-hauls and opportunistic trades throughout the United States, providing high-touch trading services for corn, soy, milo, and feed, utilizing niche market intelligence and regional arbitrage opportunities to enhance its core oats and wheat business.  HM's trading offices are located in Salina, KS, Toledo, OH, Tallulah, LA, Alabaster, AL, Kansas City, MO, Grand Island, NE, and Omaha, NE.

12. HM further ultimately owns an interest in a joint venture through JV Owner with Nautilus International Holding Corp. in which the parties are upgrading a port elevator in Houston that was originally for importing Scandinavian oats. The joint venture has been awarded a $25.4 million federal grant to complete many of the upgrade costs associated with building (a) conveyance from facility to dock, which will reduce operating costs, (b) new shipping bins, (c) dust systems, and (d) improved efficiency in loading, electrical, and drainage, with construction estimated to be completed in November 2026.

### Events Leading to the Chapter 11 Case

13. Despite Debtor's strong operations and valuable assets, Debtor has struggled financially over the past few years, due to a variety of factors, including (a) an unsuccessful conversion of a pasta plant in Fremont, Nebraska that was purchased in 2017, modified in 2017-2018, operated in 2019-2021, and sold in 2022 for a loss of approximately $15 million, (b) the unsuccessful development and implementation of proprietary trading software platform that resulted in a loss of approximately $11 million, (c) an unsuccessful attempted integration of eight elevators purchased in 2016-17 that resulted in a loss of approximately $10 million after their subsequent sale, and (d) losses in arbitrations totaling approximately $3.5 million.  Like many other companies with significant exports, the Debtor also has experienced challenges with the President's tariffs, causing Debtor simply to run out of working capital and, therefore, time.

14. Despite the challenges faced by the Debtor, it has at all times – and continues to be – mindful of their commitments to stakeholders and their obligation to preserve and maximize value.  To this end, and faced with this challenging backdrop, the Debtor has negotiated (i) the proposed use of cash collateral on terms favorable to the Debtor's estates and (ii) bidding procedures that will allow them to run a bankruptcy sale process to achieve the highest and best

5

value for their assets. Prior to entering bankruptcy, the Debtor employed Ascendant Consulting Partners, LLC ("Ascendant"), an investment banker, in September to market their assets to potentially interested parties over a two-to-three-month period in search of the highest and best bid.

15. Ascendant has contacted not less than 37 potential bidders, and the Debtor entered into nondisclosure agreements with not less than 33 parties, which allows those parties to access a data room containing confidential information. The marketing process has generated significant interest in the Debtor's assets, but indications of interest just became duel November 14.

16. While the Debtor is hopeful that it would be afforded enough time to complete the sale process outside of bankruptcy, the Debtor's tenuous financial position has deteriorated more rapidly than expected after the Nebraska Public Service Commission ("PSC") temporarily suspended its grain trading license on October 24, 2025, forcing the Debtor to field numerous inquires from different state agencies in which it operates and provide an unprecedented amount of resources toward providing information to creditors and such state agencies, consuming a large portion of Debtor's executive team's attention and distracting it from its core business and the sale process.

17. In fact, Debtor's current President, Tyler Kester, and its Chief Administrative Officer, Kary Knapp, have continuously worked 14 to 16 hour or longer days (including weekends) since the PSC temporarily suspended the Debtor's grain trading license to appease state agencies, obtain the reinstatement of Debtor's Nebraska grain trading license, field calls and meeting of concerned interested parties, and maintain the workforce of Debtor so that it may maximize its remaining value for its stakeholders. Messrs. Kester and Knapp have worked

tirelessly over these past two-to three weeks, and without their efforts, the Debtor's prospects would be dim and significant value would be lost. More specifically, Mr. Kester has specialized skills and experience in grain trading that cannot be found easily in the market and would be difficult, if not impossible, to replace if he left, and Mr. Knapp is not only serving as the Chief Administrative Officer but also performing many of the functions of the Chief Financial Officer, who resigned a few weeks ago.

18. The PSC's action to suspend Debtor's grain dealer license has had a domino effect and has necessitated the filing of bankruptcy to obtain relief from the burdens of the other state regulatory agencies that have indicated they may be following suit and the demands from other creditors that have piled on since the PSC suspended Debtor's license.

19. Accordingly, the Debtor entered into negotiations for the proposed use of its cash collateral and accelerated its timetable for a sale of its assets. Failure to receive such authorization and other relief would severely disrupt Debtor's operations at this critical juncture and cause Debtor to lose precious time and human resources.

