UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | Case No. 25-81226 |
| HANSEN-MUELLER CO.,[1] | Chapter 11 |
| Debtor. | |

**MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS; AND (II) GRANTING RELATED RELIEF**

Hansen-Mueller Co., as debtor and debtor-in-possession (the "Debtor") in the above-referenced Chapter 11 case (the "Case") moves this Court, pursuant to sections 105(a), 363, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice (the "Local Rules") for an order, substantially in the form attached hereto as Exhibit A, authorizing, but not directing, the Debtor to pay certain prepetition claims of critical vendors consistent with Debtor's authority to use cash collateral (the "Motion"). As grounds therefore, the Debtor states as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O), and the Debtor consents to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final

---

[1] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is: Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      The statutory bases for the relief requested by this Motion are sections 105(a), 363, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1.

## BACKGROUND

4.      The Debtor filed its voluntary petitions under Chapter 11 of the United States Bankruptcy Code on November 17, 2025 (the "Petition Date").

5.      Since the date of the filing of its bankruptcy petition, the Debtor has remained in possession of its assets and has operated its business and managed its financial affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

6.      A detailed description of the Debtor and its business, the facts and circumstances leading up to the filing of this Chapter 11 Case, and the facts supporting this Motion are set forth in greater detail in the *Declaration of Michael Compton, Chief Restructuring Officer of Debtor Hansen-Muller Co., in Support of Chapter 11 Petition and First-Day Motions*, (the "First Day Declaration"), filed contemporaneously herewith.

## RELIEF REQUESTED

7.      The Debtor respectfully requests entry of an Interim Order and a Final Order authorizing, but not directing, the Debtor to pay the claims of Critical Vendors (as defined below) up to an aggregate amount of $1,000,000.00 on an interim basis and on a final basis to be allocated in the Debtor's sole discretion, without prejudice to the Debtor's right to seek additional relief on an emergency basis and granting related relief.

8.      The Debtor further requests that the Interim Order and the Final Order (a) authorize all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtor in its sole discretion, to receive, process, honor, and pay any and all

checks, drafts, and other forms of payment, including fund transfers, on account of the Critical Vendor Claims (as defined below), whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorize the Banks to rely on the directions and representations of the Debtor as to which checks and fund transfers are subject to this Motion; *provided* that no such Bank shall have any liability to any party for relying on such directions and representations by the Debtor; and (c) authorize the Debtor to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts, and other forms of payment which may be dishonored or rejected.

## **CRITICAL VENDORS**

9.      The Debtor's business relies on an extensive network of critical vendors who, among other things, provide transportation services that are necessary to the Debtor's continuing operations (the "Critical Vendors") and, the fixed, liquidated, and undisputed prepetition claims held by such parties, the "Critical Vendor Claims"). In order to minimize interruptions to the Debtor's business following the commencement of this Chapter 11 Case, the Debtor seeks authority, but not direction, to pay the Critical Vendor Claims to the extent such payments are consistent with and permitted under the cash collateral order that also is being sought as part of the Debtor's first-day relief.

10.     To identify the Critical Vendors, the Debtor, in consultation with its advisors, closely reviewed its accounts payable and prepetition vendor list. In connection with these efforts, the Debtor also consulted with the employees most familiar with the Debtor's vendors to identify those vendors that are most critical to the Debtor's operations.

11.     Based on these criteria, the Debtor identified Critical Vendors that provide transportation services that are essential to the continuing operation of the Debtor's businesses,

including, but not limited to, transportation of grains and other goods (the "Transportation Services")—that is vital to the Debtor's business of buying and selling grains.[2]

12.    The Transportation Services provided by Critical Vendors enable the Debtor to (i) source, store, and sell grain across the United States and to other countries. Even a minor disruption to the Debtor's receipt of these Transportation Services resulting from friction with vendors risks causing irreparable adverse consequences for the Debtor, the Debtor's customers, the Debtor's employees, downstream end consumers and all of the Debtor's stakeholders. Any operational interruption also increases the likelihood that customers cease conducting business with the Debtor in the future. These harms could have lasting repercussions, impacting future cash flow and profitability and jeopardizing the Debtor's going concern prospects, the ongoing sale process, and the success of this Chapter 11 Case, and far exceed the cost of paying prepetition Critical Vendor Claims.

