UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | Case No. 25-81226 |
| HANSEN-MUELLER CO.,[1] | Chapter 11 |
| Debtor. | |

**DEBTOR'S MOTION TO ESTABLISH AND APPROVE BIDDING PROCEDURES AND BID PROTECTIONS FOR SALE OF DEBTOR'S ASSETS FREE AND CLEAR AND FOR ASSUMPTION AND ASSIGNMENTS OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Hansen-Mueller Co., debtor and debtor-in-possession (the "Debtor") in the above-referenced chapter 11 case (the "Case"), requests entry of an order under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 9006, approving, for the sale and assignment of portions of or substantially all of the Debtor's assets free and clear of liens, claims, encumbrances, and interests, (1) the Debtor's proposed bidding procedures, bid protections, and notice procedures attached hereto as Exhibit A (the "Bid Procedures") and (2) the Debtor's proposed procedures for assuming and assigning executory contracts and unexpired leases, and notice procedures attached hereto as Exhibit B (the "Assumption and Assignment Procedures"). In support of this Motion, the Debtor states as follows:

**INTRODUCTION**

1.      The Debtor filed its voluntary petitions under Chapter 11 of the United States Bankruptcy Code on November 17, 2025 (the "Petition Date").

---

[1] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is: Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

2.       In early September 2025, the Debtor retained Ascendant Consulting Partners, LLC as its investment banker (the "Investment Banker") to sell substantially all of the Debtor's assets and/or place new capital to increase balance sheet liquidity and financial flexibility for the Debtor. As of the Petition Date, Investment Banker has been marketing the Debtor's assets for sale and had established November 14, 2025, as a deadline for receiving letters of intent from potential purchasers. Contemporaneously herewith, the Debtor is filing an application to approve the post-petition employment of Investment Banker on the same terms and provisions as the pre-Petition arrangement between the Debtor and Investment Banker.

3.       As a result of Investment Banker's efforts, the Debtor hopes to enter into one or more purchase agreements after consultation with BMO Bank, N.A. ("BMO"), as administrative agent and collateral agent for certain revolver and term loan lenders (the "Prepetition Senior Lenders" and, together with BMO, the "Prepetition Secured Parties") (each, a "Stalking Horse Purchase Agreement") with one or more purchasers for sale and assignment of portions or substantially all of the Debtor's assets (each a "Stalking Horse Bidder").

4.       Under any Stalking Horse Purchase Agreement, the consideration for the purchase will be specified and will be the opening bid for the purchase and sale of the assets identified therein, under the Bid Procedures set forth herein. All other interested parties may submit a Qualified Bid (as defined in the Bid Procedures) and may participate in the Auction[2]. The Debtor believes, in the exercise of its business judgment, that such a process will maximize the value of its assets for the benefit of this bankruptcy estate, its creditors, and all other parties in interest.

**RELIEF REQUESTED**

5.       The Debtor is requesting the following specific relief under this Motion:

---

[2] All terms not defined herein shall have the meaning ascribed to them in the Bid Procedures.

a.     The Court's approval of the proposed Bid Procedures attached hereto as
Exhibit A;

b.     The Court's approval of the bid protections for each Stalking Horse
Bidder as set forth herein and in the Bid Procedures, and the Debtor
entering into each Stalking Horse Purchase Agreement;

c.     The Court's approval of the proposed Assumption and Assignment
Procedures attached hereto as Exhibit B; and

d.     Waiver of the 14-day stay periods under Bankruptcy Rules 6004(h) and
6006(d).

### JURISDICTION, VENUE & LEGAL PREDICATES

6.     This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This matter is a
core proceeding under 28 U.S.C. §157(b)(2).

7.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

8.     The legal predicates for this Motion are 11 U.S.C. § 363 and related statutes and
rules.

### BACKGROUND

**A.     Debtor's Business Background and Chapter 11 Filing.**

9.     As of the Petition Date, the Debtor continues to operate its businesses as the
debtor-in-possession under §§ 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or
creditor committee has been appointed in either case.

10.    The Debtor is a nationwide merchandiser and processor of grain with a diversified
agribusiness platform with locations throughout the central United States.  More specifically, the
Debtor operates nine elevators, five across the Midwest along Interstate 29, with grain storage

capacity of 30 million bushels. The Debtor also operates four port terminals: Duluth, Minnesota; Houston, Texas; Superior, Wisconsin; and Toledo, Ohio. The Debtor further owns an oats processing facility in Toledo, Ohio that produces pet food and animal feeds ("Oats Processing Facility"). Additionally, the Debtor leases and operates grain trading offices located in Toledo, Ohio; Omaha, Nebraska; Salina, Kansas; Kansas City, Missouri; Tallulah, Louisiana; Grand Island, Nebraska; and Alabaster, Alabama. The Debtor has four distinct and complementary business units: (1) Oat Trading; (2) Wheat Merchandising; (3) Cross-Country Trading; and (4) a Houston Joint Venture. The Debtor leases a private railcar fleet of 387 that provides it flexibility and national reach, traversing every major class I rail in North America and operates across all major transportation modes – truck, rail (manifest, shuttle, unit), barge, vessel, and container – to support both import and export flows of grain, optimizing cost and timing performance. The Debtor is a corporation organized under the laws of the State of Nebraska, with its principal place of business in Omaha, Nebraska and employs approximately 120 individuals in a number of different states in which it operates, including Nebraska, Iowa, Missouri, Kansas, Minnesota, North Dakota, Louisiana, Wisconsin, Ohio, Texas, and Alabama.

11.     The Debtor provides trading and logistics services in specialized commodities, feed, and other dry bulk materials. From on-farm grain loading by truck, to ocean vessels and everything in between, the Debtor has assisted with importing, exporting, storing and trans-loading bulk commodities. Commodity trading has been at the core of the Debtor's business, focusing on corn, soybeans, wheat, milo and oats, as well as a number of feed ingredients and byproducts like dried distillers grains, soybean meal, and soy hull pellets.

