UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | Case No. 25-81226 |
| HANSEN-MUELLER CO.,[1] | Chapter 11 |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO IMPLEMENT A KEY EMPLOYEE INCENTIVE PLAN AND A KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

Hansen-Mueller Co. (the "Debtor"), debtor and debtor-in-possession in the above-referenced chapter 11 case (the "Case"), moves this Court to enter an order, substantially in the form attached hereto, authorizing the Debtor to implement the key employee incentive plan (the "KEIP") and the key employee retention plan (the "KERP") and (ii) granting related relief (the "Motion"). Pursuant to the Debtor's *Motion to Seal* that is being filed concurrently with this Motion, the Debtor intends to offer the KEIP and KERP agreements under seal for this Court to review and consider and will provide the same to counsel to any party that agrees to maintain the confidentiality of the same. In support of the Motion, the Debtor respectfully states as follows:

---

[1] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is: Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

1

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O), and the Debtor consents to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. The statutory bases for the relief requested by this Motion are sections 363(b), 363(c), and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 6003 and 6004 (the "Bankruptcy Rules"), and Rule 9013-1 of the Bankruptcy Local Rules for the District of Nebraska (the "Local Rules").

**BACKGROUND**

5. The Debtor filed its voluntary petition under Chapter 11 of the United States Bankruptcy Code on November 17, 2025 (the "Petition Date").

6. Since the date of the filing of its bankruptcy petition, the Debtor has remained in possession of its assets and has operated its business and managed its financial affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

7. A detailed description of the Debtor and its business, the facts and circumstances leading up to the filing of this chapter 11 Case, and the facts supporting this Motion are set forth in greater detail in the *Declaration of Michael Compton, Chief Restructuring Officer of Debtor Hansen-Mueller Co., in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

8. Given the uncertainty created by this chapter 11 Case, the Debtor has decided that it is necessary to adopt the KERP and KEIP for certain key employees and executives to incentivize and/or retain their continued performance and avoid losing the Debtor's most valued employees during the pendency of this Case at a time the Debtor needs their industry expertise and company-specific knowledge.

9. The KEIP and KERP are designed to provide performance incentives to, and encourage the retention of the KERP/KEIP participants, who are invaluable to the sale/liquidation process and potential future operations and who will help maximize value for the benefit of all stakeholders.

10. The Debtor and its advisors have determined that the KEIP and KERP are critical to the Debtor's sale/liquidation process and value maximization strategy. Given the importance of developing a comprehensive retention and incentive program for key employees, the Debtor's Board of Directors (the "Board") engaged Silverman Consulting, Inc. as its financial advisor and Michael Compton as its Chief Restructuring Officer before the Petition Date to analyze the situation and provide a recommendation. Mr. Compton analyzed the employees' and officers' respective institutional knowledge and expected contributions during the chapter 11 case and considered a range of outcomes that could occur without these key employees and officers. Mr. Compton concluded that properly incentivizing, compensating, and rewarding the employees and officers at this critical juncture in the chapter 11 Case is in the best interests of the Debtor, its estate, and all parties in interest. Among other reasons for the KERP/KEIP, Mr. Compton believes that adopting such program will allow Debtor to maximize the value of its assets by having industry experts oversee the liquidation of grain inventory and other assets and ensure the best possible value for Debtor's assets. Further, Mr. Compton believes that the KERP/KEIP participants have

industry and Debtor-specific knowledge that would be impossible to replace on a short-term basis and if these KERP/KEIP participants decided to leave the Debtor, the Debtor would not achieve as good of a sale price for its grain inventory and other assets as it would with their participation.

## THE KEIP

11. The KEIP is designed to incentivize four key executives of the Debtor (the "Key Executives") to preserve and maximize the value of the Debtor's business for the benefit of all stakeholders in the chapter 11 Case.

12. The Debtor relies on the Key Executives' expertise to make decisions that support the operations and drive the financial performance of the Debtor's business. The Key Executives, two of which who have been working in excess of 15-hour days for the past few weeks and have assumed the functions of the CFO who recently resigned, are responsible for, among other things:

    a. the essential day-to-day business functions;

    b. implementing the Debtor's operational goals; and

    c. assisting the Debtor's sale/liquidation efforts and responding to diligence requests in connection therewith and with the chapter 11 Case more generally.