20. Because HM recently has not been operating in a cash-flow positive manner, the terms of the proposed use of cash collateral essentially reduce, on a dollar-for-dollar basis, the value that will be available for distribution to stakeholders by the costs necessary to operate the Debtor until a sale is consummated. Accordingly, time is of the essence in this case. To that end, the Debtor has commenced this chapter 11 case to facilitate a timely and efficient process that will monetize the Debtor's assets and maximize the value available to stakeholders. Consistent with and to continue this process, the Debtor filed motions seeking approval of the use of cash collateral and bidding procedures, which procedures are designed to facilitate a process that both will maximize value for the benefit of stakeholders and minimize the Debtor's

time in chapter 11 and related costs. Moving with speed and obtaining the relief sought in the First Day Motions are critical to the Debtor's ability to maximize value and reduce costs and the success of this chapter 11 case.

21. The Debtor has reduced the number of its employees to the bare minimum needed to service their customers and currently only have 120 individuals working to keep the operations running until the sale process is completed.

22. I believe that without incentive payment, many of these key individuals who are critical to keeping Debtor's operations running through the completion of the sale process, including specifically Messrs. Kester and Knapp, would resign their employment, which would cause the value of Debtor's assets to be reduced, as it would not be able to complete the work that it needs to operate/liquidate its inventory and achieve value from its assets. Further, many of these employees have specialized skills and information that are necessary to maximize the value of HM's assets and could not be replaced timely.

## Debtor's Existing Loan Facilities

23. On or about March 30, 2023, HM, as borrower, and HM Trucking, KC MO Owner, Sioux City Owner, KC KS Owner, 30th & Cornhusker Lincoln, LLC, 110 East Highway Gregory, LLC, and 805 S. Union Fremont, LLC, as guarantors, entered into a Credit Agreement and Security Agreement, among other agreements, (collectively, the "Loan") with BMO Harris Bank N.A., as administrative agent ("Agent") for certain secured creditors ("Secured Creditors") under which Secured Creditors would provide Debtor access to a line of credit (the "Revolving Loan") and fund term debt in connection with Debtor and its guarantors granting security to Agent for the benefit of the Secured Creditors in certain real property assets (the "Term Loan"). As collateral for the Loan, HM granted Agent a security interest in, and right of set-off against,

8

all right, title, and interest of borrower and guarantor, whether now owned or existing or hereafter created, acquired or arising, in and to all of the following personal property: (a) Accounts; (b) Chattel Paper; (c) Instruments (including Promissory Notes); (d) Documents; (e) General Intangibles (including Payment Intangibles and Software, patents, trademarks, tradestyles, copyrights, and all other intellectual property rights, including all applications, registration, and licenses therefor, and all goodwill of the business connected therewith or represented thereby); (f) Letters of Credit and Letter-of-Credit Rights; (g) Supporting Obligations; (h) Deposit Accounts; (i) Investment Property (including certificated and uncertificated Securities, Securities Accounts, Security Entitlements, Commodity Accounts, and Commodity Contracts); (j) Inventory and Farm Products; (k) Equipment (including all software, whether or not the same constitutes embedded software, used in the operation thereof); (l) fixtures; (m) Commercial Tort Claims (as described on Schedule F to the Security Agreement or on one or more supplements to the Security Agreement); (n) Rights to merchandise and other Goods (including rights to returned or repossessed Goods and rights of stoppage in transit) which is represented by, arises from or related to any of the foregoing; (o) Monies, personal property, and interests in personal property of such borrower and guarantor of any kind or description now held by any Secured Creditor or at any time hereafter transferred or delivered to, or coming into the possession, custody or control of, any Secured Creditor, or any agent or affiliate of any Secured Creditor, whether expressly as collateral security or for any other purpose (whether for safekeeping, custody, collection or otherwise), and all dividends and distributions on or other rights in connection with any such property; (p) supporting evidence and documents relating to any of the above-described property, including, without limitation, computer programs, disks, tapes and related electronic data processing media, and all rights of such borrower or guarantor