### PROPOSED TERMS AND CONDITIONS OF PAYMENT OF THE CRITICAL VENDOR CLAIMS

13.    To preserve liquidity during this Chapter 11 Case and ensure that the Debtor continues to receive the Transportation Services, the Debtor seeks authority, but not direction, to condition any payment on account of Critical Vendor Claims on entry into an agreement, substantially in the form attached hereto as Exhibit B (the "Form of Trade Agreement"), between the Debtor and the applicable Critical Vendor. The Debtor, however, reserves the right to negotiate different trade terms with any Critical Vendor after consultation with the Prepetition Secured Lenders (as that term in defined in the Cash Collateral Order) as a condition to payment of any Critical Vendor Claim, whether or not memorialized by a Trade Agreement (as defined herein), to the extent the Debtor determines that such trade terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtor's estate.

---

[2] Upon request, the Debtor will provide a list of the Critical Vendors to the U.S. Trustee and any official committee appointed in this Chapter 11 Case (the "Committee"). The Debtor expressly reserves the right to amend, modify, and/or supplement such list.

14.    The Form of Trade Agreement, which the Debtor proposes to send to Critical

Vendors prior to making any payments, along with a copy of the Interim Order or Final

Order, as applicable, includes, without limitation, the following terms:

(a)    The amount of such Critical Vendor's estimated claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtor (but such amount shall be used only for purposes of the order granting this Motion and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

(b)    The amount of payment toward the Critical Vendor's estimated claim;

(c)    The Critical Vendor's agreement to continue supplying goods and services to the Debtor on terms that are consistent with the historical trade terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs), representing the most favorable trade terms extended to the Debtor by the Critical Vendor within the 365-day period preceding the Petition Date (the "Customary Trade Terms"), or such other trade terms as mutually agreed to by the Debtor and the Critical Vendor, and the Debtor's agreement to pay the Critical Vendor postpetition in accordance with such terms;

(d)    The Critical Vendor's agreement not to file or otherwise assert against the Debtor, its estates, or any of its assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtor arising from goods or services provided to the Debtor prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary action to release such Lien;

(e)    The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the order granting this Motion and consents to be bound thereby;

(f)    The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claim (a "Reclamation Claim") or Bankruptcy Code section 503(b)(9) claim (a "503(b)(9) Claim"), other similar priority claim under the Bankruptcy Code or other statute (a "Priority Claim"), or other administrative expense claim under the Bankruptcy Code or other statute (an "Administrative Expense Claim") and that, to the extent that the Critical Vendor has previously asserted a Reclamation Claim, a 503(b)(9) Claim, a Priority Claim, or an Administrative Expense Claim, such Critical Vendor shall immediately

take all necessary action to withdraw such Reclamation Claim, 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim; and

(g)     If a Critical Vendor who has received payment toward a Critical Vendor Claim subsequently refuses to supply goods or services to the Debtor on Customary Trade Terms, or on such other trade terms as mutually agreed to by the Debtor and such Critical Vendor, any payments received by the Critical Vendor on account of its Critical Vendor Claim may be deemed, in the sole discretion of the Debtor, to have been payment on account of any 503(b)(9) Claim, any Priority Claim, or any Administrative Expense Claim, and that such Critical Vendor shall immediately repay to the Debtor any payments received on account of its Critical Vendor Claim, to the extent that the aggregate amount of the Debtor's payments exceeds the Critical Vendor's obligations, without the right of setoff or reclamation.