12.    On October 24, 2025, the Nebraska Public Service Commission issued the following statement "For Immediate Release," titled "PSC Temporarily Suspends Omaha Grain Dealer's License":

> The Nebraska Public Service Commission (PSC) at an emergency meeting today, Friday, Oct. 24, issued an Order (GD-2149/GDC-467) temporarily suspending the Grain Dealer license held by Hansen-Mueller Co. of Omaha and opening a department complaint (GD-2149/GDC-467). The Order means the company can no longer do business as a grain dealer in Nebraska, including buying grain from producers/sellers with the intent to sell it. "While we don't often hold emergency meetings, the Commission felt it was in the public good to move forward with the temporary suspension of this grain dealer's license at this time," said Commission Chair Tim Schram.
>
> The PSC grain department was recently made aware that Hansen-Mueller was not meeting its obligations as a grain dealer. During an Oct. 23 inspection by the PSC Grain Department, the company was alleged to be in violation of Neb. Rev. Stat § 75-903.01(2) and 291 Neb. Admin. Code §8-003.09 for failing to make payment on demand.
>
> With the filing of a formal complaint against Hansen-Mueller, the company will be required to show why its grain dealer license should not be revoked and a civil penalty assessed.
>
> Commissioner Schram said, "We encourage producer/sellers to always be vigilant. It is imperative with harvest season underway that they are well aware of this company and that it cannot act as a grain dealer in Nebraska at this time."
>
> Producers/sellers who have done business with Hansen-Mueller Co. and have questions are encouraged to contact the PSC Grain Department. Grain department contact information along with a list of licensed Grain Dealers in Nebraska can be found on the Grain Department page of the PSC website. ###

The said formal complaint against the Debtor alleges that the Debtor "has violated Neb. Rev. Stat. § 75-903(2) and 291 Neb. Admin. Code § 8-003.09, by failing to make payment [to producers] on demand as required by Nebraska Statute and Commission Rules and Regulations."

13.    Such actions by the Nebraska Public Service Commission ("PSC") created conditions that necessitated the Debtor's filing of these bankruptcy proceedings, despite the

5

Debtor obtaining the reinstatement of its license on November 4, 2025, as other state regulatory bodies have threatened to follow suit of the PSC.

14.     The purpose and goal of the Debtor's bankruptcy proceedings is two-fold: (i) to liquidate the Debtor's assets in a manner that will maximize the value of those assets, and (ii) to distribute the proceeds of those asset sales in accordance with the requirements of the Bankruptcy Code.

15.     To maximize value, the Debtor is seeking to implement a sale process in these bankruptcy proceedings for sales free and clear. Through such a process, the Debtor hopes to obtain purchase and sale agreements with one or more Stalking Horse Bidders to serve as opening bid(s) in an auction process. The Debtor intends to proceed swiftly with its continued marketing and sale efforts.

16.     A detailed description of the Debtor's assets are set forth in a Confidential Information Memorandum ("CIM") available to interested parties after their execution of a nondisclosure agreement. The Debtor's assets are generally set forth in the *Declaration of Michael Compton, Chief Restructuring Officer of the Debtor Hansen-Mueller Co., in Support of Chapter 11 Petition and First-Day Motions*.

**B.      Summary of the Timeline of the Proposed Sale.**

17.     The Debtor requests that the Court approve the following proposed timeline in connection with this Motion and the Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and (III) Granting Related Relief (the "Interim Cash Collateral Order"), the proposed Bid Procedures, and the approval of a sale:

| Event | Deadline |
|---|---|
| **Hearing on this Motion** | November 21 or 24, 2025 |

| Bid Deadline | December 12, 2025 |
|---|---|
| Auction (if necessary) | December 16, 2026 |
| Sale Objection Deadline | 5:00 p.m. CT one day prior to Sale Hearing |
| Sale Hearing | Within seven days after Auction |

**D.    The Proposed Bid Procedures.**

18.    The proposed Bid Procedures are set forth in the attached <u>Exhibit A</u> and are incorporated herein by reference.

**E.    Notice of the Bid Procedures and Proposed Sale.**

19.    The Debtor proposes the following notice procedures be implemented with respect to the Bid Procedures process:

a.    <u>Notice of Sale, Bidding Deadline, Auction, and Sale Hearing</u>.

i.    After the Court approves the Bidding Procedures, the Debtor will serve the Bidding Procedures, which include the date, time, and location of the Auction, the deadline to object to the sale, and the sale hearing, by first-class mail, or, for those parties who have consented to receive notice via CM/ECF, by ECF, upon:

(1)    All entities reasonably known to have expressed an interest in the sale with respect to all or part of the Assets;

(2)    All entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Assets;

(3)    Counsel for the Stalking Horse Bidder;

(4)    The U.S. Trustee for the District of Nebraska;

(5)    The IRS;

(6)    The Nebraska Department of Revenue;

(7)    the Alabama Department of Revenue;

(8)      the Georgia Department of Revenue;

(9)      the Iowa Department of Revenue;

(10)     the Kansas Department of Revenue; (m) the Louisiana Department of Revenue;

(11)     the Minnesota Department of Revenue;

(12)     the Missouri Department of Revenue;

(13)     the Ohio Department of Revenue/Department of Taxation;

(14)     the Oklahoma Department of Revenue;

(15)     the Tennessee Department of Revenue;

(16)     the Texas Department of Revenue;

(17)     the Wisconsin Department of Revenue;

(18)     the City of Kansas City, Missouri – Revenue Division;

(19)     the City of Toledo Income Tax;

(20)     Unified Government Treasury of Wyandotte County, Kansas;

(21)     Treasurer of Lucas County, Ohio;

(22)     Jackson County, Missouri Collector;

(23)     St. Louis County, Minnesota Auditor;

(24)     Treasurer of Douglas County, Wisconsin;

(25)     Treasurer of Saline County, Kansas;

(26)     Treasurer of Harris County, Texas;

(27)     Treasurer of Woodbury County Treasurer;

(28)     Treasurer of Douglas County, Nebraska; and

(29)    All known creditors of the Debtor, including counterparties to any executory contracts and unexpired leases set forth in <u>Schedule 1</u> to <u>Exhibit B</u> attached hereto (collectively, the "<u>Notice Parties</u>")

ii.    After execution of any one or more Stalking Horse Purchase Agreements, the Debtor will file with the Court and serve a notice of each Stalking Horse Purchase Agreement upon:

1.    All entities reasonably known to have expressed an interest in the sale with respect to all or part of the Assets; and

2.    The Prepetition Secured Lenders.

b.    <u>Bidding Deadline</u>.

Per the proposed Bid Procedures, the deadline to submit a Qualified Bid is December 12, 2025.

c.    <u>Auction</u>.

Per the proposed Bid Procedures, an auction (if necessary) will take place at the offices of Koley Jessen P.C., L.L.O., located at 1125 S. 103rd Street, Suite 800, Omaha, Nebraska 68124.

d.    <u>Notice of Successful Bidder</u>.

No later than one (1) business day following an auction, the Debtor will file (but not serve) a notice with the Court identifying the Successful Bidder.

e.    <u>Sale Hearing</u>.

The Debtor requests that the Court, upon receiving the identification of one or more Successful Bidders, schedule a sale hearing within seven days thereafter or

as soon thereafter as the Court's calendar allows. At such sale hearing, the Debtor
will seek Court approval of the Successful Bid(s).

> f.      Objection Deadline.

The Debtor requests that any objections to a sale be filed by 5:00 p.m. Central
Time the day prior to the sale hearing.

**F.      Summary of Assumption & Assignment Procedures.**

20.     The Debtor proposes the procedures below for notifying counterparties to
executory contracts and unexpired leases of proposed cure amounts in the event the Debtor
determines to assume and assign such contracts (the "Contract Counterparties") in connection
with a proposed sale.