13. A summary of the material terms of the KEIP is set forth below.

    a. Key Executives can receive compensation by achieving the following key metrics:

        i. Maintaining compliance with an approved cash collateral budget with no more than a 115% weekly variance in the aggregate;

        ii. Executing on an accelerated timeline for the auction of the Debtor's Toledo, Ohio oats facility by coordinating final diligence and negotiating a purchase agreement with no contingencies acceptable by the Debtor and BMO Bank N.A. ("BMO"), as

4

    administrative agent and collateral agent for certain revolver and term loan lenders (the "Prepetition Senior Lenders" and together with BMO, the "Prepetition Secured Parties" and the Prepetition Secured Lenders consisting of term loan lenders (the "Term Loan Lenders" and revolving loan lenders (the "Revolving Loan Lenders") by December 12, 2025;

iii. Concluding the auctions of the Working Capital Assets and Fixed Assets (as defined in the Bidding Procedures Motion) no later than December 16, 2025 (as modified or extended with the prior written consent of the Prepetition Senior Lenders).

iv. Retaining the remaining workforce to allow for an ongoing concern sale of the Ohio oats facility and the liquidation of grain assets;

v. Providing updated and timely financial reports that the CFO (who recently resigned) otherwise would have prepared;

vi. Completing accurate inventory quantity and quality weekly reporting to the Prepetition Secured Lenders;

vii. Maintaining operational expenses in compliance in compliance with the approved cash collateral budget with no more than a 115% variation weekly variance in the aggregate;

viii. Maximizing the value of the Debtor's Oat Program through contract management while liquidating 90% of open oats contracts for reasonable sale prices in consultation with the Revolving Loan Lenders before January 1, 2026; and

        ix.        Maximizing the value of the Debtor's Oat inventory (which is the the Debtor's largest and most difficult grain asset to liquidate) by liquidating 75% (by count) of the physical inventory in consultation with the Revolving Loan Lenders before January 1, 2026.

    b.    If all the foregoing key metrics were achieved, the aggregate amount paid to the Key Executives under the KEIP would be $300,000.

14.    The sale and operational targets are outcomes that will be influenced by the Key Executives' commitment to the Debtor's sale/liquidation process and are key indicators of the Debtor's performance and the overall success of the chapter 11 Case. Accordingly, the KEIP is well suited to incentivize, measure, and reward the Key Executives' performance.

## THE KERP

15.    The KERP is designed to help ensure that twenty-three valuable, hard-to-replace, non-insider employees (the "Key Employees") who are important to the Debtor's sale/liquidation efforts are retained and properly motivated to preserve and maximize the value of the Debtor's business for the benefit of the Debtor's stakeholders in the chapter 11 Case.

16.    The Debtor seeks to provide incentives to the Key Employees to commit to this goal. The KERP will help ensure that these Key Employees, whom the Debtor has identified as important to the success of its chapter 11 Case, remain with the Debtor through the sale/liquidation process, as well as help manage the Debtor's ongoing operations and the administration of the Debtor's estate during the chapter 11 Case. Without payments under the KERP, the Debtor believes that the Key Employees are likely to pursue alternative employment, harming the value of the Debtor's estate and negatively affecting the Debtor's ongoing sale/liquidation efforts.

6

17. The KERP is effectively a roll-up of bonuses that have accrued for Key Employees who have not voluntarily left the Debtor's employ or been terminated for cause before the proposed payout dates while the Debtor completes the sale/liquidation process in the chapter 11 Case.

18. If all of the Key Employees were retained through the time period set forth in the KERP the aggregate cost of the KERP would be approximately $400,000.

19. While Key Employees may have titles that include words that may suggest officer status, none of the Key Employees is, in reality, an "insider" as defined by the Bankruptcy Code or under applicable law. Although the Key Employees are valuable to the Debtor's business and are particularly vital during the chapter 11 Case, their titles do not reflect that such Employees control the Debtor's operations. Each Key Employees reports to more senior employees of the Debtor and must obtain approval from appropriate senior personnel before taking any significant action with respect to, among other things, the Debtor's corporate policies or the disposition of significant assets.

20. In addition, no Key Employee is a member of the Board, was appointed by, or reports to, the Board, and no Key Employee regularly attends, or participates at, Board meetings. Further, the Key Employees' duties do not extend to the Debtor's business operations as a whole, but rather, are restricted to particular aspects or segments of the Debtor's business, and no Key Employee has authority to make company-wide decisions on the Debtor's behalf.

21. The Debtor believes that the award opportunities provided under the KERP are consistent with market practice for similarly situated employers and are, both individually and collectively, reasonable under the circumstances of the chapter 11 Case. Further, the Debtor believes the proposed KERP fairly addresses its need to preserve and maintain operational and workforce stability with a reasonable, retention-based program.

**RELIEF REQUESTED**

22.     Pursuant to sections 363(b), 363(c), and 503(c) of the Bankruptcy Code, the Debtor seeks entry of an order approving the KEIP and the KERP.