to retrieve the same from their parties, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes and other evidences of indebtedness, insurance certificates and the like, other with all books of account, ledgers and cabinets in which the same are reflected or maintained; (q) Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; and (r) Proceeds and products of the foregoing and all insurance of the foregoing and proceeds thereof (collectively, the "Personal Property Collateral").  In addition, the Debtor and its subsidiaries (*i.e.*, the guarantors under the Loan), pledged their interest in certain real estate and fixtures (the "Real Estate Collateral" and together with the Personal Property Collateral, the "Collateral") by executing certain mortgages, deeds of trust, assignments of rent, and security instruments in favor of certain Secured Creditors that were recorded in Iowa, Kansas, Missouri, Minnesota, Ohio, and Wisconsin, among other states.  On March 31, 2023, Agent filed a UCC-1 Financing Statement with the Nebraska Secretary of State under "Hansen-Mueller Co.", describing its collateral as "All right, title and interest in and to all personal property and fixtures of the debtor, whether now owned or existing or hereafter created, acquired or arising."  Agent subsequently amended the Financing Statement on July 9, 2024, and July 10, 2024, to change Agent's name and HM's address, respectively.

      24.    On December 20, 2023, HM and its guarantors entered into the First Amendment and Waiver to Credit Agreement with Agent and the Secured Creditors.  On December 21, 2023, Agent filed a UCC-1 Financing Statement with the Nebraska Secretary of State under "Hansen-Mueller Co.", describing the collateral as "All right, title and interest in and to all personal property and fixtures of the Debtor, whether now owned or existing or hereafter created, acquired or arising."

25. On March 30, 2023, HM and its guarantors entered into the Second Amendment and Waiver to Credit Agreement with Agent and the Secured Creditors. Subsequently, HM entered a Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, and Fourteenth Amendment, with the Fourteenth Amendment dated as of October 9, 2025, serving as a Forbearance Agreement as well.

26. As of November 14, 2025, the outstanding principal amount of the Loan is $50,883,149.20, comprised of $32,008,149.16 relating to the Revolving Loan and $18,875,000.00 relating to the Term Loan, plus a deficiency fee of $2,598,404.00, and HM holds approximately $5,300,000.00 in its bank account with Agent, subject to outstanding but uncleared checks and obligations ("Cash Collateral").

27. The Debtor anticipates receiving additional cash in the regular course of its business during the pendency of its bankruptcy case but suspects that such cash receipts will not be as predictable as they were previously.

**Debtor's Cash Needs Post-Petition and Cash Management System**

28. In the near term, the Debtor will need access to the Cash Collateral to fund day-to-day operations in the ordinary course, including its (a) bi-weekly payroll (including benefits) of approximately $340,000.00, plus the $90,000.00 of payroll (including benefits) associated with those employees seconded to its joint venture for which it ultimately will be reimbursed, (b) insurance obligations, including its workers compensation insurance, its health insurance, dental insurance, and life insurance for its employes, and its property, casualty, general liability, auto, and umbrella policies, in the amount of approximately $215,000.00 per month, and (c) taxes and fees, including real estate taxes and personal property taxes of $200,000.00 and $300,000.00 respectively, due in 2025 but not payable until 2026. The certainty of being able to make

11

payments when due is essential to the continued operation of the Debtor's business during the pendency of these cases and thus, the Debtor's ability to maximize the value of its assets.

29. Debtor maintains its cash primarily in three bank accounts with BMO as part of its cash management system and one with First National Bank of Omaha (in the name of HM Trucking) that holds approximately $700,000.00 for purposes of meeting Debtor's needs and obligations under certain key employee retention and incentive plan agreements, which were necessary to retain certain employees discussed above. It would be very time consuming, difficult, and costly for the Debtor to establish an entirely new system of accounts and a new cash management system and doing so would disrupt the Debtor's relationships with its key counterparties. The attendant delays from opening new accounts, revising cash management procedures, and instructing their commercial counterparties and countless other entities to redirect payments would negatively impact the Debtor's ability to operate its businesses and preserve and maximize the value of its bankruptcy estate while pursuing these arrangements. Under the circumstances, maintenance of the Debtor's existing cash management system is essential and clearly in the best interest of the Debtor's estate. Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary and costly distractions that would inevitably be associated with any substantial disruption to the cash management system would facilitate the Debtor's efforts to maximize the value of its estate in the chapter 11 case. In short, any benefits of the Debtor's strict compliance with the U.S. Trustee Guidelines would be far outweighed by the resulting expense, inefficiency, and disruption to the Debtor's business.