15.     Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms (the "Trade Agreement").[3]

16.     The Debtor hereby seeks authority to enter into Trade Agreements with the Critical Vendors if the Debtor determines, in its discretion, after consultation with the Prepetition Secured Lenders, that such agreements are necessary to its postpetition operations. Maintaining normal trade-credit terms will improve the Debtor's chances of a robust and competitive auction and successful sale transaction, as purchasing goods on credit preserves working capital and liquidity, enabling the Debtor to maintain its competitiveness and to maximize the value of its businesses.  Absent the relief requested herein, many of the Debtor's vendors may attempt to place the Debtor on cash-in-advance or cash-on-delivery terms, which the Debtor estimates could drain its estates of resources that would otherwise be available for

---

[3] The Debtor's entry into a Trade Agreement shall not (a) effect a novation of any existing agreements between the Critical Vendor and the Debtor, (b) modify any of the conditions, covenants, representations and warranties, or other terms of any such existing agreements, other than as agreed between the Debtor and the Critical Vendor, (c) constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement, or (d) change the nature or priority of the underlying Critical Vendor Claims or entitle the Critical Vendor to treatment of its claim as an Administrative Expense Claim.

other funding needs during the critical first weeks of the Debtor's bankruptcy Case. The Debtor is seeking to prevent the compression of trade terms early in this Chapter 11 Case.

17.     If a Critical Vendor refuses to supply goods or services to the Debtor on Customary Trade Terms, or such other trade terms as mutually agreed to by the Debtor and such Critical Vendor, following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtor, the Debtor hereby seeks authority, in its discretion and without further order of the Court, but with notice to the affected Critical Vendor, to declare (a) such Trade Agreement immediately terminated (if applicable) and (b) any payments made to such Critical Vendor on account of the applicable Critical Vendor Claim to have been in payment of obligations owed to such Critical Vendor on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim.

18.     In the event that the Debtor exercises either of the rights set forth in the preceding paragraph, the Debtor requests that the Critical Vendor against which the Debtor exercises such rights be required to immediately return to the Debtor any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the amounts owed to such Critical Vendor on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, without giving effect to any rights of setoff or reclamation.

**BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY**

**A. Payment of the Critical Vendor Claims Is Authorized under Section 363 of the Bankruptcy Code.**

19.     The Debtor should be authorized to pay the Critical Vendor Claims on the terms set forth in the Interim Order and Final Order, as it reflects a sound exercise of their business judgment.  Under section 363(b) of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so.  *See In re ICL Holding Co.*, 802 F.3d 547, 551 (3d Cir. 2015) (citing *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153–54 (Bankr. D. Del. 1999)).

20.     Moreover, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000, at \*39–40 (Bankr. D. Del. Apr. 29, 2014) (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)). So long as a debtor's actions satisfy the business judgment rule, the action "should be approved under section 363(b)(1)." *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764, at \*260 (Bankr. D. Del. Aug. 15, 2007); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near- Herculean task.").

21.     The Debtor believes that if the Critical Vendors are not paid in the ordinary course, they may refuse to provide goods and services to the Debtor. Any disruption—however short—would adversely and severely impact the businesses of the Debtor, the businesses of the Debtor's customers, and the customers' willingness to conduct business with the Debtor in the future. Accordingly, given the demonstrated benefits of paying the Critical Vendor Claims in exchange for a postpetition trade relationship governed by the Trade Agreement or other mutually agreed terms, the Debtor submits that paying such claims represents a sound exercise of its business judgment.

## B.  Payment of Critical Vendor Claims Is Appropriate under the Doctrine of Necessity.

22.     The bankruptcy court's power to authorize the pre-plan satisfaction of prepetition claims whose payment is critical to the debtor's business is firmly established under the "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).[7] Although the "doctrine of necessity" pre-dates the Bankruptcy Code, *see Miltenberger v. Logansport C. & S.W. R.Co.*, 106 U.S. 286 (1882), the modern application of

the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a), and 1108. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value). Courts have located additional support for the pre-confirmation satisfaction of critical claims in section 363(b) of the Bankruptcy Code, under which a court may authorize the use of property outside the ordinary course of business where a debtor "articulate[s] some business justification, other than mere appeasement of major creditors" for such relief. *See Ionosphere*, 98 B.R. at 175.