21.     Notice of Potential Assumption & Assignment.

> a.      Prior to a sale hearing, the Debtor will file with the Court a notice of
> assumption and assignment and attach thereto a list (the "Contracts List")
> that sets forth:

> > i.      Each of the Debtor's executory contracts and unexpired leases that
> may be assumed and assigned in connection with a sale, including the name of the
> non-Debtor counterparty to the executory contract or unexpired lease (the
> "Contracts"); and

> > ii.     The proposed amount, if any, to cure any monetary defaults, if any,
> under the Contracts (the "Cure Amount").

> b.      The Debtor will serve, via first class mail, the Notice of Potential
> Assignment and Assumption, with the Contracts List, on all Contract

Counterparties and any other party entitled to notice under Bankruptcy Rule 2002, substantially in the form attached hereto as <u>Exhibit B</u>.

22.     <u>Objection to Assumption & Assignment</u>.

    a.     A counterparty to a Contract listed on the Notice of Potential Assignment and Assumption may file an objection (the "<u>Contract Objection</u>") to the proposed assumption and assignment or the proposed Cure Amount, if any.

    b.     A Contract Objection must be filed seven (7) days following the service of the Notice of Potential Assumption and Assignment as set forth above.

23.     <u>Resolution of Objection at Sale Hearing</u>.

    a.     If a Contract Objection is filed and the Debtor and the counterparty to the Contract are unable to amicably resolve the dispute prior to a sale hearing, the amount to be paid or reserved with respect to such Contract Objection will be determined at the Sale Hearing or at a subsequent date determined by this Court.

## <u>LEGAL AUTHORITY</u>

**A.     The Sale Procedures are Supported by Debtor's Reasonable Business Judgment.**

24.     Section 363(b)(1) of the Bankruptcy Code provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

25.     "The decision to enter into an agreement outside the ordinary course of a Debtor's business is to be based on the reasonable business judgment of the Debtor." *In re Trilogy Dev. Co., LLC*, Case No. 09-44219-DRD-11, 2010 WL 6972664 (Bankr. W.D. Mo. Aug. 31, 2010)

(citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*,

722 F.2d 1063, 1070 (2d Cir. 1983)).

26.     Courts will approve a sale of property under § 363(b) if the Debtor has established

some articulated business justification for the proposed transaction. *Id.* (citing *In re Walter*, 83

B.R. 14, 16 (9th Cir. B.A.P. 1988); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr.

C.D. Cal. 1991)).

27.     In this case, the Bid Procedures are fully supported by the Debtor's reasonable

business judgment. The Debtor is seeking to sell its assets to generate funds to pay creditors,

which efforts began pre-petition. The Debtor has now determined, based on its business

judgment, that a sale of the Assets through Chapter 11 according to the Bid Procedures identified

herein will maximize the value of the Assets and will be in the best interests of the Debtor's

creditors.

**B.     The Bid Procedures are designed to maximize the Sale proceeds to the bankruptcy
         estate.**

28.     With respect to § 363 sales, a primary objective of the Bankruptcy Code is to

"enhance the value of the estate at hand." *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65

(8th Cir. 1997). *See In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (stating

that "[i]t is a well established principle of bankruptcy law that the objective of the bankruptcy

rules and the debtor's duty with respect to such sales is to obtain the highest price or greatest

overall benefit possible for the estate.") (internal quotations omitted).

29.     In accordance with that objective, bankruptcy courts routinely authorize the use of

bid procedures that are intended to enhance competitive bidding, thus furthering the objective of

maximizing the value of the assets for the bankruptcy estate. Courts provide debtors substantial

deference to formulate bidding procedures for selling assets. *See Integrated Resources*, 147 B.R.

at 656-57, 659 (finding that the bidding procedures, which are "important tools to encourage bidding and to maximize the value of Debtor's assets," are presumptively valid under the business judgment rule). *See also In re Financial News Network*, 126 B.R. 152, 156 (S.D.N.Y. 1991) (stating that "court-imposed rules for the disposition of assets" should "provide an adequate basis for comparison of offers" and should also "provide for a fair and efficient resolution of bankrupt estates.") (citations omitted).

30.    Here, the Bid Procedures establish a process through which the Debtor's Assets will be sold by competitive bidding to the bidder making the highest and best offer for a sale of assets. The Bid Procedures will allow the Debtor to conduct a sale through an open, controlled and fair process, allowing interested bidders time to conduct due diligence and submit well-informed bids. A Stalking Horse Purchase Agreement will set a minimum purchase price for the assets identified therein, a price that will then be tested in the market under the Bid Procedures, thereby ensuring that the Debtor is able to obtain fair market value for the Assets. By selling the assets in an expeditious and orderly manner, the value of the Debtor's assets will be maximized for the benefit of creditors and minimize the cost of the bankruptcy process.

31.    The Bid Procedures are similar to other bidding procedures approved by this Court and applied in other Chapter 11 bankruptcies. *E.g.*, *In re Gordmans Stores, Inc.*, Case No. 17-80304 (TLS) (Docs. 24 & 150); *In re Broadkey Brothers, Inc.*, Case No. 13-80203 (TLS) (Docs. 12 & 62, Feb. 15, 2013); *In re Professional Veterinary Products, Ltd.*, Case No. 10-82436 (Docs. 21 & 78).

**C.    Bid Protections included in the Bid Procedures are also designed to maximize proceeds to the bankruptcy estate.**

32.     In this case, the Bid Procedures provide a modest break-up fee measured at 2% of the purchase price in the Stalking Horse Bid, along with a requirement that the amount of any over-bid be in a sufficient amount to fund the break-up fee (the "<u>Bid Protections</u>").

33.     A breakup fee is an "incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode to attract other bidders to the auction." *Integrated Resources*, 147 B.R. at 659 (citations omitted). Breakup fees are "important tools to encourage bidding and to maximize the value of the debtor's assets." *Id.*

34.     Bankruptcy courts routinely permit "break up" fees to be paid to stalking horse bidders provided that the fees create an incentive for increased bidding in sales from bankruptcy assets. *In re Wintz Companies*, 230 B.R. 840, 846 (8th Cir. B.A.P. 1999) (citations omitted). *See also Integrated Resources*, 147 B.R. at 659 (stating that "[t]he usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable."). The question for this Court is whether the proposed fee, and the transaction as a whole, makes economic sense and are in the best interest of the bankruptcy estate and its creditors. *Wintz*, 230 B.R. at 846 (citations omitted).

35.     Here, a payment of the Bid Protections is a critical part of the sale process. Each Stalking Horse Bidder will have spent significant time and resources conducting due diligence, preparing the Stalking Horse Purchase Agreement, and otherwise valuing the Debtor's Assets, at the risk of not eventually becoming the Successful Bidder. The Bid Protections are a way to ensure that the Debtor's estates receive the benefit of the Stalking Horse Purchase Agreement.