**BASIS FOR RELIEF**

**I.    THE KEIP**

**A. Authorization of the KEIP is Appropriate Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.**

23.     Sections 363(b) and 503(c) of the Bankruptcy Code govern court approval of non-ordinary course of business employee incentive and retention plans. 11 U.S.C. §§ 363(b), 503(c). Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor must demonstrate that "a sound business purpose justifies such actions*." In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999). Under section 363(b), a debtor has the burden to establish it has a valid business purpose for using estate property outside the ordinary course of business. *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983). Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief that the action was in the debtor's best interest. *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." *Montgomery Ward*, 242 B.R. at 155.

24.     Section 503(c)(3) prohibits "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired

8

after the date of the filing of the petition." 11 U.S.C. § 503(c)(3). Section 503(c)(3) prohibits non-ordinary course of business transactions that are not justified by the facts and circumstances of the case. Many courts have noted that the section 503(c)(3) test is akin to the business judgment test of section 363. "Most bankruptcy courts that have considered the issue have concluded that section 503(c) adds nothing to the preexisting business judgment standard, and therefore regardless of Section 503(c)(3), the business judgment standard controls." *In re FirstEnergy Sols. Corp.*, 591 B.R. 688, 695 (Bankr. N.D. Ohio 2018); *In re Borders Grp., Inc.*, 453 B.R. 459, 474 (Bankr. S.D.N.Y. 2011) ("Since the legal standard under section 363(b) is no different than section 503(c)(3), the following analysis is equally applicable to both statutory provisions."). Other courts, however, believe that section 503(c) sets forth a stricter standard. *See GT Advanced Techs., Inc. v. Harrington*, 2015 U.S. Dist. LEXIS 947432015 (D.N.H. July 21, 2015) ("This court is persuaded by *Pilgrim's Pride* [*In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009)] that 11 U.S.C. § 503(c)(3) directs courts to give more scrutiny to the business judgment of debtors than is permitted under the § 363(b)(1) business judgment test").

25. In assessing whether the debtor has demonstrated sound business judgments, courts look to the following factors set forth in *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006):

a) Is there a reasonable relationship between the plan proposed and the results to be obtained (i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance)?

b) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

c) Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

d) Is the plan or proposal consistent with industry standards?

e) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

f) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).

26. The Court should approve the KEIP pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code because the KEIP is justified by the facts and circumstances of this Chapter 11 case and satisfies the business judgment test (even under the stricter standard).

27. The factors cited by the court in *Dana*, weigh heavily in favor of Court approval of the KEIP.

**B. The KEIP is an Exercise of Sound Business Judgment under the Dana Factors**

*a) The KEIP is Calculated to Achieve the Desired Performance*

28. The KEIP provides incentives for a select group of executives to achieve targets that will enhance the value of the estate for the benefit of the Debtor's stakeholders. The awards are tied to performance metrics. Achieving the targets will be difficult, and to do so, the Key Executives must undertake significant efforts towards related metrics.

*b) The Debtor's CRO Engaged in Due Diligence with the Assistance of Independent Counsel in Creating the KEIP*

29. In formulating the KEIP, the Debtor worked with third-party advisors (the "<u>Advisors</u>") including, but not limited to Silverman Consulting, Inc. and the Chief Restructuring Officer, Michael Compton, to develop the KEIP. The Advisors reviewed incentive plans among other chapter 11 debtors and companies similar to the Debtor and, informed by this market review, the Debtor and the Advisors structured the KEIP to use appropriate incentives and benchmarks for the circumstances presented in this chapter 11 Case.

*c) The Cost of the KEIP is Reasonable and Consistent with Market Practice*

30. If all key metrics were achieved, the aggregate cost of the KEIP is $300,000. This cost is reasonable given the size and nature of the Debtor's business and the expected value retained by the bankruptcy estate in retaining the Key Executives through the sale and liquidation process.

*d) The KEIP is Fair and Reasonable*

31. The Key Executives are a select group whose skills and performance are needed for the Debtor to achieve the performance targets. The Debtor and its advisors devised the KEIP to properly motivate those executives.

32. In light of the above facts, the implementation of the KEIP is a sound exercise of the Debtor's business judgment and should be approved by the Court.

**C.    The KEIP is an Exercise of Sound Business Judgment under the *Dana* Factors**

33. The Court should approve the KEIP pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code. Based on the factors described in *Dana*, the KEIP is an exercise of sound business judgment and is justified by the facts and circumstances of the case.