30. By avoiding the disruption and delay to the Debtor's disbursements that would necessarily result from closing its bank accounts and opening new DIP Accounts, all parties in interest, including employees, vendors, and other counterparties, would be best served by

preserving business continuity. The benefit to the Debtor, its business operations, and all parties in interest would be considerable. The confusion that would ensue absent the relief requested herein would substantially hinder the Debtor's efforts in the chapter 11 case.

## Exploration of Strategic Alternatives

31. Recognizing the need to explore strategic alternatives and because of a desire of the owners to exit the business, the Debtor retained the investment banker, Ascendant, in early September to market the Debtor and its assets to potentially interested parties. In connection with this process, Ascendant compiled diligence information, prepared a confidential information memorandum, and compiled a targeted list of strategic and financial buyers.

32. Since September to the present, the Debtor has provided interested parties information related to their operations and assets and continues to explore a transaction with various interested parties to maximize value, maintaining and directing such parties to review diligence materials in a data room. However, the Debtor's financial condition has continued to deteriorate, particularly after the PSC temporarily suspended Debtor's grain trading license in Nebraska, which led to an unprecedented number of inquires by regulators, creditors, and contract counterparties.

33. To afford itself some breathing room and to preserve and maximize value, the Debtor filed bankruptcy and seeks to continue its sale process, this time in connection with a chapter 11 filing that would allow the assets to be sold free and clear. The Debtor has proposed bidding procedures pursuant to which it will complete the process to solicit bidders for its operations and/or assets. The proposed bidding procedures include approval of the terms of one or more stalking horse purchase agreements, including a modest break-up fee payable to such stalking horse bidders in the event a stalking horse purchase agreement is terminated.

34. The need to proceed swiftly cannot be overstated. It is critical for the Debtor's preserving value for the benefit of its estate to consummate a sale to monetize its assets as soon as possible. To that end, the Debtor will propose an expedited schedule to obtain competing bids and approve an asset disposition. More specifically, the Debtor will request to have a hearing to consider their proposed bidding procedures, including the bid protections under any stalking horse purchase agreement.

35. To continue its operations until a sale process can be completed, the Debtor needs use of its Cash Collateral to pay its employees, professionals, and necessary vendors so that the assets to be sold by Debtor maintain their value to potential purchasers, and the Debtor achieves the highest and best bids.

36. To that end, Debtor also has negotiated with BMO for the consensual use of its cash collateral on terms favorable to the estates that will enable the Debtor to maximize value for creditors through this chapter 11 case. The Debtor negotiated this agreement with the goal of minimizing administrative and other costs to the estates (*e.g.*, operating on a bare-bones budget, a prompt marketing process, and certain credit-bidding limitations) to maximize creditor recoveries. Indeed, in the stipulation to use cash collateral, Agent and Secured Creditors have agreed to certain concessions that provide a direct and immediate benefit to the Debtor and its estate, which terms include (among others):

    a. use of cash pursuant to an approved budget, setting forth a budget through and including January 2, 2026, which reflects on a line-item basis the Debtor's anticipated disbursements through such date, subject to a permitted variance of 15% on certain line items other than professional fees;

    b.    a carveout for payment for certain fees to be paid to the Clerk of the Bankruptcy Court, the U.S. Trustee, professionals, any Official Committee of Unsecured Creditors; and

    c.    investigative and challenge rights related to the Secured Creditors' liens and security interests.

37. The Debtor has spent substantial time and effort exploring alternative financings, but has been unable to obtain other financing. The Debtor is unable to obtain unsecured credit. Indeed, the credit made available through the use of Secured Creditors' Cash Collateral is the only credit that Debtor has been able to obtain on palatable terms despite Debtor's substantial time and effort, seeking financing for their business operations. Moreover, as mentioned, the proposed use of Cash Collateral is typical for the market.

38. The Debtor recognizes that the terms of the proposed use of Cash Collateral essentially reduce, on a dollar-for-dollar basis, the value that will be available for distribution to stakeholders by the costs necessary to operate the Debtor until a sale is consummated and, thus, believe time is of the essence in this case

39. In addition to preserving value, the Debtor must proceed quickly in an efficient manner to minimize the costs of the Debtor's chapter 11 case and maximize and realize value as quickly as possible. Accordingly, the Debtor intends to swiftly proceed with a fair and efficient process to preserve and maximize value for stakeholders.

## Debtor's Utilities

40. The Debtor owes approximately $30,000.00 in existing utilities charges, incurs monthly charges related to utilities in the amount of approximately $100,000.00, and expects such amount to remain relatively consistent for the next couple months or increase slightly.