23.     For the reasons set forth herein, satisfaction of the Critical Vendor Claims in the ordinary course of business is critically important to the Debtor's ongoing business. Even if the Debtor could avoid payment of certain accrued Critical Vendor Claims, the collateral consequences on the Debtor's go-forward business would vastly exceed whatever modest short-run cost savings the Debtor might achieve.

**C. The Proposed Payment-Processing Procedures Are Appropriate.**

24.     As set forth above, the Debtor requests that all Banks be authorized and directed to honor and process payments on account of the Critical Vendor Claims as directed by the Debtor. The Debtor believes it will have sufficient liquidity to pay the amounts delineated in this Motion in the ordinary course of business, and has implemented controls to ensure that prepetition claims will not be paid except as authorized by this Court. The Debtor therefore submits that the payment processing procedures described in this Motion are appropriate.

<u>**IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY**</u>

25.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule

6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  In the context of preliminary injunctions, the Third Circuit has interpreted the language "immediate and irreparable harm" to refer to a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages are inadequate.  *See, e.g.*, *Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  The harm also must be actual and imminent, not speculative or unsubstantiated.  *See, e.g.*, *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653-55 (3d Cir. 1994). The Debtor submits that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

26.     The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtor requests the Court waive the stay imposed by Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

27.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtor's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

## NOTICE

28.     The Debtor will provide notice of this Motion to (a) the Office of the United States Trustee for the District of Nebraska; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the Debtor's prepetition secured lenders, BMO Bank N.A., Farm Credit

Services of America, PCA, Farm Credit Mid-America, PCA, and CoBank, FCB; (d) the United States Attorney's Office for the District of Nebraska; (e) the Internal Revenue Service; (f) counsel to any official committee of unsecured creditors appointed in this chapter 11 Case (upon appointment); (g) the Nebraska Department of Revenue; (h) the Alabama Department of Revenue; (i) the Georgia Department of Revenue; (j) the Iowa Department of Revenue; (k) the Kansas Department of Revenue; (l) the Louisiana Department of Revenue; (m) the Minnesota Department of Revenue; (n) the Missouri Department of Revenue; (o) the Ohio Department of Revenue/Department of Taxation; (p) the Oklahoma Department of Revenue; (q) the Tennessee Department of Revenue; (r) the Texas Department of Revenue; (s) the Wisconsin Department of Revenue; (t) the City of Kansas City, Missouri – Revenue Division; (u) the City of Toledo Income Tax; (v) Unified Government Treasury of Wyandotte County, Kansas; (w) Treasurer of Lucas County, Ohio; (x) Jackson County, Missouri Collector; (y) St. Louis County, Minnesota Auditor; (z) Treasurer of Douglas County, Wisconsin; (aa) Treasurer of Saline County, Kansas; (bb) Treasurer of Harris County, Texas; (cc) Treasurer of Woodbury County; (dd) Treasurer of Douglas County, Nebraska; and (ee) all parties on the Rule 2002 Notice list.

29.    The Debtor submits that, under the circumstances, no further notice of the hearing is necessary and requests that any further notice be dispensed with and waived.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the court enter an Order providing the relief set forth herein and such other, further and different relief as the Court deems just and equitable.

DATED this 17th day of November, 2025.

HANSEN-MUELLER CO., Debtor,

By: /s/ *Brian J. Koenig*
    Brian J. Koenig, #23807
    Donald L. Swanson, #16385
    Trevor J Lee, #27063
    KOLEY JESSEN P.C., L.L.O.
    1125 South 103rd Street, Suite 800
    Omaha, NE 68124
    (402) 390-9500
    (402) 390-9005 (fax)
    Brian.Koenig@koleyjessen.com
    Don.Swanson@koleyjessen.com
    Trevor.Lee@koleyjessen.com