**D.      Any proposed sale will be made free and clear of liens under § 363(f) of the bankruptcy code.**

36.     Under Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of liens, claims and encumbrances if –

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.     The conditions in § 363(f) are drafted in the disjunctive so only one of the five conditions must be met for authority to sell property free and clear of liens. *In re Heine*, 141 B.R. 185, 189 (Bankr. S.D. 1992).

38.     Here, at least one of the five conditions will be satisfied: any holder of any lien claims or interests in the assets being sold could be compelled to accept a money judgment for their purported interest in such assets. Any lien, claim, or encumbrance will attach to the net sale proceeds, subject to any claims or defenses the Debtor may have, and thus will be adequately protected.

**E.     Credit bidding is permitted under § 363(k) of the Bankruptcy Code.**

39.     Section 363(k) of the Bankruptcy Code provides that at a sale of property secured by a lien under Section 363(b), the holder of such secured claim may bid at the sale and if the holder of the secured claim purchases such property, the holder may offset its claim against the purchase price of such property. *See* 11 U.S.C. § 363(k).

40.     "It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)." *In re SubMicron Systems Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted). *See In re WBE Co.*, Case No. 06-80006, 2007 WL 4893471, *6 (Bankr. D. Neb. Dec. 19, 2007) (stating that Section 363(k) gives a secured creditor a right to credit bid upon a proposed sale of its collateral).

41.     The Bid Procedures provide that any Qualified Bidder that is also a secured creditor shall have the right to bid all or a portion of the value of the secured creditor's claim(s) under Section 363(k). This provision is consistent with other bidding procedures that have been approved by this Court. *See, e.g., In Re Gordmans Stores, Inc.*, Case No. 17-80304 (Docs. 24 & 150).

42.     This right to credit bid is consistent with Section 363(k), case law, and bidding procedures previously approved by this Court and credit bidding should therefore be permitted with respect to a sale.

**F.      Any Stalking Horse Bidder or Successful Bidder is entitled to the protections under Section 363(m) of the Bankruptcy Code.**

43.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser, providing that –

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

44.     § 363(m) prevents a modification or reversal of a bankruptcy court's order authorizing the sale of the Debtor's assets from affecting the validity of the sale." *Fulmer v. Fifth Third Equip. Fin. Code (In re Veg Liquidation, Inc.)*, 572 B.R. 725, 735-36 (Bankr. E.D. Ark.

May 2, 2017) (quoting *In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003); *In re Farmland Indus., Inc.*, 408 B.R. 497, 508 (8th Cir. B.A.P. 2009)).

45.     The proposed Bid Procedures are designed so that each Successful Bidder – whether the Stalking Horse Bidder or a different Successful Bidder – will qualify as a good faith purchaser under 363(m). Further, any Stalking Horse Sale Agreement, or any revised versions thereof submitted by each Successful Bidder, is a good-faith, arm's length transaction entitled to the protections of § 363(m). At a sale hearing, the Debtor will present the Court with evidence to establish that the § 363(m) good faith standard has been satisfied.

**G.     The Assumption & Assignment of the Contracts is Supported by Debtor's Reasonable Business Judgment.**

46.     The Debtor is seeking authority to assume and assign contracts to a Successful Bidder to facilitate the proposed sale process. The Debtor anticipates that any Successful Bidder will seek the assignment and assumption of certain of the Debtor's executory contracts and unexpired leases and that by facilitating the assignment of such contracts, the value of the Debtor's assets will be maximized for the benefit of the bankruptcy estate.

47.     Section 365 of the Bankruptcy Code provides that a bankruptcy court may authorize a debtor to assume and/or assign its executory contracts and unexpired leases, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

48.     Similar to the question of whether to approve a sale under § 363 of the Bankruptcy Code, "[i]n the Eighth Circuit, the business judgment test is used in deciding whether to approve a trustee's motion to assume, reject, or assign an executory contract or unexpired lease, which entails a determination that the transaction is in the best interest of the estate." *In re Noranda Aluminum, Inc.*, 549 B.R. 725, 727-28 (Bankr. E.D. Mo. 2016) (internal

quotations omitted). A bankruptcy court does not interfere with a debtor in possession's business judgment except on a finding of bad faith or gross abuse of their business discretion. *Id.* at 728 (internal quotations omitted).

49.     The Debtor requests that the Court approve the Debtor's decisions to assume and assign executory contracts and unexpired leases as a reasonable exercise of the Debtor's business judgment. The assumption and assignment of executory contracts and unexpired leases is vital to receiving the highest and best bids for the Debtor's Assets. The contract counterparties will receive notice of the proposed assumption and assignment and will have the opportunity to object.

50.     Moreover, the requirements of § 365(b)(1) will be satisfied. First, any defaults existing with respect to the Contracts must be cured under the terms of the Bid Procedures. 11 U.S.C. § 365(b)(1)(A). Second, § 365(b)'s requirement that adequate assurance of future performance be provided will also be satisfied in this matter. 11 U.S.C. § 365(b)(1)(C). "In making the determination of 'adequate assurance,' the court must give a practical pragmatic construction based on the circumstances of each case." *In re Tama Beef Packing, Inc.*, 277 B.R. 407, 411 (Bankr. N.D. Iowa 2002). Courts find it helpful to show "sufficient financial backing" to demonstrate assurance of future performance. *Id.*

51.     Here, the Bid Procedures require that the Debtor receive proof of a Qualified Bidder's financial wherewithal to complete each sale and via authorized due diligence, and the Debtor will obtain the information necessary to demonstrate that each Successful Bidder is able to perform under the contracts assigned to the Successful Bidder in connection with a sale.

52.     Further, based on the Bid Procedures and the Assumption and Assignment Procedures, the Contract Counterparties and other parties in interest will be provided with the opportunity to challenge the Successful Bidder's ability to adequately perform.

53.     In this matter, assignment of contracts to the Successful Bidder is integral to a sale of the Debtor's Assets and maximizing the value of the estate for the benefit of all parties in interest. The Assumption and Assignment Procedures will allow for the assignment of the Contracts in a manner consistent with § 365 of the Bankruptcy Code.

**H.      Waiver of the 14-day stay period under Bankruptcy Rules 6004(h) & 6006(d) is appropriate.**

54.     Bankruptcy Rule 6004(h) provides that an order authorizing the sale of property is stayed until the expiration of 14 days after entry of the order, unless the Court orders otherwise. FED. R. BANKR. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) also provides that an order authorizing the trustee to assign an executory contract or unexpired lease is stayed until the expiration of 14 days after entry of the order, unless the Court orders otherwise. Fed. R. Bankr. P. 6006(d).

55.     The Debtor respectfully requests that the Court waive these 14-day stay periods to allow a sale to close in an expeditious manner following a sale hearing. Based on the procedure and notice set forth herein, no party in interest will be prejudiced by waiver of the 14-day stay periods and it will instead enhance the value to the estate.