**D.    Section 503(c)(1) of the Bankruptcy Code Does Not Apply to the KEIP**

*a) The KEIP is Not a Retention Plan Under Section 503(c)(1) of the Bankruptcy Code*

34. Section 503(c)(1) imposes restrictions on payments to insiders for the purpose of inducing such persons to remain with a debtor's business. Section 503(c)(1) applies to retention plans, and not incentive plans. This is the case even if the incentive plan may have some retentive effect. *See In re Velo Holdings, Inc.*, 472 B.R. 201, 209-10 (Bankr. S.D.N.Y. 2012) ("Although a purported KEIP may contain some retentive effect, that does not mean that the plan, overall, is retentive rather than incentivizing in nature.") (internal quotation marks omitted); *In re Glob.*

11

*Home Prods*., LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact, as Debtors pointed out, that all compensation has a retention element does not reduce the Court's conviction that Debtors' primary goal is to create value by motivating performance.").

35. However, calling a plan an "incentive plan" does not automatically take the plan outside the scope of section 503(c)(1). *See In re Alpha Nat. Res., Inc*., 546 B.R. 348, 357 (Bankr. E.D. Va. 2016) ("A Court cannot defer to the labels used by a debtor when determining whether a KEIP's true purpose is to either incent or retain."). It is the debtor's burden to demonstrate that the plan is primarily incentivizing rather than primarily retentive. *See In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012). If the targets are readily achievable, the plan may be retentive in nature. *See In re Residential Capital, LLC*, 491 B.R. 73, 86 (Bankr. S.D.N.Y. 2013); In re Hawker Beechcraft, Inc., 479 B.R. 308, 315 (Bankr. S.D.N.Y. 2012).

36. In this case, the KEIP is an incentive plan, and not a "pay to stay" retention plan. The payments are tied to performance metrics. No payments are made if the thresholds are not met. Thus, the Key Executives do not receive payment under the KEIP merely for remaining employed with the Debtor on a certain date or upon the occurrence of a certain event. Accordingly, section 503(c)(1) is inapplicable.

## II. THE KERP

### A. Authorization of the KERP is Appropriate Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

37. As set forth above, sections 363(b) and 503(c) of the Bankruptcy Code govern court approval of non-ordinary course of business employee incentive and retention plans and in assessing whether the debtor has demonstrated sound business judgments, courts look to the following factors set forth in *In re Dana Corp*., 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006):

38. Based on the factors described in Dana, the KERP is an exercise of sound business judgment and is justified by the facts and circumstances of the case.

**B.    The KERP is an Exercise of Sound Business Judgment under the *Dana* Factors**

*i.    The KERP is Calculated to Achieve the Desired Performance*

39. The KERP is designed to encourage the Key Employees to remain with the Debtor through this chapter 11 Case. The payments are designed to compensate such employees for their additional responsibilities during the chapter 11 Case. If a Key Employee voluntarily leaves (or is terminated for cause), the employee will not receive the corresponding KERP payments. Thus, the KERP is calculated to encourage employees to stay for the desired period.

*ii.    The Debtor Engaged in Due Diligence with the Assistance of Independent Counsel in Creating the KEIP*

40. In formulating the KERP, the Debtor worked with the Advisors including, but not limited to Silverman Consulting, Inc. and its counsel, to develop the KERP. The Advisors reviewed incentive plans among other chapter 11 debtors and companies similar to the Debtor and, informed by this market review, the Debtor and the Advisors structured the KERP. The Debtor also worked with the Advisors to ensure that there were no insiders selected as Key Employees and that each Key Employee was essential to this chapter 11 Case

*iii.    The Cost of the KERP is Reasonable and Consistent with Market Practice*

41. As discussed above, the Advisors reviewed various retention plans in the formation of the KERP.

42. If all of the Key Employees were retained through the time period set forth in the KERP the aggregate cost of the KERP is approximately $400,000. This cost is reasonable given the size and nature of the Debtor's business and the expected value retained by the bankruptcy estate in retaining the Key Employees through the sale and liquidation process.

*iv.  The KERP is Fair and Reasonable*

43. The Key Employees are a select group whose skills and performance are needed for the Debtor to achieve its operational goals. The Debtor and its advisors devised the KERP to encourage these employees to remain with the Debtor during this critical time.

44. In light of the above facts, the implementation of the KERP is a sound exercise of the Debtor's business judgment and should be approved by the Court.

**C.  The KERP is an Exercise of Sound Business Judgment under the *Dana* Factors**

45. The Court should approve the KERP pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code. Based on the factors described in *Dana*, the KERP is an exercise of sound business judgment and is justified by the facts and circumstances of the case.