**Debtor's Insurance Program**

41. The Debtor has insurance obligations, including its workers compensation insurance, its health insurance, dental insurance, and life insurance for its employes, and its property, casualty, general liability, auto, and umbrella policies, in the amount of approximately $215,000.00 per month.

**First Day Motions**

42. Contemporaneous herewith, the Debtor has filed a number of First Day Motions in this chapter 11 case seeking orders granting various forms of relief intended to enable it to efficiently administer its estates with minimal disruption and loss of value during the liquidation or other asset disposition process described herein. The Debtor requests that the relief requested in each of the First Day Motions be granted as critical elements in ensuring the maximization of value of the Debtor's estates. I believe the relief requested in the First Day Motions is necessary to allow the Debtor to operate with minimal disruption during this chapter 11 case pending consummation of an asset sale. I have reviewed each of the First Day Motions discussed below, and the facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief.

43. The First Day Motions include:

a. *Extension of Time to File Schedules and Statements of Financial Affairs:* Debtor's Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs.

b. *Bank Accounts, Cash Management and Investment Guidelines:* Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 345 and 363 (A) Authorizing Continued Use and Maintenance of Existing Bank Accounts and Business Forms, and (B) Waiving Investment and Deposit Requirements.

16

c. *Employee Wages and Benefits:* Debtor's Motion for Entry of an Order (I) Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief.

d. *Utilities:* Debtor's Motion For Entry of an Order (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices and (B) Deeming the Utility Companies Adequately Assured of Payment.

e. *Cash Collateral:* Debtor's Motion for Approval of an Agreed Order Authorizing Interim Use of Cash Collateral and Providing Adequate Protection and Setting Final Hearing.

f. *Continuing Insurance Programs:* Debtor's Motion for Entry of an Order (I) Authorizing Debtor to Continue and Renew Insurance Policies and Honor Obligations in Respect Thereof and (II) Granting Related Relief.

g. *Prepetition Sales, Use, and Other Taxes:* Debtor's Motion for Entry of an Order (I) Authorizing, But Not Directing, Debtor to Pay Certain Prepetition Taxes and (II) Granting Related Relief.

h. *Critical Trade Vendors*: Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to Pay Certain Prepetition Claims of Critical Vendors and (ii) Granting Related Relief.

i. *Bankruptcy Counsel:* Debtor's Application to Employ and Retain Koley Jessen P.C., L.L.O. as Counsel, *Nunc Pro Tunc*, to the Petition Date.

j. *Chief Restructuring Officer and Financial Advisor:* Debtor's Application to Employ Michael G. Compton and Silverman Consulting, Inc. as Chief Restructuring Officer and Financial Advisor, respectively, *Nunc Pro Tunc*, to the Petition Date.

k. *Claims and Notice Agent:* Debtor's Application for an Order Appointing Epiq Systems, Inc. as Claims and Noticing Agent for Debtor, *Nunc Pro Tunc*, to the Petition Date.

    l.    *Investment Banker:* Debtor's Application to Employ Ascendant Consulting Partners, LLC as Investment Banker, *Nunc Pro Tunc*, to the Petition Date.

    m.    *Expedited Hearing and Shortened Notice re First Day Motions:* Debtor's Request for (I) an Expedited Hearing; (II) Shortened Notice; and (III) an Expedited Ruling with Respect to Debtor's First Day Motions.

44. The First Day Motions seek authority to, among other things, use cash collateral and grant prepetition lenders adequate protection on an interim basis, honor employee-related wages and benefits obligations, preserve client and customer relationships, ensure the continuation of the Debtor's cash management systems and other business operations without interruption, approve and establish bidding procedures for an auction process, and approve an expedited ruling and shortened notice period with respect to hearing and ruling on Debtor's motions. I believe that the relief requested in the First Day Motions is necessary to giving the Debtor an opportunity to work towards a successful restructuring that will benefit all of the Debtor's stakeholders.

45. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm." In light of this requirement, the Debtor has narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate. Other relief will be deferred for consideration at a later hearing.

46. I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor

to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully restructuring the Debtor's business. Several of the First Day Motions request authority to pay certain prepetition claims.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 17 day of November, 2025.

By /s/ Michael Compton
Michael Compton
Chief Restructuring Officer
Hansen-Mueller Co.