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT NEBRASKA

| | |
|---|---|
| In re: | Case No. 25-81226 |
| HANSEN-MUELLER CO.,[1] | Chapter 11 |
| Debtor. | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND (II) GRANTING RELATED RELIEF**

Upon the motion, dated November 17, 2025 (the "Motion") (Doc. __), of the Debtor Hansen-Mueller Co. (the "Debtor"), in the above-referenced Chapter 11 case (the "Case"), requesting entry of an order (this "Order"), pursuant to sections 105(a), 363, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice (the "Local Rules"), that, among other things, authorizes, but does not direct, the Debtor to pay certain prepetition claims of Critical Vendors and to set a final hearing on the Motion in connection with Debtor's authority to use cash collateral on a final basis.

Having considered the Motion and the evidence submitted or proffered at the hearing on this Interim Order (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(d) and 9014 and all applicable Local Rules, notice of the Motion and the Interim

---

[1] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is: Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); an Interim Hearing

having been held and concluded on November 17, 2025; and it appearing that approval of the

interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the

Debtor pending the Final Hearing and otherwise is fair and reasonable and in the best interests of

the Debtor, its creditors, the estate, and all parties in interest, and is essential for the continued

operation of the Debtor's business and the preservation of the value of the Debtor's assets; and

after due deliberation and consideration, and good and sufficient cause appearing therefore:

1.      **Motion Granted**. The Motion is hereby granted in accordance with the terms and

conditions set forth in this Interim Order.

2.      **Authorization to Pay Critical Vendors**. The Debtor is hereby authorized, but not

required, to pay, in its sole discretion, without further order of this Court, the Critical Vendor

Claims, up to an aggregate amount of $1,000,000.00 without further order of the Court.

3.      **Trade Agreement**. The form of Trade Agreement attached as Exhibit B to the

Motion is hereby approved. The Debtor is authorized, but not directed, to enter into Trade

Agreements. No Trade Agreement will (a) effect a novation of any existing agreements between

the Critical Vendor and the Debtor, (b) modify any of the conditions, covenants, representations

and warranties, or other terms of any such existing agreements, other than as agreed between the

Debtor and the Critical Vendor, (c) constitute an assumption or rejection of any executory contract

or prepetition or postpetition agreement, or (d) change the nature or priority of the underlying

Critical Vendor Claims or entitle the Critical Vendor to treatment of its claim as an Administrative

Expense Claim. Any Critical Vendor that accepts payment pursuant to the authority granted in

this Order agrees to supply goods and/or services to the Debtor postpetition on Customary

Trade Terms or on such other trade terms as mutually agreed to by the Debtor and such Critical

Vendor; *provided, however*, that the Debtor's inability to agree on Customary Trade Terms

2

shall  not preclude it from paying a Critical Vendor Claim if the Debtor determines, in the reasonable exercise of its business judgment, that such payment is necessary to the Debtor's operations. If a Critical Vendor refuses to supply goods and/or services to the Debtor on Customary Trade Terms, or on such other trade terms as mutually agreed to by the Debtor and such Critical Vendor, following receipt of any payment on account of its Critical Vendor Claim, then the Debtor may, in its sole discretion with notice to the affected Critical Vendor, declare any payment made to such Critical Vendor on account of its Critical Vendor Claim to have been on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, without giving effect to any rights of setoff or reclamation.  Nothing herein shall constitute a waiver of the Debtor's rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

4.      **Authorization to Bank**. All Banks are (a) authorized and directed to receive, process, honor and pay any and all postpetition checks, drafts, electronic transfers and other forms of payment used by the Debtor to satisfy its Critical Vendor Claims to the extent such payments are consistent with and permitted under the Cash Collateral Order; provided that sufficient funds are on deposit in the applicable accounts to cover such payments, and (b) prohibited from placing any holds on, or attempting to reverse, any automatic transfers on account of Critical Vendor Claims. The Banks may rely on the directions and representations of the Debtor as to which checks and fund transfers should be honored and paid pursuant to this Interim Order, and no such Bank shall have any liability to any party for relying on such directions and representations by the Debtor as provided for in this Interim Order.