## NO PRIOR REQUEST

56.     No prior motion for the relief requested herein has been made to this or any other court.

**NOTICE**

57.    The Debtor will provide notice of this Motion to (a) the Office of the United States Trustee for the District of Nebraska; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the Debtor's prepetition secured lenders, BMO Bank N.A., Farm Credit Services of America, PCA, Farm Credit Mid-America, PCA, and CoBank, FCB; (d) the United States Attorney's Office for the District of Nebraska; (e) the Internal Revenue Service; (f) all parties who have expressed an interest to Ascendant Consulting Partners, LLC in some or all of the assets; (g) counsel to any official committee of unsecured creditors appointed in this chapter 11 case (upon appointment); (h) the Nebraska Department of Revenue; (i) the Alabama Department of Revenue; (j) the Georgia Department of Revenue; (k) the Iowa Department of Revenue; (l) the Kansas Department of Revenue; (m) the Louisiana Department of Revenue; (n) the Minnesota Department of Revenue; (o) the Missouri Department of Revenue; (p) the Ohio Department of Revenue/Department of Taxation; (q) the Oklahoma Department of Revenue; (r) the Tennessee Department of Revenue; (s) the Texas Department of Revenue; (t) the Wisconsin Department of Revenue; (u) the City of Kansas City, Missouri – Revenue Division; (v) the City of Toledo Income Tax; (w) Unified Government Treasury of Wyandotte County, Kansas; (x) Treasurer of Lucas County, Ohio; (y) Jackson County, Missouri Collector; (z) St. Louis County, Minnesota Auditor;   (aa) Treasurer of Douglas County, Wisconsin; (bb) Treasurer of Saline County, Kansas; (cc) Treasurer of Harris County, Texas; (dd) Treasurer of Woodbury County; (ee) Treasurer of Douglas County, Nebraska; and (ff) all parties on the Rule 2002 Notice list. The Debtor submits that, under the circumstances, no further notice of the hearing is necessary and requests that any further notice be dispensed with and waived.

58.     Contemporaneously herewith, the Debtor filed a Motion for Shortened Notice to this Motion pursuant to Local Rule 9006-1, seeking for this Court to shorten the resistance deadline to not more than seven (7) days.

WHEREFORE, the Debtor respectfully request that the Court enter an Order (1) approving of the proposed Bid Procedures attached hereto as <u>Exhibit A</u>; approving of the bid protections for each Stalking Horse Bidder as set forth herein and in the Bid Procedures, and the Debtor entering into each Stalking Horse Purchase Agreement; (c) approving the proposed Assumption and Assignment Procedures attached hereto as <u>Exhibit B</u>; (d) waiving of the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d); and (e) granting such other and further relief as this Court deems just and equitable.

DATED this 17th day of November, 2025.

HANSEN-MUELLER CO., Debtor,

By: *[s] Brian J. Koenig*
    Brian J. Koenig, #23807
    Donald L. Swanson, #16385
    Trevor J Lee, #27063
    KOLEY JESSEN P.C., L.L.O.
    1125 South 103rd Street, Suite 800
    Omaha, NE 68124
    (402) 390-9500
    (402) 390-9005 (fax)
    Brian.Koenig@koleyjessen.com
    Don.Swanson@koleyjessen.com
    Trevor.Lee@koleyjessen.com

## EXHIBIT A

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | Case No. 25-_____ |
| HANSEN-MUELLER CO.,[1] | Chapter 11 |
| Debtor. | |

### DEBTOR'S BID PROCEDURES

On November 17, 2025, Hansen-Mueller Co. (the "Debtor") filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

These bid procedures set forth the process by which the Debtor is seeking authority to conduct at least two auctions for the sale or other disposition of substantially all of the Debtor's assets.

### I.    ASSETS TO BE SOLD.

A.    The Debtor will conduct at least two auctions of its assets under § 363 of the Bankruptcy Code, subject to the terms and conditions set forth herein. One category of assets that will be sold/auctioned will be all working capital assets, including all grain inventory and any grain contracts ("Working Capital Assets"), which may be further broken out by location. The other category of assets that will be sold/auctioned will be all fixed assets and rolling stock ("Fixed Assets"), which may be further broken out by location. The assets to be sold constitute all of the Debtor's assets, properties, rights and interests of every kind, character and

---

[1] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is: Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

description, whether tangible or intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, whether owned, leased or licensed, wherever located, and whether or not reflected on the books and records of the Debtor, used in, held for use in connection with, or otherwise related to, the Debtor's businesses.  The purchaser(s) of any Fixed Assets will be required to allow the purchaser(s) of the Working Capital Assets at least 90 days after closing to remove any grain inventory from any Fixed Assets but will be permitted to charge and collect a reasonable storage and other customary fees.

## II.    POTENTIAL BIDDERS.

A.    To participate in the bidding process, a person or entity interested in completing a purchase of the assets pursuant to a sale agreement (a "Potential Bidder") must deliver to the Debtor or have previously delivered to the Debtor an executed confidentiality agreement on terms acceptable to the Debtor ("Confidentiality Agreement").  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**

## III.    QUALIFIED BIDDERS.

A.    A "Qualified Bidder" is a Potential Bidder who submits a bid that qualifies as a Qualified Bid (as defined below), and (ii) who the Debtor determines should be considered a Qualified Bidder after consultation with BMO Bank, N.A. ("BMO"), as administrative agent and collateral agent for certain revolver and term loan lenders (the "Prepetition Senior Lenders" and, together with BMO, the "Prepetition Secured Parties").

B.      Any Stalking Horse Bidder (as defined in the *Motion to Establish and Approve Bidding Procedures and Bid Protections for Sale of Debtor's Assets Free and Clear and for Assumption and Assignments of Executory Contracts and Unexpired Leases*) shall be considered a Qualified Bidder at all times and the Stalking Horse Bidder's Bid will be considered a Qualified Bid at all times.

C.      Any dispute related to these Bid Procedures, including whether a Bid qualifies as a Qualified Bid, shall be resolved by the Court.

## IV.    DUE DILIGENCE PROVIDED TO POTENTIAL BIDDERS.

A.      Upon execution of a Confidentiality Agreement, Potential Bidders may receive due diligence information and will obtain access to the Debtor's electronic data room to conduct due diligence.

B.      The Debtor will provide to each Potential Bidder reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtor shall post all written due diligence provided to any Potential Bidder to the Debtor's electronic data room. For all Potential Bidders other than a Stalking Horse Bidder, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtor shall have no obligation to furnish any due diligence information.

C.      The Debtor reserves the right to withhold any due diligence information that the Debtor determines is sensitive or otherwise not appropriate for disclosure to a Potential Bidder.