**D.  Section 503(c)(1) is Not Applicable to the KERP.**

46. The Debtor did not select any insiders to participate in the KERP, and thus section 503(c)(1) is not applicable.

47. Insiders are defined in section 101(31) of the Bankruptcy Code. If the debtor is a corporation, insiders include any director, officer, or person in control of the debtor, or a relative of any such person. 11 U.S.C. § 101(31)(B). Insiders are also persons who directly or indirectly own, control, or hold with the power to vote at least 20% of the voting securities of the debtor-corporation. 11 U.S.C. §§ 101(2) and 101(31)(E).

48. A person's job title generally is not outcome determinative. *In re Borders Grp., Inc.,* 453 B.R. 459, 468-69 (Bankr. S.D.N.Y. 2011) ("An individual's title, by itself, is insufficient to establish that an individual is a director or officer."). Rather, courts look to the totality of the circumstances, including the person's involvement in the debtor's affairs. *Id.* However, once a person is found to be a director or officer of the corporation (such as one who serves on the governing board or was elected or appointed by the board of directors), that person is an insider.

*Office of the U.S. Tr. v. Fieldstone Mortg. Co.*, 2008 U.S. Dist. LEXIS 91479 (D. Md. Nov. 5, 2008); see also Borders Grp., 453 B.R. at 468-470.

49. The lack of a title does not preclude a person from being an insider. Employees who have sufficient authority to make company-wide or strategic decisions, or to dictate corporate policy and the disposition of assets, may be insiders even if they lack an officer or director title. *See In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 150 (Bankr. E.D.N.Y. 2012).

50. Here, none of the Key Employees is an insider. No Key Employee has been appointed or elected by the board of directors, nor does any serve on the board. None of the Key Employees has the authority to make company-wide or strategic decisions. Nor can any Key Employee take significant actions with respect to corporate policies or dispose of significant assets without approval from a senior manager.

## WAIVER OF BANKRUPTCY RULE 6004

51. The Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004 and that the Debtor has established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004, which is necessary to implement the relief requested in this Motion.

## NOTICE

52. The Debtor will provide notice of this Motion to (a) the Office of the United States Trustee for the District of Nebraska; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the Debtor's prepetition secured lenders, BMO Bank N.A., Farm Credit Services of America, PCA, Farm Credit Mid-America, PCA, and CoBank, FCB; (d) the United States Attorney's Office for the District of Nebraska; (e) the Internal Revenue Service; (f) all parties who have expressed an interest to Ascendant Consulting Partners, LLC in some or all of the assets; (g)

counsel to any official committee of unsecured creditors appointed in this chapter 11 case (upon appointment); (h) the Nebraska Department of Revenue; (i) the Alabama Department of Revenue; (j) the Georgia Department of Revenue; (k) the Iowa Department of Revenue; (l) the Kansas Department of Revenue; (m) the Louisiana Department of Revenue; (n) the Minnesota Department of Revenue; (o) the Missouri Department of Revenue; (p) the Ohio Department of Revenue/Department of Taxation; (q) the Oklahoma Department of Revenue; (r) the Tennessee Department of Revenue; (s) the Texas Department of Revenue; (t) the Wisconsin Department of Revenue; (u) the City of Kansas City, Missouri – Revenue Division; (v) the City of Toledo Income Tax; (w) Unified Government Treasury of Wyandotte County, Kansas; (x) Treasurer of Lucas County, Ohio; (y) Jackson County, Missouri Collector; (z) St. Louis County, Minnesota Auditor; (aa) Treasurer of Douglas County, Wisconsin; (bb) Treasurer of Saline County, Kansas; (cc) Treasurer of Harris County, Texas; (dd) Treasurer of Woodbury County; (ee) Treasurer of Douglas County, Nebraska; and (ff) all parties on the Rule 2002 Notice list.

53.    Contemporaneously herewith, the Debtor filed a Motion for Shortened Notice to this Motion pursuant to Local Rule 9006-1, seeking for this Court to shorten the resistance deadline to not more than seven (7) days because the Debtor fears that without a KERP/KEIP program, employees will leave quickly.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an Order providing the relief set forth herein and such other, further and different relief as the Court deems just and equitable.

DATED this 17th day of November, 2025.

        HANSEN-MUELLER CO., Debtor,

By: */s/ Brian J. Koenig*
    Brian J. Koenig, #23807
    Donald L. Swanson, #16385
    Trevor J Lee, #27063
    KOLEY JESSEN P.C., L.L.O.
    1125 South 103rd Street, Suite 800
    Omaha, NE 68124
    (402) 390-9500
    (402) 390-9005 (fax)
    Brian.Koenig@koleyjessen.com
    Don.Swanson@koleyjessen.com
    Trevor.Lee@koleyjessen.com