5.      **Authorization to Remit Payment**. To the extent the Debtor has not yet sought to remit payment on account of the Critical Vendor Claims, the Debtor is authorized, but not directed, to issue checks or provide for other means of payment of the Critical Vendor Claims. Any party

3

receiving payment from the Debtor is authorized and directed to rely upon the representations of the Debtor as to which payments are authorized by this Interim Order.

6.      **No Waiver/Admission.** Nothing in the Motion or this Interim Order or the relief granted (including any actions taken or payments made by the Debtor pursuant thereto) shall be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtor's or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

7.      **Bankruptcy Rules 6003 and 6004**. The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm. Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be effective and enforceable immediately upon entry hereof.

8.      **Further Action** The Debtor is authorized and empowered to take all actions necessary to implement this relief granted in this Interim Order.

9.      **Final Hearing**. The Final Hearing to consider entry of the Final Order is scheduled for December __, 2025, at _:____ a.m. / p.m. (prevailing Central time) at the United States Bankruptcy Court for the District of Nebraska.  The Debtor shall file a proposed copy of the Final Order with the Bankruptcy Court no later than December ___, 2025.

10.     **Retention of Jurisdiction**. This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

4

Dated: November ___, 2025                    BY THE COURT:


_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

November __, 2025

*TO:*     **[Critical Vendor/Service**
          **Provider Name]**

          **[Address]**

Dear Valued Service Provider:

As you are aware, Hansen-Mueller Co. (the "Debtor") filed a voluntary petition (the "Chapter 11 Case") for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Nebraska ("Bankruptcy Court") on November 17, 2025 (the "Petition Date"). On the Petition Date, in recognition of the importance of its relationship with vendors and suppliers and its desire that the Chapter 11 Case have as little effect on such parties as possible, the Debtor requested the Bankruptcy Court's approval to pay the prepetition claims of certain critical vendors and suppliers. On November 17, 2025, the Bankruptcy Court entered an interim order (the "Order") authorizing the Debtor, under certain conditions, to pay the prepetition claims, in accordance with the terms of the Order, of certain trade creditors that agree to the terms set forth below and agree to be bound by the terms of the Order. A copy of the Order is enclosed for your reference. The Debtor has asked the Bankruptcy Court to schedule a final hearing and thereafter grant the relief provided in the Order on a final basis.

Under the Order, in order to receive payment of its prepetition claim, each selected trade creditor must agree to continue to supply services to the Debtor based on "Customary Trade Terms." In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), which were most favorable to the Debtor and in effect between such trade creditor and the Debtor on a historical basis for the period within 365 days of the Petition Date, or such other trade terms as mutually agreed to by the Debtor and such trade creditor.

For purposes of administering this trade program, as authorized by the Bankruptcy Court and in accordance with the terms of the Order, the Debtor and **[Name of Trade Vendor]** agree as follows (the "Agreement"):

> (a)     The estimated balance of the prepetition trade claim (net of any setoffs, credits or discounts) (the "Trade Claim") asserted against the Debtor by **[Name of Trade Vendor]** is $_____. Your Trade Claim does not necessarily constitute a claim allowed by the Bankruptcy Court in the Chapter 11 Case, and signing this Trade Agreement does not excuse you from any requirement of filing a proof of claim in the Chapter 11 Case.
>
> (b)     The Debtor shall pay $_____towards the Trade Claim (the "**Payment**").

(c)     **[Name of Trade Vendor]** agrees to supply goods/services to the Debtor in accordance with the Customary Trade Terms, and the Debtor agrees to pay **[Name of Trade Vendor]** in accordance with such Customary Trade Terms.

(d)     The open trade balance or credit line that **[Name of Trade Vendor]** will extend to the Debtor for shipment of postpetition provision of postpetition services is $_____.