D.  All due diligence requests must be directed to Mark Warren at mark.warren@ascendantpartners.com with a copy to the Debtor's counsel, Brian J. Koenig at brian.koenig@koleyjessen.com.

## V.  DUE DILIGENCE PROVIDED BY POTENTIAL BIDDERS.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access requested by the Debtor regarding the ability of a Potential Bidder to complete the Sale. Failure by a Potential Bidder to comply with such reasonable requests for information and due diligence materials may be a basis for the Debtor to determine that the Potential Bidder is not a Qualified Bidder or that a Bid made by the Potential Bidder is not a Qualified Bid.

## VI.  SUBMISSION OF BIDS & BID REQUIREMENTS.

A bid by a Qualified Bidder that is submitted in writing and satisfies each of the requirements set forth below (collectively, the "Bid Requirements"), as determined by the Debtor in its reasonable business judgment, after consultation with the Prepetition Secured Parties, on or by the Bid Deadline (as defined below), shall constitute a "Qualified Bid." Any Stalking Horse Purchase Agreement will be deemed a Qualified Bid for all purposes.

A.  **Assets.** Each Bid must provide for the purchase of and must specifically identify the assets of the Debtor that the Qualified Bidder is proposing to purchase (including all executory contracts and unexpired leases it wishes to assume) or otherwise dispose of and which liabilities of the Debtor the Qualified Bidder is agreeing to assume.

B.      **Bid Price, Minimum Amount.** Each bid must specify the price offered (the "Bid Price") for the assets that are being bid upon, and the contracts and leases as to which the Potential Bidder seeks to assume, and an allocation of the Bid Price to the specific items being bid upon. The Bid Price must be equal to or greater than (i) the sum of the Purchase Price set forth in any applicable Stalking Horse Purchase Agreement, (ii) the value of the Bid Protections (defined below), and (iii) $100,000.00.

C.      **Deposit.** Each Potential Bidder must submit a deposit of ten percent (10%) of the Bid Price in immediately available cash funds via wire transfer to be held in the trust account of Koley Jessen P.C., L.L.O. pending completion of the auction (the "Deposit"). If the Potential Bidder is unsuccessful, the Deposit will be returned to the Potential Bidder as set forth below.

D.      **Same or Better Terms.** Each Bid must be on terms that are not more burdensome or conditional than the terms of any applicable Stalking Horse Purchase Agreement and must expressly provide for the payment in full in cash of the entire purchase price, as applicable, upon the consummation of the transactions contemplated by such bid. Further, each bid must include duly executed, non-contingent (other than the contingency of approval by this Court) transaction documents necessary to effectuate the sale in substantially the form agreed to by any applicable Stalking Horse Bidder, including a clearly marked version of any Stalking Horse Purchase Agreement that shows any differences between any Stalking Horse Purchase Agreement and the changes requested by the Potential Bidder, as well as all other material documents integral to such bid.

E.  **Financial Wherewithal.** Each bid must provide documentary information that demonstrates the financial wherewithal of the Potential Bidder to consummate the sale. A Qualified Bidder must have, in the Debtor's reasonable business judgment, after consultation with the Prepetition Secured Parties, the necessary financial capacity to consummate the transactions required by its bid and provide adequate assurance of future performance under all contracts to be assumed by such bid.

F.  **No Contingencies.** A bid shall include a statement that the Potential Bidder is prepared to enter into a legally binding purchase agreement, that the Bid is irrevocable until closing of the sale of the assets as approved by the Bankruptcy Court, and that such bid is unconditional and not subject to any due diligence, or financing contingency, or internal approval or any other contingency other than approval by this Court.

G.  **Identity.** Each bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with the bid, including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the sale and the complete terms of any such participation. Each bid must also include contact information for the specific persons whom the Debtor should contact regarding the bid.

H.  **No Break-Up Fee.** Each bid (other than any Stalking Horse Purchase Agreement) must disclaim any purported right to receive and not request or entitle the

Potential Bidder to receive a break-up fee, expense reimbursement, or any other similar form of compensation.

I.    **Authorization.** Each bid must contain evidence that the Potential Bidder has obtained authorization from the board of directors or comparable governing body with respect to the submission of its bid and the consummation of the sale.

J.    **As Is. Where Is.** The sale is "as is, where is" and each bid must include a written acknowledgment that the Potential Bidder (i) has had an opportunity to conduct any and all due diligence regarding the assets prior to making its bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guarantees whatsoever, whether express, implied by operation of law, or otherwise, regarding the assets or the completeness of any information provided in connection therewith or the auction, except as expressly stated in the bid.

K.    **Bid Procedures.** By submitting its bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bid Procedures and agrees not to submit a bid or seek to reopen the auction after the conclusion of the auction.

L.    **Consent to Jurisdiction.** Each Potential Bidder must submit to the jurisdiction of the U.S. Bankruptcy Court for the District of Nebraska.

M.    **Binding and Irrevocable.** A Qualified Bid is irrevocable until the Debtor accepts a higher bid, other than the Qualified Bid of any Back-Up Bidder, which shall remain irrevocable until closing of any Sale(s).

N.  **Bid Deadline.** Each bid must be transmitted via email so as to be actually received on or before 5:00 p.m. (Central Standard Time) on December 12, 2025 (the "<u>Bid Deadline</u>") by submitting proof of compliance with the Bid Requirements to the following: Mark Warren at mark.warren@ascendantpartners.com with a copy to the Debtor's counsel, Brian J. Koenig at brian.koenig@koleyjessen.com.

## VII.  RIGHT TO CREDIT BID.

A.  At any auction, any Prepetition Secured Party and any Qualified Bidder who has a valid and perfected lien on any assets of the Debtor's estate (a "<u>Secured Creditor</u>") shall have the right to credit bid all or a portion of the value of the Secured Creditor's claims under § 363(k) of the Bankruptcy Code to the extent that such secured claim is not disputed.  For the avoidance of doubt, a credit bid submitted by BMO Bank N.A., as administrative agent and collateral agent for certain revolver and term loan lenders (the "<u>Prepetition Secured Parties</u>") shall be deemed a Qualified Bid.  For the purposes of evaluating competing bids, every dollar of a credit bid shall be treated the same as a dollar from a cash bid, and a credit bid shall not be considered inferior to a comparable cash bid because it is a credit bid.  The fact that a bid is composed of a credit bid (whether in whole or in part) shall not be a factor considered by the Debtor in its determination of the highest or otherwise best bid for such asset.

B.  Notwithstanding anything set forth herein or in any other document, in the event of a competing Qualified Bid, any Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any and all such overbids to

include the full amount of the Bid Protections in lieu of cash and for purposes of evaluating the overbid equal to cash in the same amount.

C.      Credit bids, if any, will not impair or otherwise affect their entitlement to the Bid Protections granted under the Bidding Procedures Order. And any bidder who submits a credit bid must, in that bid, include sufficient cash to close the transaction, including sufficient cash to pay the full amount of the Bid Protections obligations.