(e)     In consideration for the Payment, you agree not to file or otherwise assert against the Debtor, its estate or any other person or entity or any of its respective assets or property (real or personal) any lien (a "Lien"), claim for reclamation ("Reclamation Claim"), claim under Bankruptcy Code section 503(b)(9) (a "503(b)(9) Claim"), any similar priority claim under the Bankruptcy Code or other statute (a "Priority Claim"), or other administrative expense claim under the Bankruptcy Code or other statute (an "Administrative Expense Claim") regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtor arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent you have already obtained or otherwise asserted such a Lien, Reclamation Claim, 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, you shall take (at your own expense) whatever actions are necessary to release such Lien or withdraw such Reclamation Claim, 503(b)(9) Claim, Priority Claim, or Administrative Claim unless your participation in the trade payment program authorized by the Order (the "Trade Payment Program") is terminated.

Your execution of this Agreement and return of the same to the Debtor constitutes an agreement by **[Name of Trade Vendor]** and the Debtor:

1.     to be bound by the Customary Trade Terms (as modified herein) and, subject to the reservations set forth in the Order, to the amount of the Trade Claim set forth above;

2.     that [**Name of Trade Vendor**] will continue to supply the Debtor with goods and/or services pursuant to the Customary Trade Terms (as modified herein) and that the Debtor will pay for such goods and/or services in accordance with the Customary Trade Terms (as modified herein);

3.     that **[Name of Trade Vendor]** has reviewed the terms and provisions of the Order and that it consents to be bound by such terms;

4.     that **[Name of Trade Vendor]** will not separately seek payment for Liens, Reclamation Claims, 503(b)(9) Claims, Priority Claims, Administrative Expense Claims and similar claims outside of the terms of the Order unless its participation in the Trade Payment Program is terminated;

5.     that if either the Trade Payment Program or your participation therein terminates as

3

provided in the Order, any payments received by you on account of your Trade Claim may be deemed, in the sole discretion of the Debtor, to have been in payment on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, and you will immediately repay to the Debtor any payments made to you to the extent that the aggregate amount of such payments exceeds such obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense;

6.      that if the Debtor shall be in default under this Agreement, **[Name of Trade Vendor]** shall have no obligation to supply goods and/or services to the Debtor on Customary Trade Terms (as modified herein) until the Debtor cures such default and **[Name of Trade Vendor]** shall have the right to terminate this Agreement upon written notice to the Debtor detailing the Debtor's defaults hereunder (which the Debtor shall have the right to dispute) and the Debtor's failure to cure such default within five business days of such notice, in which event **[Name of Trade Vendor]** may retain all sums paid to it hereunder on account of its Trade Claim; and

7.      entry into this Trade Agreement shall not (a) effect a novation of any existing agreements between **[Name of Trade Vendor]** and the Debtor, (b) modify any of the conditions, covenants, representations and warranties, or other terms of any such existing agreements, other than as agreed between the Debtor and **[Name of Trade Vendor]**, (c) constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement, or (d) change the nature or priority of **[Name of Trade Vendor]**'s underlying claim(s) or entitle **[Name of Trade Vendor]** to treatment of its claim(s) as an Administrative Expense Claim(s).

The Debtor and **[Name of Trade Vendor]** also hereby agree that any dispute with respect to this Agreement, the Order and/or **[Name of Trade Vendor]**'s participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or our financial restructuring, please do not hesitate to contact the Debtor's counsel:

> Brian J. Koenig, #23807
> Donald L. Swanson, #16385
> Trevor J Lee, #27063
> KOLEY JESSEN P.C., L.L.O.
> 1125 South 103rd Street, Suite 800
> Omaha, NE 68124
> (402) 390-9500
> (402) 390-9005 (fax)
> Brian.Koenig@koleyjessen.com
> Don.Swanson@koleyjessen.com
> Trevor.Lee@koleyjessen.com


> HANSEN-MUELLER CO., Debtor,


> By: _____
> Its:_____

Agreed and Accepted by:

**_[Name of Trade Vendor]_**


By:_____
 Name: **[Name]**
Title: **[Title]**

Dated: _____