## VIII.   AUCTION.

A.      If the Debtor receives more than one Qualified Bid, or receives a Qualified Bid and has entered a Stalking Horse Purchase Agreement, the Debtor will conduct an auction to determine the Successful Bidder. If the Debtor does not receive a Qualified Bid, other than a Stalking Horse Purchase Agreement, the Debtor will not conduct an auction and will designate any Stalking Horse Bidder's Bid as the Successful Bid.

B.      Any auction will take place at a date and time to be specified and at the offices of Koley Jessen P.C., L.L.O., 1125 South 103rd Street, Suite 800, Omaha, NE 68124, and Qualified Bidders will be allowed to participate electronically.

C.      <u>Conducting the Auction.</u>

1.      The Debtor and its professionals will direct and preside over each auction. At the start of each auction, the Debtor will describe the terms of any applicable Stalking Horse Bid. All bids made thereafter must be Overbids (as defined below) and shall be made and received on an open basis,

meaning the material terms of each Overbid will be fully disclosed to all other Qualified Bidders.

2. The Debtor will maintain a written record of all bids made and announced at each auction, including each Overbid and the Successful Bid.

D. <u>Good Faith Offer</u>.

1. Each Qualified Bidder participating in an auction will be required to confirm on the record at the auction that it has not engaged in any collusion with respect to the bidding, its bid is a good faith offer, and it intends to consummate the sale if selected as the Successful Bidder.

E. <u>Overbids</u>.

1. "<u>Overbid</u>" means any bid made at an auction by a Qualified Bidder subsequent to the Debtor's announcement of a Stalking Horse Bid.

2. An initial Overbid, if any, shall provide for total consideration to the Debtor with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the Stalking Horse Bidder's reasonable expenses and its two percent (2%) break up fee, plus $25,000.00 and that is sufficient to pay the Bid Protections obligations in full and in cash.

F. <u>Successful Bid</u>.

The Debtor, after consultation with their professionals and the Prepetition Secured Parties (specifically the Revolver Loan Lenders on the Working Capital Assets Sale(s) and the Term Loan Lenders on the Fixed Assets Sale(s), and based on their reasonable business judgment, will select the bid at the conclusion of each

auction that they believe to be the highest or otherwise best bid (the "<u>Successful Bid</u>") at the conclusion of the auction. The determination of the Successful Bid will remain, however, subject to the Bankruptcy Court's approval. The Successful Bidder must complete and sign all agreements or other documents with the Debtor evidencing and containing the terms and conditions upon which a Successful Bid was made before the auction is concluded.

## IX.    SALE HEARING.

A.    A hearing to consider a sale of assets to the Successful Bidder (or to approve the Stalking Horse Purchase Agreement, if no auction is held) (the "<u>Sale Hearing</u>") will occur at a time to be designated before the Bankruptcy Court.

B.    At a Sale Hearing, the Debtor will present the Successful Bid to the Bankruptcy Court for approval.

## X.    FAILURE OF SUCCESSFUL BIDDER TO CONSUMMATE SALE.

A.    If for any reason a Successful Bidder fails to consummate a sale of assets, or any part thereof, the Qualified Bidder with the second highest or best bid for the Assets (the "<u>Backup Bidder</u>") (as determined by the Debtor in its reasonable business judgment) will automatically be deemed to have submitted the highest and best bid, and the Debtor is authorized to effect a sale of assets, or any part thereof, to such offeror, as soon as commercially reasonable and without further order of the Bankruptcy Court.

B.    The identity of a Backup Bidder and the amount and material terms of the Backup Bidder's Bid will be announced by the Debtor at the conclusion of the Auction at the same time that the Debtor announces the identity of the Successful Bidder.

The Backup Bidder will be required to keep its bid open and irrevocable until the closing of the sale with the Successful Bidder. The Backup Bidder's Deposit will be held by the Debtor until the closing of the sale with the Successful Bidder.

C.     If a failure to consummate a purchase is the result of a breach by the Successful Bidder, the Successful Bidder's Deposit shall be forfeited to the Debtor.

## XI.     BID PROTECTIONS.

A.     To provide an incentive to and compensate a Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary to enter into the Stalking Horse Purchase Agreement with the knowledge and risk that arises from participating in the subsequent bidding process, the Debtor will pay a Stalking Horse Bidder a breakup fee in the amount of the Stalking Horse Bidder's reasonable expenses and 2% of the total Stalking Horse Bid Price (the "Bid Protections").

B.     The Bid Protections will be an allowed administrative expense priority claim, senior to all other administrative expense priority claims, and will be secured by a claim against the proceeds of the Sale, and will be paid as a cost of the sale.

C.     A Stalking Horse Bidder shall have standing to appear and be heard on all issues related to the auction, including the right to object to the conduct of the auction and interpretation of these Bidding Procedures.

## XII.     RETURN OF DEPOSIT.

The Deposit of a Successful Bidder shall be applied to the purchase price of the sale at closing. The Deposit for each Qualified Bidder shall be returned (other than with respect to the Backup Bidder and Successful Bidder) on or within seven (7) business days

after the Sale Hearing, provided that the Bankruptcy Court approves the sale to the Successful Bidder. The Deposit of the Backup Bidder will be returned as set forth above.

## XIII.   DEBTOR'S RESERVATION OF RIGHTS.

The Debtor reserves at least the following rights:

A.   To extend the deadlines in these Bid Procedures with the consent of the Prepetition Secured Parties;

B.   To add procedural rules reasonably necessary for conducting an auction with the consent of the Prepetition Secured Parties;

C.   To reject any or all Bids after consultation with the Prepetition Secured Parties (specifically the Revolver Loan Lenders on the Working Capital Assets Sale(s) and the Term Loan Lenders on the Fixed Assets Sale(s));

D.   To adjourn an auction at the auction and/or adjourning the Sale Hearing in open court without further notice with the consent of the Prepetition Secured Parties; and

E.   To cancel the auction.

DATED this ___ day of November, 2025.

HANSEN-MUELLER CO., Debtor,

By: _____
      Brian J. Koenig, #23807
      Donald L. Swanson, #16385
      Trevor J Lee, #27063
      KOLEY JESSEN P.C., L.L.O.
      1125 South 103rd Street, Suite 800
      Omaha, NE 68124
      (402) 390-9500
      (402) 390-9005 (fax)
      Brian.Koenig@koleyjessen.com
      Don.Swanson@koleyjessen.com

Trevor.Lee@koleyjessen.com

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | Case No. 25-_____ |
| HANSEN-MUELLER CO.,[2] | Chapter 11 |
| Debtor. | |

**NOTICE TO CONTRACT PARTIES OF POTENTIAL ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE DISPOSITION OF CERTAIN OF
DEBTOR'S ASSETS AND PROPOSED CURE COSTS**

**YOU ARE RECEIVING THIS NOTICE OF POTENTIAL ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE DISPOSITION OF THE DEBTOR'S ASSETS AND
PROPOSED CURE COSTS (THE "NOTICE OF POTENTIAL ASSUMPTION AND
ASSIGNMENT") BECAUSE YOU MAY BE A COUNTERPARTY TO AN EXECUTORY
CONTRACT OR UNEXPIRED LEASE WITH HANSEN-MUELLER CO. OR ONE OR
MORE OF ITS AFFILIATES (COLLECTIVELY, THE "DEBTOR"). PLEASE READ
THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE
TRANSACTIONS DESCRIBED HEREIN.**

**PLEASE TAKE NOTICE** that on November 13, 2025, the above-captioned debtor and

debtor in possession (the "Debtor") filed *the Debtor's Motion to Establish and Approve Bidding*

*Procedures and Bid Protections for Sale of the Debtor's Assets Free and Clear and For*

*Assumption and Assignments of Executory Contracts and Unexpired Leases* (Doc. ___) (the

"Motion") with the United States Bankruptcy Court for the District of Nebraska (the

"Bankruptcy Court") seeking, among other things, entry of an order: (a) approving the proposed

Bid Procedures, (b) approving the proposed Assumption and Assignment Procedures, including

---

[2] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is:
Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

this <u>Exhibit B</u>, (c) approving the bid protections for each Stalking Horse Bidder and for the Debtor entering into each Stalking Horse Purchase Agreement, and (d) waiving the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

**PLEASE TAKE FURTHER NOTICE** that on November __, 2025, the Bankruptcy Court entered an order (Doc. ____) (the "<u>Bidding Procedures Order</u>") granting the relief sought in the Motion, including, among other things, approving the Bidding Procedures and the Assumption and Assignment Procedures.

**PLEASE TAKE FURTHER NOTICE** that, under the Assumption and Assignment Procedures and by this written notice, the Debtor hereby notifies you that the Debtor **may** determine, in the exercise of its business judgment, that one or more of the executory contracts and unexpired leases and any modifications thereto identified on **Schedule 1** attached hereto (collectively, the "<u>Assumable Contracts</u>") **may** be assumed and assigned to the Successful Bidder, subject to the Successful Bidder's payment of the cure amounts set forth on **Schedule 1**, or such other cure amounts that are agreed to by the parties.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere identification of any executory contract or unexpired lease as an Assumable Contract on **Schedule 1** does not require or guarantee that it will be assumed by the Debtor at any time or assumed and assigned, and all rights of the Debtor and the Successful Bidder with respect to such Assumable Contracts are reserved. Furthermore, the Debtor explicitly reserves its rights, in its reasonable discretion, to seek to reject or assume each Assumable Contract under § 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtor and/or Successful Bidder, as applicable, to designate any Assumable Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided by the Bidding Procedures Order, the time for filing objections to (a) the cure amounts related to the Assumable Contracts, (b) the Debtor's ability to assume and assign any Assumable Contract, and (c) adequate assurance of future performance by the assumption and assignment to the Successful Bidder must be filed and served on December 5, 2025.

DATED this ___ day of November, 2025.

HANSEN-MUELLER CO., Debtor,


By: _____
    Brian J. Koenig, #23807
    Donald L. Swanson, #16385
    Trevor J Lee, #27063
    KOLEY JESSEN P.C., L.L.O.
    1125 South 103rd Street, Suite 800
    Omaha, NE 68124
    (402) 390-9500
    (402) 390-9005 (fax)
    Brian.Koenig@koleyjessen.com
    Don.Swanson@koleyjessen.com
    Trevor.Lee@koleyjessen.com

## SCHEDULE 1 – ASSUMABLE CONTRACTS

| Lessor/Vendor | Description of Lease/Contract | Cure Amount |
|---|---|---|
| BNSF Rail | Duluth, MN elevator land and track lease | $0.00 |
| Canadian Pacific | Access/Roadway to Duluth, MN elevator | $786.12 |
| Brad Cummings, LLC | Sioux City, IA elevator lease | $0.00 |
| Union Pacific | Kansas City, KS elevator lease | $0.00 |
| Brooklere | Alabaster, AL office lease | $0.00 |
| Kansas City Southern Railway | Kansas City, MO land lease for scalehouse and truck scales | $3,136.10 |
| Kansas City Southern Railway | Kansas City, MO land lease around the elevator | $0.00 |
| Kansas City Southern Railway | Kansas City, MO land and track lease around the elevator | $0.00 |
| Toledo Metro Development | Toledo, OH office lease | $0.00 |
| Norfolk Southern | Toledo, OH track lease | $0.00 |
| Falcon Grain | Grand Forks, ND elevator lease | $0.00 |
| B&D Land & Development | Council Bluffs, IA elevator lease | $0.00 |
| Everest Railcar Services, Inc. | HM-0125 SCH 1 - Railcars lease | $0.00 |
| Everest Railcar Services, Inc. | HM-0125 SCH 2 - Railcars lease | $0.00 |
| Carmath, Inc. | Rider Number 1 - Railcar lease | $13,600.00 |
| Carmath, Inc. | Rider Number 2 - Railcar lease | $18,900.00 |
| GATX Corporation | Schedule 1 - Railcar lease | $81,635.52 |

| | | |
|---|---|---|
| Chicago Freight Car Leasing Co. | 1266-13-11 - Railcar lease | $35,250.00 |
| Chicago Freight Car Leasing Co. | 1266-13-10 - Railcar lease | $0.00 |
| Chicago Freight Car Leasing Co. | 1266-13-09 - Railcar lease | $0.00 |
| Wells Fargo Rail | Railcar lease | $0.00 |
| The CIT Group | HAMU01001 - Railcar lease | $0.00 |
| The CIT Group | HAMU01002 - Railcar lease | $0.00 |
| The CIT Group | HAMU01003 - Railcar lease | $21,850.00 |
| The CIT Group | HAMU01004 - Railcar lease | $0.00 |
| RTEX Railcar Leasing and Sales, LLC | Brokerage for two of the CIT Leases | $1,500.00 |
| Byline Financial Group | 66357 - Railcar Mover lease | $0.00 |
| Byline Financial Group | 67053 - Railcar Mover lease | $5,959.90 |
| AITX Leasing LLC | l04175 - Railcar lease | $60,290.50 |
| AITX Leasing LLC | l04094 - Railcar lease | $11,880.00 |
| Independent Locomotive Leasing | Locomotive lease | $2,000.00 |
| Agrilogistics Inc. | Equipment lease to purchase | $1,760.00 |
| Alliance Funding Group | Equipment lease to purchase | $0.00 |
| Watco Mechanical Services | Oklahoma City handling agreement | $20,494.72 |
| Watco Mechanical Services | Memphis handling agreement | $19,476.26 |
| Algoma Central Corporation | Contract of Affreightment | CAD $426,380.02 |