| | |
|---|---|
| In re: | Case No. 25-81226-TLS |
| HANSEN-MUELLER CO.,[1] | Chapter 11 |
| Debtor. | |

**DEBTOR'S BRIEF IN SUPPORT OF ITS OMNIBUS OBJECTION TO CERTAIN
CLAIMS FILED PURSUANT TO 11 U.S.C. § 557 PROCEDURES**

Hansen-Mueller Co., as debtor and debtor-in-possession (the "Debtor") in the above-referenced chapter 11 case, by and through undersigned counsel, respectfully submits the following Brief in support of *Debtor's Omnibus Objection to Certain Claims filed Pursuant to 11 U.S.C. § 557 Procedures* (Doc. 430) (the "Objection") and states as follows:

**INTRODUCTION**

The Objection should be sustained in its entirety because every one of the Objected Claims[2] fails as a matter of law. The claimants—regardless of how they style their claims—cannot establish the ownership interests, perfected security interests, or priority rights they assert. In its Objection, the Debtor requests the Court resolve the Objected Claims by applying straightforward legal principles to undisputed facts.

Most significantly, 41 of the Objected Claims identified on Exhibit B to the Objection (the "Exhibit B Claims") assert ownership interests in grain that was sold to the Debtor—not stored with the Debtor. *See* Doc. 430, Ex. B. These claimants marked boxes on the Grain Claim Form indicating "Grain stored with Debtor" or "Holders of warehouse receipts," yet their own attached

---

[1] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is: Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

[2] Capitalized terms not defined herein have the meaning ascribed to them in the Objection.

purchase contracts and settlement sheets demonstrate just the opposite: they sold their grain to Debtor and transferred title to Debtor. A seller of grain to a grain elevator cannot later claim to own that same grain when the elevator files for bankruptcy. Where title passed at the time of sale, no bailment relationship exists, no warehouse receipts exist, and no ownership interest remains with the seller. These 41 claims should be disallowed for this reason alone.

The 19 claims identified on Exhibit D of the Objection asserting interests under Texas Property Code Chapter 70, Subchapter E (the "Exhibit D Claims") fare no better. *See* Doc. 430, Ex. D. These claimants seek "super priority" status under Texas law, but they universally failed to perfect their interests by filing a UCC-1 Financing Statement in Nebraska—the state where the Debtor is incorporated and where Article 9 of the Uniform Commercial Code mandates filing for perfection. Of the 19 claims, 15 claimants filed no UCC-1 at all (*i.e.*, failed to file in either Nebraska or Texas), and two claimants filed in Texas but outside the 90-day grace period. *See* Texas Property Code § 70.4045 (granting agricultural producers a 90-day grace period to file a UCC-1 Financing Statement to perfect). The remaining two claimants filed timely in Texas, but not in Nebraska. Under both Texas and Nebraska law, the location of the debtor governs perfection of security interests in inventory. *See* Texas UCC § 9.301(1); Neb. UCC § 9-301(1). When Debtor took possession of the grain, the grain ceased to be "farm products" and became inventory as a matter of law. *See* Neb. UCC § 9-102(34); Texas UCC § 9.102(34). Thus, these claimants were required to file financing statements in Nebraska to perfect, and none did so. Their unperfected interests are subordinate to prior perfected security interests and subject to avoidance under 11 U.S.C. § 544.

Nine of these 19 claimants also make claims based upon security interests the claimants created in favor of their lenders, who did not file claims pursuant to the 557 Procedures (the

"Exhibit G Claims"). *See* Objection, Ex. G. These claimants lack standing to assert the purported rights of their third-party lenders who could have asserted those rights themselves. However, even if claimants had standing, those claims fail because Debtor is a buyer in the ordinary course of business who took free of the purported security interest of claimants' lenders because the lenders failed to provide direct notice to Debtor of such security interest as required by the Food Security Act of 1985 ("FSA").

The claims identified on Exhibit E to the Objection seeking priority under 11 U.S.C. § 507(a)(6) (the "Exhibit E Claims") fail too because Congress intended Section 507 to protect only farmers who store grain, not farmers who sell grain. *See* Doc. 430, Ex. E. Congress enacted Sections 557 and 507(a)(6) to protect farmers who store grain in a bailment relationship with a grain storage facility—not farmers who sell grain outright. Legislative history confirms that these provisions were designed to address the "farming crisis of the 1980's" and protect "farmers as bailors." *In re Mickelson*, 205 B.R. 190, 194 (D. N.D. 1996). As Representative Glickman explained on the House floor, "the priority provided under the bill extends only to farmers as bailors. That basically means that they had grain stored at the elevator and nothing more." *Id*. at 194-95. The Exhibit E Claimants sold grain to Debtor; they did not deposit it for storage. Because they cannot claim to have retained title to the grain, they fail to qualify for § 507(a)(6) priority. *See id*. at 195. Moreover, the Louisiana Department of Agriculture and Forestry's claim (Claim No. 365) fails for an additional, independent reason: as a subrogee, it is barred from claiming priority status under § 507(d). *See* 11 U.S.C. § 507(d) (stating that "[a]n entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection . . . (a)(6) . . . of this section is not subrogated to the right of the holder of such claim to priority under such subsection.")

The reclamation claims under 11 U.S.C. § 546 identified on Exhibit F to the Objection (the

"Exhibit F Claims") also fail because none of the claimants made timely written demands for reclamation within ten days of delivery as required by 11 U.S.C. § 546(d). *See* Doc. 430, Ex. F. Two claimants – Elliot AGCO (Claim No. 332) and Kyle Miller (Claim No. 342) – attached written demands, but those demands came 39 and 43 days after delivery, respectively. Doc. 332 at 4, 59-62; Doc. 342 at 4, 70-73. The remaining reclamation claimants attached no written demand at all. The ten-day requirement is mandatory, and claims based on untimely demands must be disallowed. *See In re Dynamic Techs. Corp.*, 106 B.R. 994, 1003-04 (Bankr. D. Minn. 1989).

The Objected Claims also suffer from fundamental procedural defects. Multiple claims identified on Exhibit N to the Objection (the "Exhibit N Claims") were filed after the February 2, 2026, Grain Claim Bar Date established by the 557 Procedures Order—and that Order expressly provides that late-filed claims "shall result in expungement and disallowance . . . without further order of the Court." *See* Doc. 430, Ex. N; Doc. 260. Several claims identified on Exhibit J, (the "Exhibit J Claims") are outright duplicates that should be disallowed to prevent double recovery. *See* Doc. 430, Ex. J. Still others assert claims for goods that do not constitute "grain" under 11 U.S.C. § 557(b)(1) (the "Exhibit O Claim"), or are filed by claimants who do not qualify as "producers" under § 557(b)(3) (the "Exhibit I Claims"). *See* Doc. 430, Exs. I, O.

Finally, numerous claims (the "Exhibit M Claims") improperly attempt to invoke the laws of other jurisdictions—including Texas and North Dakota's "super priority" statutes—in an effort to leapfrog Debtor's perfected secured creditors. *See* Doc. 430, Ex. M. But each claimant contracted with Debtor in a "purchase contract" that provides that Nebraska law governs if the National Grain and Feed Association ("NGFA") trade and arbitration rules are found unenforceable, which the Court has discretion to find under these circumstances. *E.g.*, Doc. 348 at 19. Even setting aside that contractual choice, Nebraska's choice-of-law rules mandate that the

4

law of the debtor's location governs perfection, effect of perfection, and priority. *See* Neb. UCC § 9-301(1). The Debtor is incorporated in Nebraska. Doc. 3 at ¶¶ 7-8. Nebraska law does not provide for the "super priority" these claimants seek. Accordingly, their claims for priority based on non-Nebraska law should be denied.

In sum, the Objected Claims fail on multiple, independent grounds. The Court can resolve the vast majority of these claims by applying clear legal principles to undisputed facts: sellers of grain do not own the grain they sold; unperfected security interests are subordinate to perfected interests and avoidable under Section 544; untimely reclamation demands are ineffective; late-filed claims are barred; and non-Nebraska law does not govern perfection and priority when the debtor is incorporated in Nebraska. For these reasons and those set forth more fully below, the Objected Claims should be disallowed.

**BACKGROUND**

The Debtor filed its voluntary petition under chapter 11 of the United States Bankruptcy Code on November 17, 2025 (the "Petition Date"). Since the Petition Date, the Debtor has remained in possession of its assets and has operated its business and managed its financial affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. On or about December 5, 2025, certain of the claimants from Texas (the "Texas Claimants") filed an *Amended Emergency Motion of Texas Producers Under 11 U.S.C. § 557 for Determination of Rights in Grain and Grain Proceeds, and for Segregation and Protection of Procedures*. Doc. 122. Prior to December 22, 2025, the Texas Claimants, Debtor, the Official Unsecured Creditors Committee, BMO Bank N.A., Harco National Insurance Company, and International Fidelity Insurance Company, conferred and agreed to enter into a stipulation establishing certain Section 557 Processes and Procedures that was announced to the Court at the hearing held on December 22, 2025. *See* Doc.

262 at 3. On January 9, 2026, this Court entered the *Stipulation and Agreed Order Establishing Procedures for Determination of Rights, Ownership Interests, Liens, Security Interests, and All Other Interests in and to Grain and Proceeds of Grain Pursuant to 11 U.S.C. § 557 and for Segregation and Protection of Proceeds* (the "557 Procedures Order"). Doc. 262. The 557 Procedures Order established the framework for the filing and adjudication of grain claims in this case.

Pursuant to the 557 Procedures Order, claimants submitted 89 claims for priority in the Grain and Grain Proceeds. On March 3, 2026, in accordance with the 557 Procedures Order, the Debtor filed the Objection to all 89 claims, though it acknowledges that even if granted in its entirety, the Objection will not resolve all claims. Many of the 89 claims filed pursuant to the 557 Procedures Order assert common legal bases for their claimed interest and, accordingly, may be disposed of on the same grounds, as set forth herein.

**ARGUMENT**

I. **DEBTOR OBJECTS TO CLAIMS ASSERTING OWNERSHIP OVER GRAIN WHERE CLAIMANT SOLD GRAIN TO DEBTOR.**

Debtor objects to 41 claims (as set forth on Exhibit B to the Objection) that assert ownership interests in grain that was sold to the Debtor rather than stored or held on consignment by the Debtor. Debtor objects to these claims because the grain at issue in those claims was sold to Debtor, title passed to the Debtor at the time of sale, and no evidence of a bailment relationship or warehouse receipts exist. As demonstrated through the *Declaration of Kary Knapp* (Doc. 429) ("Knapp Declaration"), none of the 41 claims holds a storage claim against the Debtor. Further, most of the 41 claims attach a "Purchase Contract" or settlement sheet(s) that demonstrates that the claimant sold its grain to Debtor.

Each Claim included on Exhibit B asserts a purported ownership interest in grain by

marking the following box(es) on the Grain Claim Form as the basis for its interest: "Grain stored with Debtor," "Holders of warehouse receipts or other documents of title," and/or wrote in the "other" category that Claimant sold grain to the Debtor as the basis for its interest on the Grain Claim Form.  If the Court concludes that Debtor's objection to each of the Exhibit B Claims is valid, the Court may dispose of the Exhibit B Claims in their entirety, with the exception of the Claims asserted by BB Szepanski LP (Claim No. 281)[3], Tyler Narloch (Claim No. 284)[4], Joey Lee Potucek (Claim No. 295)[5], and Old Stage Farms (Claim No. 340)[6], who assert additional bases for their interest on the Grain Claim Form.

The 557 Procedures Order is clear that each Claimant "must include all information and documents requested by the Grain Claim Form to have its claim" determined by the Court and that "[e]ach Producer of Grain or other party that files a Grain Claim Form . . . must include all information and documents requested by the Grain Claim Form to have its claim to the Grain or the proceeds of the Grain ("Grain Proceeds") determined by the Court pursuant to these 557 Processes and Procedures. . . ." and that "[i]f you intend to rely on any documents supporting your claim at the 557 Hearing, you must attach said documents to this form" and "[y]ou may not rely on any documents at the 557 Hearing that are not attached to or referenced in this form."

None of the Exhibit B Claimants holds an ownership interest in the Grain or Grain Proceeds that they purport to assert. *Compare* Doc. 429 at ¶ 3 and Ex A, *with Objection*, Ex B.  All of the Exhibit B Claimants fail to provide any evidence of their purported ownership interest through

---

[3] BB Szepanski LP's claim (Claim No. 281) may be disposed of in its entirety with a favorable ruling on the objection Debtor asserted to those claims on **Exhibit E** of the Objection.

[4] Tyler Narloch's claim (Claim No. 284) may be disposed of in its entirety with a favorable ruling on the objection Debtor asserted to those Claims on **Exhibit M** of the Objection.

[5] Joey Lee Potucek's claim (Claim No. 295) may be disposed of in its entirety with a favorable ruling on the objection Debtor asserted to those claims on **Exhibit C** of the Objection.

[6] Old Stage Farms' claim (Claim No. 340) may be disposed of in its entirety with a favorable ruling on the objection Debtor asserted to those claims on **Exhibit E** of the Objection.

warehouse receipts or other documents evidencing an ownership interest and 39 Claimants provide evidence of just the opposite by attaching, or referencing, a "purchase contract" or settlement sheet(s) to their claims.[7]   Accordingly, the Exhibit B Claimants' ownership claims should be disallowed because they do not own the grain; they sold it to Debtor.

## II.   DEBTOR OBJECTS TO CLAIMS ASSERTING OWNERSHIP OR A PURPORTED SECURITY INTEREST THAT FAIL TO INCLUDE SUFFICIENT SUPPORTING DOCUMENTATION.

Debtor objects to the claims as set forth on Exhibit C to the Objection (the "Exhibit C Claims"), which fail to include sufficient supporting documentation to support claims for ownership of grain or a security interest in grain. These claims assert ownership of grain and/or a purported security interest but fail to attach or reference warehouse receipts, other documents of title, signed or authenticated security agreements, or filed UCC-1 Financing Statements.

If the Court concludes that Debtor's objection to the Exhibit C Claims is valid, the Court may dispose of the following claims in their entirety: (a) Collwest Grain Ltd (Claim No. 296); (b) S & B Grain Co LLC (Claim No. 299); (c) Richardson Farms (Claim No. 300); (d) Jason Bonifas (Claim No. 327); (e) James W Lawrence (Claim No. 330); (f) Bunge Canada, Inc. (Claim No. 360); (g) Keller Grain, Inc. (Claim No. 376); and for an additional and independent reason, all of the Exhibit B Claims in their entirety – with the exception of the Claims asserted by BB Szepanski LP (Claim No. 281)[8], Tyler Narloch (Claim No. 284)[9], and Old Stage Farms (Claim No. 340)[10],

---

[7] Only River Bottom Farms, LLC (Claim No. 305) and Dillon Scott Springer (Claim No. 385) do not attach or reference evidence that directly contradicts their ownership claims; however, they fail to attach sufficient evidence of ownership in the form of warehouse receipts, storage agreement, bailment agreement, or other documents evidencing ownership.

[8] BB Szepanski LP's claim (Claim No. 281) may be disposed of in its entirety with a favorable ruling on the objection Debtor asserted to those claims on **Exhibit E** of the Objection.

[9] Tyler Narloch's claim (Claim No. 284) may be disposed of in its entirety with a favorable ruling on the objection Debtor asserted to those Claims on **Exhibit M** of the Objection.

[10] Old Stage Farms' claim (Claim No. 340) may be disposed of in its entirety with a favorable ruling on the objection Debtor asserted to those claims on **Exhibit E** of the Objection.

who assert additional bases for their interest on the Grain Claim Form.

The 557 Procedures Order is clear that each Claimant "must include all information and documents requested by the Grain Claim Form to have its claim" determined by the Court and that "[e]ach Producer of Grain or other party that files a Grain Claim Form . . . must include all information and documents requested by the Grain Claim Form to have its claim to the Grain or the proceeds of the Grain ("Grain Proceeds") determined by the Court pursuant to these 557 Processes and Procedures. . . ." and that "[i]f you intend to rely on any documents supporting your claim at the 557 Hearing, you must attach said documents to this form" and "[y]ou may not rely on any documents at the 557 Hearing that are not attached to or referenced in this form."

A non-possessory security interest is only enforceable if a ***signed*** or authenticated security agreement that provides a description of the collateral exists. Neb. UCC § 9-203(3)(A); *Mid-Am. Dairymen, Inc. v. Newman Grove Co-op. Creamery Co.,* 191 Neb. 74, 78, 214 N.W.2d 18, 22 (1974). Thus, to claim a security interest in the grain, the claimant must have a ***signed*** or authenticated security agreement describing the collateral. In addition, to perfect a non-possessory security interest, a financing statement must be filed, absent specifically enumerated exceptions, none of which apply here. *See* Neb. UCC § 9-310 (stating "a financing statement must be filed to perfect all security interests…"). Thus, to claim a perfected security interest, a claimant must attach a valid UCC-1 Financing Statement that was filed with the Nebraska Secretary of State.

Each of the Exhibit C Claims fails to attach or reference documents sufficient to support its ownership claims or its purported security interest. The Exhibit C Claims fail to attach or reference warehouse receipts, other documents evidencing ownership, signed or authenticated security agreements, or filed UCC-1 Financing Statements. The Exhibit C Claims should be disallowed because they fail to attach or reference requisite supporting documentation and, thus,

cannot state a claim for ownership or a security interest.

**III.  DEBTOR OBJECTS TO CLAIMS ASSERTING A PURPORTED INTEREST THAT IS UNPERFECTED DUE TO CLAIMANTS' FAILURE TO FILE A UCC-1 FINANCING STATEMENT IN *NEBRASKA*.**

Debtor objects to certain claims (as set forth on Exhibit D to the Objection) asserting an interest by virtue of Texas Property Code Chapter 70, Subchapter E because they are unperfected for failing to file a UCC-1 Financing Statement in Nebraska. There are 19 Exhibit D Claims. Of those, 15 claimants failed to file a UCC-1 Financing Statement in any state and an additional two claimants filed UCC-1 Financing Statements out of time under Texas law. The remaining two claimants filed UCC-1 Financing Statements within the required time period under Texas law, but failed to file in Nebraska.

First and foremost, regardless of whether Nebraska or Texas law applies, the vast majority of the Exhibit D Claims failed to file a UCC-1 Financing Statement timely in either Texas or Nebraska, so those claims are unperfected and/or subordinate to prior perfected security interests. Secondarily and independent of Debtor's first argument, if Texas law applies, which is disputed by Debtor but accepted for purposes of argument, the Exhibit D Claims have unperfected security interests because Claimants failed to file UCC-1 Financing Statements timely in Nebraska, which is where Debtor is incorporated, to perfect their interest in Debtor's inventory. The Debtor, by virtue of the hypothetical lien creditor status granted under 11 U.S.C. § 544, has priority over prior unperfected security interests and, thus, may avoid the security interest claimed by the Exhibit D Claims. Moreover, the Exhibit D Claims, as unperfected secured parties, have an interest that is subordinate to Debtor's perfected secured creditors. Therefore, the Exhibit D Claims should be disallowed.

If the Court concludes that Debtor's objection to the Exhibit D Claims is valid, the Court

may dispose of all of the Exhibit D Claims in their entirety, with the exception of Elliot AGCO (Claim No. 332) and Kyle Miller (Claim No. 342), who assert additional bases for their interest on the Grain Claim Form.[11] The Exhibit D Claims assert a super priority security interest in grain pursuant to Texas Property Code Chapter 70, Subchapter E, and Article 9 of the Texas UCC that requires the claimant to perfect its interest by filing a UCC-1 Financing Statement. *E.g.*, Doc. 348 at 5. In Texas, an agricultural producer who sells grain under a contract to a buyer has an interest[12] in such grain. Texas Property Code § 70.402. The interest attaches on the date physical possession of the grain is delivered from the agricultural producer to the contract purchaser. Texas Property Code § 70.402. The producer then has a 90-day grace period to perfect its security interest by filing a UCC-1 Financing Statement. Texas Property Code § 70.4045. This is similar to the grace period afforded a secured party with a purchase money security interest, who receives a 20-day grace period to file a UCC-1 financing statement that will then relate back. *See* UCC § 9-317(e). Under Texas (and Nebraska) law, agricultural producers, however, must still comply with Article 9 of the UCC's filing and perfection requirements to perfect within the 90-day grace period. Texas Property Code § 70.404(a) ("Except as provided by section 70.4045 of this code, Chapter 9, Business & Commerce Code, ***including applicable filing and perfection requirements***, applies to a lien created under this subchapter.") (emphasis added). "If a financing statement covering the agricultural crop is not filed within the time prescribed….the lien is considered unperfected." Texas Property Code § 70.4045(b).

---

[11] Elliot AGCO's claim (Claim No. 332) and Kyle Miller's claim (Claim No. 342) can be disposed of in their entirety with a favorable ruling on the objection Debtor asserted to those claims on **Exhibit F** of the Objection.

[12] The Texas legislature uses the term "lien" in Texas Property Code Subchapter 70, Subchapter E, to refer to the property interest granted to an agriculture producer, however, the purported "lien" is actually a security interest under the Uniform Commercial Code adopted by both Texas and Nebraska. *See* Neb. UCC § 1-201(b)(35); Texas Business & Commerce Code § 1.201(b)(35). For the sake of clarity and consistency, Debtor will refer to the "lien" as an interest or under its UCC definition as a security interest.

**A.      The majority of the Exhibit D Claims are unperfected because they failed to file a UCC-1 Financing Statement.**

First and foremost, the majority of the Exhibit D Claims are unperfected because claimants failed to file a UCC-1 Financing Statement in either Texas or Nebraska within the 90-day grace period. For those 17 claimants (of which 15 claimants failed to file a UCC-1 Financing Statement at all and 2 claimants filed outside of the 90-day grace period) the Court need not determine whether the claimants must file in Texas or Nebraska for the UCC-1 Financing Statement to be valid because they filed in neither state, leaving for the Court to determine only the appropriate filing state for the claims of J&K Ag, LLC (Claim No. 350) and AKA Farms (Claim No. 355).

Under Texas (and Nebraska) law, agricultural producers must comply with Article 9 of the UCC's filing and perfection requirements to perfect within the 90-day grace period. *See* Texas Property Code § 70.404(a) ("Except as provided by section 70.4045 of this code, Chapter 9, Business & Commerce Code, ***including applicable filing and perfection requirements***, applies to a lien created under this subchapter.") (emphasis added). "If a financing statement covering the agricultural crop is not filed within the time prescribed….the lien is considered unperfected." Texas Property Code § 70.4045(b).

Here, all of the Exhibit D Claims failed to timely file a UCC-1 Financing Statement, except for J&K Ag, LLC (Claim No. 350) and AKA Farms (Claim No. 355). For 15 of the Exhibit D Claims, the claimants failed to file a UCC-1 Financing Statement at all. Thus, those claims are unperfected. As set forth in more detail below, those claims may be avoided under 11 U.S.C. § 544(a). For two of the Exhibit D Claims, Mikel Brothers (Claim No. 333) and Dustin Mikel (Claim No. 348), the claimants filed a UCC-1 Financing Statement in Texas, but filed outside the 90-day grace period. More specifically, the Mikel Brothers asserts that it last delivered grain to Debtor on July 31, 2025, so it had until October 29, 2025, to file a UCC-1 Financing Statement to perfect.

*See* Doc. 333 at 4. The Mikel Brothers filed a UCC-1 Financing Statement in Texas on November 13, 2025. Doc. 333 at 20. Dustin Mikel asserts that he last delivered grain to the Debtor on July 28, 2025, so he had until October 27, 2025, to file a UCC-1 Financing Statement to perfect. *See* Doc. 348 at 4. Dustin Mikel filed a UCC-1 Financing Statement in Texas on November 13, 2025, as well. Thus, the Mikel Brothers and Dustin Mikel's purported security interests were unperfected from October 29th and 27th until November 13th respectively. By filing outside the applicable 90-day grace period, the Mikel Brothers and Dustin Mikel lost out on the super priority afforded to them under Texas Property Code § 70.4045. *See* Texas Property Code § 70.4045(b) ("If a financing statement covering the agricultural crop is not filed within the time prescribed….the lien is considered unperfected."); Texas Property Code § 70.404(a) (stating, "Except as provided by Section 70.4045 of this code, Chapter 9, Business & Commerce Code, including applicable filing and perfection requirements, applies to a lien created under this subchapter."). Accordingly, even if the Mikel Brothers and Dustin Mikel have a perfected security interest, it is subordinate to security interests perfected prior to November 13, 2025. *See* Texas UCC § 9.322(a)(1); Neb. UCC § 9-322(a)(1).

The claimants assert that by filing a notice with the Court they have perfected their purported security interest in the grain. *E.g.* Doc. 342 at 6 (stating, "the Claimant timely filed a Notice of Perfection of Agricultural Lien [Dkt #119] on December 5, 2025 pursuant to 11 U.S.C. § 546(b)(1)(A) to preserve and continue perfection of its lien"). Not so, however, because the filing of a notice of perfection did not operate to perfect claimants' purported security interest because the Exhibit D Claims were not subject to the automatic stay and claimants were allowed to file UCC-1 financing statements during the 90-day grace period to perfect.

The Exhibit D Claims are subject to an exception to the automatic stay that would allow them to file a UCC-1 financing statement in Nebraska to attempt to perfect their security interest after the Petition Date. *See* 11 U.S.C. § 362(b)(3) (providing the automatic stay does not apply to "any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title"). 11 U.S.C. § 546(b) provides that:

> The rights and powers of a trustee under section[] 544 … of this title are subject to any generally applicable law that…permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.

The purpose of 11 U.S.C. § 546(b) "is to protect, in spite of the surprise intervention of a bankruptcy petition, those whom state law protects by allowing them to perfect their liens or interests as of an effective date that is earlier than the date of perfection." *In re Polo Club Apartments Assocs. Ltd. P'ship*, 150 B.R. 840, 853 (Bankr. N.D. Ga. 1993). Courts have interpreted 11 U.S.C. § 362(b)(3) and 11 U.S.C. § 546(b) as applying to UCC § 9–317(e), "which permits a purchase money security interest to have priority over a lien that arises prior to perfection of the purchase money security interest, provided perfection occurs within 20 days of the date the debtor took possession of the collateral." *In re Lockridge*, 303 B.R. 449, 456-457 (Bankr. D. Ariz. 2003); *In re Roser*, 613 F.3d 1240, 1248 (10th Cir. 2010).

In *In re Lockridge*, the court addressed UCC § 9–317(e)'s 20-day perfection grace period where the debtor took possession of the collateral on July 25, the debtor filed for bankruptcy on August 12, and the secured party recorded its interest on August 19. 303 B.R at 456-457. The debtor filed for bankruptcy during the 20-day grace period for perfection, so 11 U.S.C. § 362(b)(3) would have allowed the secured party to perfect its lien. *Id*. at 457. However, the secured party recorded on the 25th day after the debtor took possession of the collateral, outside the 20-day grace period allowed by UCC § 9-317(e). *Id*. The court concluded that while the secured party was

14

excepted from the automatic stay to perfect during the 20-day grace period allowed for by statute, upon the expiration of that grace period, the automatic stay applied. *Id.* Therefore, the recording of the secured party's interest on the 25th day, outside the 20-day grace period, was void, not merely voidable. *Id*.

Here, similar to UCC § 9-317(e)'s 20-day grace period to file a UCC-1 financing statement to perfect and have priority over prior perfected parties and lienholders, the Texas Property Code allows agricultural producers a 90-day grace period to perfect their security interests and have superior rights to prior perfected parties and lienholders. *See* Texas Property Code § 70.4045. As in *In re Lockridge*, the Debtor took possession of the Grain prior to the date of filing for bankruptcy on November 17, 2025; in many cases, Debtor took possession long before the date of filing. Doc. 1; *E.g.* 333 at 4. As of March 2, 2026, no Exhibit D Claimant has filed a UCC-1 financing statement in Nebraska. Doc. 429 at ¶ 3. While Exhibit D Claimants would have been able to file a valid UCC-1 financing statement in Nebraska to perfect their security interests during the 90-day grace period, as applicable to each Exhibit D Claim, without violating the automatic stay, Exhibit D Claimants can no longer do so because the 90-day grace period has expired and any filing now will violate the automatic stay. Thus, the Exhibit D Claims, who claim to be perfected by virtue of filing a notice with the Bankruptcy Court, are unperfected and can no longer be perfected.

For those 17 claimants (of which 15 failed to file a UCC-1 Financing Statement at all and two filed outside of the 90-day grace period), the Court need not determine whether they must file in Texas or Nebraska for a UCC-1 Financing Statement to be valid. For the 15 claimants that failed to file a UCC-1 Financing Statement, the filing of a notice with the Bankruptcy Court did not perfect those claimants' purported security interests. For the two claimants who filed outside the 90-day grace period, to the extent Texas law applies, which is disputed and assumed only

*arguendo*, they are subordinate to any party's claim who perfected before November 13, 2025, and those claims may be avoided under 11 U.S.C. §§ 544 and 547. Therefore, the Court need only consider the Debtor's second argument below regarding the location that the financing statement must be filed, to resolve Debtor's objection to two of the Exhibit D Claims, although it applies to all of the Exhibit D Claims equally.

### B. Under Texas law, the UCC-1 Financing Statements must be filed in Nebraska to perfect.

Secondarily, and independent of Debtor's first argument above, under Texas (and Nebraska) law, claimants must file a financing statement in Nebraska to perfect their purported interests. However, none of the Exhibit D Claims have filed a UCC-1 Financing Statement in Nebraska, so all of the Exhibit D Claims are unperfected.

Revised Article 9 of the UCC was adopted by all states in 2001, including Texas. *In re Glob. One Media, Inc.*, 667 B.R. 878, 881 (B.A.P. 9th Cir. 2025). The purpose of the 2001 revision to the UCC was to shift "the focus for filing purposes from 'location of goods' as the controlling factor to 'location of the debtor.'" *Id*. at 881-882 (citing 8 Quinn's UCC Commentary & Law Digest § 9-307[A][3] [REV] (Rev. 2d ed.)). One of the reasons for the change was it created more certainty and fewer changes to the governing law where goods were moved from one state to another after a UCC-1 financing statement is properly filed. *See id*. (citing UCC § 9-301 cmt. 4 ("Presumably, debtors change their own location less frequently than they change the location of their collateral.")).

Under Title 1 of the Texas Business and Commerce Code ("Texas UCC"), the law of the state that governs perfection is the law of the state where the debtor is located. Texas UCC § 9.301(1). A debtor, who is a registered organization, is located in its state of organization. *See* Texas UCC § 9.307(e) (stating "[a] registered organization that is organized under the law of a

state is located in that state."). Under Nebraska law, a UCC-1 Financing Statement must be filed with the office of the Nebraska Secretary of State. *See* Neb. UCC § 9-501(a)(2) (stating "if the local law of this state governs perfection of a security interest or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is:…(2) the office in the Secretary of State…").

Here, the Debtor is formed and organized under the law of Nebraska, so it is located in the state of Nebraska. Doc. 3 at ¶ 7-8; *See* Texas UCC § 9.102(a)(71) ("'Registered organization' means an organization formed or organized solely under the law of a single state… by the filing of a public organic record with … the state."). Therefore, the law of Nebraska governs perfection, so the Exhibit D Claims must file a financing statement in Nebraska to perfect their purported interests.

1.      *A UCC-1 Financing Statement filed in Texas does not perfect the purported interest asserted in the Exhibit D Claims.*

The Exhibit D Claimants assert that Texas law applies to perfection. *E.g.* Doc. 333 at 6. They argue that UCC § 9-302 applies, which provides that "[w]hile ***farm products*** are located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of an ***agricultural lien on the farm products***." Neb. UCC § 9-302; Texas UCC § 9.302. Debtor anticipates that the Exhibit D Claimants will argue that UCC § 9-302 applies and under either Nebraska or Texas law, the state in which the claimants needed to file UCC-1 Financing Statements was Texas. *See* Texas UCC § 9.501(2).  However, this argument is misguided. Under UCC § 9-102 as soon as a farm product is sold to an elevator, such as Debtor, it is converted to inventory under the UCC. *See* NEB. UCC § 9-102(34) *and* Texas UCC § 9.102(34) (both defining "farm products" as "goods . . . with respect to which the debtor is engaged in a farming operation"); NEB. UCC. § 9-102(34), cmt. 4(a) *and* Texas UCC § 9.102(34), cmt. 4(a) (both

providing: "Crops, livestock, and their products cease to be "farm products" when the debtor ceases to be engaged in farming operations with respect to them. If, for example, they come into the possession of a marketing agency for sale or distribution or of a manufacturer or processor as raw materials, they become inventory.").

UCC § 9-302 applies to farm products and an agricultural lien on farm products. *See* Neb. UCC § 9-302; Texas UCC § 9.302. Where farm products are sold to an elevator they are converted to inventory under the UCC. *First Bank of N. Dakota (N.A.)-Jamestown v. Pillsbury Co.*, 801 F.2d 1036, 1038 (8th Cir. 1986) ("the farm products grown here were converted to inventory when they were sold to the elevator and intermingled with other grain."); *First State Bank v. Producers Livestock Marketing Ass'n Non-stock Co-op*, 200 Neb. 12, 16-17, 261 N.W.2d 854, 858 (1978) (providing that where there was no evidence to indicate that cattle that were sold had any connection with a farmer's farming and ranching operation, the "cattle were inventory as a matter of law"); *see also United States v. Progressive Farmers Marketing Agency*, 788 F.2d 1327, 1329 (8th Cir. 1986) (quoting IOWA CODE § 554.1209, cmt. 4) ("When crops or livestock or their products come into the possession of a person not engaged in farming operations they cease to be 'farm products.' If they come into the possession of a marketing agency for sale or distribution or of a manufacturer or processor as raw materials, they become inventory.").

Here, when Debtor took possession of the grain from the Exhibit D Claimants, which is also the time their purported security interest attached, the grain was inventory. *See Id*; Texas Property Code § 70.403 ("[a] lien created under this subchapter attaches on the date on which physical possession of the agricultural crop is delivered[.]"). Thus, UCC § 9-302 does not apply because the grain is inventory, not farm products or an agricultural lien on farm products. Instead, the general rule as provided in UCC § 9-301 applies, so the location of the Debtor governs

perfection, and thus, the claimants must file a UCC-1 financing statement in Nebraska to perfect their purported interests.

**C.** **The Exhibit D Claims are unperfected security interests that are subordinate to prior perfected security interests and subject to avoidance under Section 544.**

The Exhibit D Claims are unperfected security interests by virtue of the claimants' failure to file a UCC-1 financing statement in Nebraska. The Debtor may avoid the purported security interests of the claimants in accordance with the powers under 11 U.S.C. § 544(a) as a hypothetical lien creditor. In any event, the Exhibit D Claims are subordinate to any prior perfected security interests.

Under Texas Property Code § 70.404(a), the Claimants have 90 days to perfect their security interests by filing a valid UCC-1 financing statement. "If a financing statement covering the agricultural crop is not filed within the time prescribed….the lien is considered unperfected." Texas Property Code § 70.4045(b). The Debtor has the power to avoid any transfer of property or any obligation of the debtor that is voidable by a lien creditor. 11 U.S.C. § 544(a); *In re Roser*, 613 F.3d 1240, 1243 (10th Cir. 2010) ("The Bankruptcy Code gives the bankruptcy trustee the rights and powers of a hypothetical person who acquired a judicial lien on the debtor's property at the time that the bankruptcy petition was filed."); *see* Neb. UCC § 9-102(a)(52)(C) (stating lien creditor "means a trustee in bankruptcy from the date of the filing of the petition"). Thus, by law, the Debtor is granted status as a hypothetical lien creditor. Under either Texas or Nebraska law, a lien creditor has priority over an unperfected security interest. Neb. UCC § 9-317(a)(2) ("A security interest or agricultural lien is subordinate to the rights of:…a person that becomes a lien creditor before the earlier of the time: (A) the security interest or agricultural lien is perfected; or (B) one of the conditions specified in Section 9-203(b)(3) is met and a financing statement

19

covering the collateral is filed."); Texas UCC § 9.317(a)(2) (same).

As of March 2, 2026, none of the Exhibit D Claimants filed a financing statement in Nebraska. Doc. 429 at ¶ 3. All of the Exhibit D Claims assert the last date of its grain delivery occurred prior to the filing of the bankruptcy petition by Debtor on November 17, 2025. Doc. 1. The 90-day grace period for filing UCC-1 Financing Statements has expired because more than 90 days have elapsed since the Petition Date. Accordingly, all of the Exhibit D Claims are unperfected and cannot be perfected. Accordingly, the Exhibit D Claims should be disallowed.

Alternatively, Debtor's objection to 15 of the Exhibit D Claims may be resolved on the same basis, even if Texas is the appropriate filing state for UCC-1 Financing Statements, because the claimants failed to file a UCC-1 Financing Statement at all within the 90-day grace period.

## IV. DEBTOR OBJECTS TO CLAIMS ASSERTING PRIORITY STATUS UNDER § 507(A)(6) BECAUSE IT DOES NOT APPLY TO CLAIMANTS WHO *SOLD* GRAIN TO THE DEBTOR.

Debtor objects to the claims as set forth on Exhibit E to the Objection, asserting priority status under 11 U.S.C. § 507(a)(6). The Exhibit E Claims are not entitled to priority status under 11 U.S.C. § 507(a)(6) because none of them provide any supporting documents to assert an ownership interest or security interest in the Grain or Grain Proceeds, making their claims inappropriate under 11 U.S.C. § 557, as Section 557 is intended to establish an expedited determination of ownership interests in grain (*e.g.*, storage claims or claims asserting lien or security interest in grain). In addition, and secondarily, Section 507(a)(6) does not apply to grain sold by the claimant to the Debtor because Section 507(a)(6) claims were intended by Congress to be similarly limited to claims asserting an ownership or security interest in grain or grain proceeds and were not intended to create an unsecured claim priority solely under Section 507(a)(6) for grain sold to the Debtor. Finally, with respect to the Louisiana Department of Agriculture and Forestry's claim (Claim No. 365), it cannot qualify for priority status under Section 507(a)(6) as

20

it is a subrogee and 11 U.S.C. § 507(d) disallows claims of a subrogee asserting priority under Section 507(a)(6).

If the Court concludes that Debtor's objection to the Exhibit E Claims is valid, the Court may dispose of the Exhibit E Claims in their entirety, with the exception of the claims of BB Sczepanski LP (Claim No. 281) and Old Stage Farms (Claim No. 340). However, if the Court concludes that Debtor's objection to the Exhibit B Claims and Exhibit E Claims is valid, it may dispose of the claims of BB Sczepanski LP (Claim No. 281) and Old Stage Farms (Claim No. 340) in their entirety as well.

     1.     *11 U.S.C. § 557 procedures are intended to determine ownership of grain on an expedited basis.*

Both 11 U.S.C. § 557 and 11 U.S.C. § 507(a)(6)[13] are products of the 1984 Amendments to the Bankruptcy Code. *In re Esbon Grain Co., Inc.*, 55 B.R. 308, 309 (Bankr. D. Kan. 1985); *In re Mickelson*, 205 B.R. 190, 193 (D.N.D. 1996). "Sections 507(a)(5)(A)[, renumbered as subsection (a)(6)(A) in 2005,] and 557 were both enacted in response to the farming crisis of the 1980s." *In re Mickelson*, 205 B.R. at 193 (internal citations omitted). The 1984 Amendments were intended as amelioratory changes to solve a specific problem arising when a grain storage facility files for bankruptcy. *In re Esbon Grain Co., Inc.*, 55 B.R. at 310. Often grain storage facilities hold grain for a producer as "open storage" or under a bailment agreement where grain is comingled with other producers' grain and grain owned by the storage facility where the purchase price has yet to be paid. When the storage facility files for bankruptcy, the grain depositor is denied his right to withdraw his grain from the storage facility in kind because the entire amount of grain in storage is deemed "property of the estate." *Id*. Consequently, bailed grain risks being used to

---

[13] The current language in 11 U.S.C. § 507(a)(6) was originally numbered as subsection (a)(5) when it was added to 11 U.S.C. § 507 by the Bankruptcy Amendments and Federal Judgeship Act of 1984 and subsequently renumbered by Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

satisfy the claims of secured creditors and used to pay the administrative expenses of the bankruptcy estate. *See id*. at 313; *In re Mickelson*, 205 B.R. at 309.

The court in *In re Mickelson,* in interpreting "the legislative history surrounding the 1983 and 1984 farm elevator bankruptcy amendments reveals Congressional intent to limit the application of those amendments to bailor/bailee relationships." 205 B.R. at 193. The Senate's legislative history identifies the following problems that the 1984 Amendments would solve, in pertinent part:

> (3) *the requirements of present law which mandate that owners of crop assets held by the debtor solely on the basis of his status as a bailee must share grain assets held by the trustee in bankruptcy on a pro rata basis with any creditor holding a security interest in assets of a similar type which are owned by the debtor, such that the bailors of such storage contract crop assets have the value of their property diminished for the benefit of such creditors when there is a shortage of produce on hand;…*
>
> (5) *the reluctance of some courts to accept warehouse receipts and scale tickets, the principle [sic] documents used in warehouse business to establish record of ownership of crop assets stored in warehouse facilities on bailment contracts, as evidence of ownership in bankruptcy abandonment proceedings;*

*In re Esbon Grain Co., Inc.*, 55 B.R. at 313 (internal citations omitted) (emphasis added in original). The testimony before the Senate legislative history further states that the 1984 Amendments would accomplish the following to alleviate the above-described problems:

> (2) *The bill would require the court to distribute grain assets or the proceeds of such assets first to producers who have merely stored their grain in such a facility upon a contract of bailment;…*
>
> (6) *The bill contains measures requiring the bankruptcy court to accept valid warehouse receipts and scale tickets as proof of ownership of crop assets possessed by the debtor upon contracts of bailment where they were issued for that purpose;…*

*Id*. at 313-314 (internal citations omitted) (emphasis added in original). The Court in *In re Mickelson*, stated that:

Congressional statements regarding the 1984 amendments further support and demonstrate that Congress was concerned only with bailor/bailee relationships in the context of §§ 557(b) and 507(a)(5)(A)[, renumbered as subsection (a)(6)(A) in 2005]. As Representative Glickman explained on the House floor:

> Why should we give special considerations to farmers over other creditors in grain elevator bankruptcies? In response, I would point out a number of factors which put farmers in a unique situation vis-a-vis their elevators in these cases:
>
> …
>
> No. 4, the priority provided under the bill extends *only to farmers as bailors*. That basically means that they had grain stored at the elevator and nothing more.

Representative Emerson's statements regarding §§ 557(b) and 507(a)(5)(A)[, renumbered as subsection (a)(6)(A) in 2005,] similarly demonstrated concerns for farmers as bailors:

> The transaction between a farmer and the warehouseman is ordinarily a bailment. The farmer delivers his grain to the warehouse under a contract of *bailment* [.] Under this contract, the warehouseman, bailee, agrees to redeliver the bailed property to the farmer, bailor, on demand and in the same condition in which it was originally received....
>
> At this point, an important distinction must be observed. The simple bailment situation is to be contrasted with the delayed-pricing contract. *In the bailment, as I have said, title to the grain does not pass to the warehouseman*. This is to be contrasted with the situation in the delay-pricing contract, where there is an actual sale in which title passes from the farmer to the warehouseman. So, the distinction is that under the bailment, title of the grain remains with the farmer....

205 B.R. at 194-195 (internal citations omitted) (emphasis added in original). The court in *In Re Mickelson* reasoned that "the legislative history surrounding the 1983 and 1984 farm elevator bankruptcy amendments reveals Congressional intent to limit the application of those amendments to bailor/bailee relationships." 205 B.R. at 193. The court "concluded that § 557 addresses those situations where producers have deposited grain in a grain storage facility for storage and/or resale, but where title always remains with the producer." *Id.* at 195.

> 2.      *Section 507(a)(6) does not apply to grain owned by the Debtor.*

In light of the clear congressional intent to limit the application of the 1984 amendments to bailor/bailee relationships, the court in *In re Mickelson*, found that where claimants could not

show that they retained title to grain, their claims were properly denied priority status under 11 U.S.C. § 507(a)(6). *In re Mickelson*, 205 B.R. at 195 ("Since Johnson cannot claim to have retained title to the grain, he was properly denied § 507(a)(5)(A) priority status….Haman cannot claim to have retained title to the grain he sold to Debtor. Accordingly, Pete Haman also fails to qualify as § 507 priority claimant.").

Here, all of the Exhibit E Claims are for grain that was sold by the Claimant to Debtor. *See* Doc. 429 at ¶ 3. In addition, each of the Exhibit E Claims attaches or references purchase contracts with Debtor, which directly contradicts Claimants' assertion of ownership. Because none of the Exhibit E Claimants retained title to the grain sold to Debtor, they each fail to qualify as a § 507 priority claimant.

3.      *The Louisiana Department of Agriculture and Forestry's claim as subrogee for claimants in Louisiana is barred because a subrogee cannot qualify for priority status under § 507(a)(6).*

The claim filed by Louisiana Department of Agriculture and Forestry (the "LA Ag Department") (Claim No. 365) fails to qualify for priority status for the additional and independent reason that it is a subrogee to the claims of multiple Louisiana based claimants. Even if the original claim holder would have been entitled to priority status under § 507, a subrogee is not subrogated to a claim holder's priority status. *See In re Chateaugay Corp.,* 89 F.3d 942, 954 (2d Cir. 1996) ("we affirm the district court's conclusion that § 507(d) prevents Aetna from claiming excise tax priority as a subrogee.").

Under Louisiana state law, an indemnity fund is created for grain claimants where they sell grain to a grain dealer and are not fully compensated for such sale due to the insolvency of a grain dealer. La. R.S. § 3:3412.1(A), (F). In exchange for accepting payments from the indemnity fund, the grain claimant agrees to subrogate its claim against the warehouseman to the state and thereby

subrogate its interest in a cause of action against all parties. La. R.S. § 3:3412.1(L) ("As a condition of payment of a claim from the Grain and Cotton Indemnity Fund, the claimant shall subrogate its interest, if any, to the commission in a cause of action against all parties, to the amount of the loss that the claimant was reimbursed by the fund."). Under 11 U.S.C. § 507(d), "[a]n entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection…(a)(6)… of this section is not subrogated to the right of the holder of such claim to priority under such subsection."

Here, the LA Ag Department fails to attach or reference documents showing that it made payment to the claimants from the grain indemnity fund such that it has standing to assert the rights of the claimants identified in Claim No. 365 as subrogee. Even assuming that the LA Ag Department had attached or referenced evidence demonstrating that it made payments to the claimants and was subrogated to the rights of such claim holders, as a subrogee it is not entitled to priority status under 11 U.S.C. § 507(a)(6) as a matter of law by virtue of subsection (d).

**V.      DEBTOR OBJECTS TO CLAIMS FOR RECLAMATION THAT HAVE FAILED TO MEET THEIR BURDEN TO ESTABLISH A RECLAMATION RIGHT, INCLUDING THE REQUIREMENT THAT A CLAIMANT MAKE A WRITTEN DEMAND WITHIN 10 DAYS OF DELIVERY OF GOODS TO THE DEBTOR.**

Debtor objects to the claims as set forth on Exhibit F to the Objection, asserting reclamation rights under 11 U.S.C. § 546 because the Claimants fail to provide sufficient evidence to support a reclamation claim. The Claimants fail to meet their burden to establish a reclamation claim on multiple bases. However, the Court need only consider one to dispose of the reclamation claims of each of the Exhibit F Claims: None of the Exhibit F Claims made timely reclamation demands, so they should be disallowed.

The bankruptcy code recognizes reclamation rights created by state law pursuant to UCC § 2-702, but only to the extent allowed by Section 546. *E.g. In re Dynamic Techs. Corp.*, 106 B.R. 994, 1003 (Bankr. D. Minn. 1989) ("the overwhelming consensus of authorities hold that the

seller's right to reclamation provided by section 2–702 of the Uniform Commercial Code is recognized in bankruptcy proceedings only to the extent provided in Section 546(c) of the Bankruptcy Code") (internal citations omitted); *In re Pro. Veterinary Prods., Ltd.*, 454 B.R. 479, 482 (Bankr. D. Neb. 2011) ("BIV's reclamation claim is brought under 11 U.S.C. § 546(c), which is the exclusive reclamation remedy in the Bankruptcy Code."); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 372 (1977), reprinted in 5 U.S.Code Cong. & Admin.News 5787, 5973, 6328 ("The purpose of the provision [§ 546(c)] is to recognize, in part, the validity of Section 2-702 of the Uniform Commercial Code, which has generated much litigation, confusion, and divergent decisions in different circuits.").

The Exhibit F Claims assert that their reclamation demands fall under 11 U.S.C. § 546(c). However, their claims actually fall under 11 U.S.C. § 546(d), which specifically applies "[i]n the case of a seller who is a producer of grain sold to a grain storage facility, owned or operated by the debtor, in the ordinary course of such seller's business (as such terms are defined in section 557 of this title)[.]"; *See also* 11 U.S.C. § 546(c) (stating subsection (c) specifically excepts section 557 grain claimants in its first sentence, which states "Except as provided in subsection (d) of this section").

The burden is on the party asserting a right to reclaim goods sold to a debtor prepetition to establish each element of a reclamation claim, which are: (1) it sold goods to debtor in the ordinary course of business, (2) it delivered those goods to the debtor at a time when the debtor was insolvent as that term is defined in the Bankruptcy Code, (3) that within ten days after the goods were delivered to the debtor, the seller made a written demand for the return of the goods, and (4) the debtor has possession of the goods at the time of the reclamation demand or the goods were not in the hands of a buyer in the ordinary course of business or a good faith purchaser at the time

26

of the demand. 11 U.S.C. § 546(d); *see In re Dynamic Techs. Corp.,* 106 B.R. 994 (Bankr. D. Minn. 1989).

The Exhibit F Claims fail to attach or reference any supporting documents or evidence that it delivered goods to the Debtor at time when it was insolvent as that term is defined under the Bankruptcy Code *or* that the Debtor had possession of the goods at the time of the reclamation demand. However, to dispose of the Exhibit F Claims, the Court need focus its attention only on the requirement that a claimant make a written demand for the return of goods within ten days because none of the Exhibit F Claims made timely written demand. *See In re Dynamic Techs. Corp.,* 106 B.R. at 1003-1004 (stating "the greater flexibility of the U.C.C. with respect to the type of demand will not apply; for Bankruptcy Code purposes, only a written demand will suffice").

All of the Exhibit F Claims, except for the claims of Elliot AGCO (Claim No. 332) and Kyle Miller (Claim No. 342), assert a right of reclamation but do not attach or reference any written demand to Debtor. Thus, those reclamation claims should be disallowed because they do not satisfy the written demand requirement. Two of the Exhibit F Claims, Elliot AGCO (Claim No. 332) and Kyle Miller (Claim No. 342), attach written reclamation demands. Doc. 332 at 59-62; Doc. 342 at 70-73. However, their demands are untimely. Elliot AGCO asserts that the last date it delivered grain to Debtor was on October 27, 2025. Doc. 332 at 4. Mr. Miller asserts that the last date he delivered grain to Debtor was on October 23, 2025. Doc. 342 at 4. Both Elliot AGCO and Mr. Miller attach written reclamation demands dated December 5, 2025. Doc. 332 at 59-62; Doc. 342 at 70-73. Elliot AGCO made a written demand 39 days after it claims it last delivered grain to Debtor, and Mr. Miller made a written demand 43 days after he claims he last delivered grain to Debtor. Therefore, Elliot AGCO and Mr. Miller failed to make a written reclamation demand

within 10 days of Debtor's receipt of the grain. Thus, the Exhibit F Claims for reclamation should all be disallowed.

## VI. LACK OF STANDING

Debtor objects to the claims identified on Exhibit G to the Objection because those claims assert the rights of third parties. These claimants lack standing to assert the rights of third-party lenders, as such claims belong to their lenders. "The third-party standing doctrine generally bars litigants in federal court from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves." *Smalis v. City of Pittsburgh Sch. Dist.*, 556 B.R. 703, 711-12 (W.D. Pa. 2016) (*quoting In re Olick*, 517 Fed. App'x 103, 105 (3d Cir. 2014)) (citing *Kane v. Johns-Manville Corp.*, 483 F.2d 636, 643-44 (2d Cir. 1988)).

"The Supreme Court has articulated two important policies justifying this prudential limitation on the federal courts' jurisdiction: '[f]irst, the courts should not adjudicate [third-party] rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not...Second, third parties themselves usually will be the best proponents of their own rights.'" *Id.* at 712 (quoting *Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) (citations omitted). "The 'limits on third-party standing are particularly relevant to appellate standing in bankruptcy proceedings' because '[b]ankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party.'" *Id.* (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); (citing *In re WR Grace & Co.*, 729 F.3d 332, 340 (3d Cir. 2013))."The Supreme Court has recognized that under some special circumstances these concerns are not present." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (2d Cir. 1988). "[W]here the litigant's interests are closely allied with those of the third parties, standing is

permitted because the litigant is likely to be as effective a proponent of the third-party rights as the third parties themselves." *Id.* at 643-44 (internal citations omitted). "Furthermore, where third parties are unable to assert their own rights, current litigants are allowed to assert third-party claims that might otherwise remain unvindicated. *Id.* at 644 (internal citations omitted). "However, where these special considerations are absent, a litigant is restricted to asserting his own constitutional and statutory rights." *Id.*

In this case, the Exhibit G Claimants' assert the security interests of their third-party lenders created by the Exhibit G Claimants in favor the third-party lenders. The Exhibit G Claimants have failed to attach or reference an assignment or other form of authorization to assert rights that do not belong to them. In addition, the Exhibit G Claimants have failed to set forth facts or argue that special circumstances exist that prevent their third-party lenders from making the claims themselves, so no exception applies to the standing requirement at issue. Therefore, the Exhibit G Claims should be denied because they lack standing to assert the purported rights of their third-party lenders.

**VII. EVEN IF THE EXHIBIT G CLAIMANTS HAVE STANDING, DEBTOR IS A BUYER IN THE ORDINARY COURSE WHO TOOK FREE OF THE PURPORTED SECURITY INTEREST OF CLAIMANTS' LENDERS BECAUSE THEY FAILED TO PROVIDE DIRECT NOTICE TO DEBTOR UNDER 7 U.S.C. § 1631.**

Even if the Exhibit G Claimants have standing to assert the rights of claimants' non-party secured lenders, Debtor objects to the claims identified on Exhibit H to the Objection (the "Exhibit H Claims") because claimants' secured lenders did not comply with the requirements of the Food Security Act of 1985, 7 U.S.C. § 1631, ("FSA") by filing an effective financing statement or providing direct notice of their security interests to the Debtor. Claims based on security interests in farm products must comply with the FSA, which requires the filing of an effective financing

statement or providing direct notice to the Debtor, to enforce such security interests against a buyer in the ordinary course like Debtor. The Exhibit H Claims fail to demonstrate that claimants' secured lenders complied with the FSA's requirements, and thus, Debtor purchased claimants' grain in the ordinary course of business free of the purported secured lenders' security interests.

Under the FSA, in general, a buyer of farm products, who is a buyer in the ordinary course of business takes free of a security interest created by the seller. 7 U.S.C. § 1631(d). A buyer in the ordinary course of business is "a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is the business of selling farm products." 7 U.S.C. § 1631(c)(1). However, a "farm products purchaser takes subject to a security interest created by the seller if (1) the secured creditor provided, within a year before the sale, the farm products purchaser with direct written notice of the secured creditor's interest (direct notice exception); or (2) the secured creditor filed an effective financing statement covering the farm products if the state has established a central filing system that complies with the Act (central filing exception)." *Farm Credit Midsouth, PCA, f/k/a E. Arkansas Prod. Credit Ass'n. v. Farm Fresh Catfish Co.*, 371 F.3d 450, 453 (8th Cir. 2004) (internal citations and quotations omitted).

"To comply with the direct notice exception, a secured creditor must send the farm products purchaser a written notice listing (1) the secured creditor's name and address, (2) the debtor's name and address, (3) the debtor's social security number or taxpayer identification number, (4) a description of the farm products covered by the security interest and a description of the property, and (5) any payment obligations conditioning the release of the security interest." *Farm Credit Midsouth*, 371 F.3d at 453. In addition, the description must include the amount, crop year, and counties where the farm products are located or produced. *Id*. The direct notice exception requires strict compliance. *Id*. The Eighth Circuit Court of Appeals found that a purchaser took

free of a security interest in farm products where the secured party sent a letter to the purchaser that did not contain the debtor's taxpayer identification number, address, or the counties where the farm products were produced or located. *Id*. at 454.

Here, Debtor is a "nationwide merchandiser and processor of grain" that handles "approximately 18 million of the roughly 60 million bushels [of oats] produced annually" and "over 77 million bushels of wheat annually." Doc. 3 at ¶¶ 5, 9. Debtor also provides "trading services for corn, milo, and feed." *Id*. at ¶11. As a nationwide merchandiser and processor of grain handling substantial amounts of grain at its various facilities, Debtor purchases grain regularly in the ordinary course of its business and did so when it purchased grain from the Exhibit H Claimants. The Exhibit H Claims are made by claimants who meet the definition of a "producer" under 11 U.S.C. § 557, so Debtor also purchased grain from a person engaged in farming operations who is in the business of selling farm products. *See* 11 U.S.C. § 557(b)(3) ("'producer' means an entity which engages in the growing of grain"). Thus, Debtor is a buyer in the ordinary course of business with respect to the grain identified in the Exhibit H Claims.

Notably, the Exhibit H Claimants each represented and warranted that they are "a MERCHANT (as that term is used in the UCC) and a commercial market participant regularly making or taking delivery in the ordinary course of their business with respect to the commodity covered by this Contract." *E.g.* Doc. 348 at 19. If claimants are not in the business of selling grain, and as a result, Debtor is not considered a buyer in the ordinary course of business, then claimants are in breach of their contracts with Debtor and Debtor may also have a claim against such claimants for misrepresentation.

All of the Exhibit H Claims are made by producers located in the state of Texas. The "state of Texas does not have a central filing system as defined in section 1631." *Nelson v. Am. Nat. Bank*

*of Gonzales*, 921 S.W.2d 411, 417 (Tex. App. 1996). Thus, the only way for Debtor to take subject to a security interest created by Claimants, *i.e.*, the purported security interest of claimants' lenders, is for those lenders to provide direct notice to Debtor within one year before the sale. None of the Exhibit H Claims attach or reference a written notice sent to Debtor that complies with the direct notice requirements of the FSA. In fact, none of the Exhibit H Claims attaches or references any written notice sent to Debtor within one year before the sale. Accordingly, as a buyer in the ordinary course of business, Debtor took free of any security interest created by the Exhibit H Claimants in the grain they sold to Debtor. Thus, the Exhibit H Claims should be disallowed.

## VIII. THE EXHIBIT I CLAIMANTS DO NOT CONSTITUTE A "PRODUCER" UNDER 11 U.S.C. § 557(B)(3).

Debtor objects to the claims identified on Exhibit I to the Objection because they were filed by claimants who do not constitute "producers" as defined by 11 U.S.C. § 557(b)(3). Section 557(b)(3) defines a "producer" as "an entity which engages in the growing of grain." The Exhibit I Claims are made by transportation companies, grain elevators, or biofuel companies. Transportation companies, grain elevators, and biofuel companies are not engaged in the growing of grain. Instead, they are engaged in the transportation of grain, storage or sale of grain, and distribution and sale of biofuels. The Exhibit I Claims are not made by "producers" and are not entitled to the protections afforded to grain producers under Section 557 of the Bankruptcy Code. Thus, the Exhibit I Claims should be disallowed.

## IX. THE EXHIBIT J CLAIMS ARE DUPLICATE CLAIMS THAT SHOULD BE DISALLOWED.

Debtor objects to the claims listed on Exhibit J to the Objection, on the basis that they are duplicates of other claims filed by the same claimants. As noted on Exhibit A to the Objection, USB Joint Venture's Claim No. 352 is a duplicate of Claim No. 373, Roger Love's Claim No. 388

is a duplicate of Claim No. 338, Green Plains Trade Group, LLC's Claim No. 390 is a duplicate of Claim No. 375, and Middleton Planting Co.'s Claim No. 392 is a duplicate of Claim No. 379. Duplicate claims should be disallowed to prevent a claimant from receiving a double recovery. Moreover, each of the Exhibit J Claims is objectionable on the same basis asserted on Exhibit A to the Objection as its corresponding duplicate and should be disallowed on the same basis.

**X. THE EXHIBIT K CLAIMS SHOULD BE DISALLOWED BECAUSE THE DURATION OF THE LIEN HAS EXPIRED.**

Debtor objects, in part, to Rodney and Sandra Janczak Farms J.V.'s Claim No. 343 on the basis that it asserts a security interest under Texas Property Code Chapter 70, Subchapter E, for grain delivered more than one year ago (the "Exhibit K Claim"). Even if Texas law applies, which is disputed, and if Rodney and Sandra Janczak Farms J.V. had properly perfected, which it has not, then Claim No. 343 still should be disallowed in part.

Under Texas Property Code § 70.405, a security interest created under Chapter 70, Subchapter E, has a duration of only one year. The Exhibit K Claim asserts a security interest in 1,207.50 bushels of corn that it claims were delivered to Debtor over five years ago on August 30, 2020. Doc. 343 at 4. Because the grain was delivered to Debtor over a year ago, even if Rodney and Sandra Janczak Farms J.V. had a perfected security interest, which it does not, it is expired. Thus, the Exhibit K Claim should be disallowed.

**XI. THE EXHIBIT L CLAIMS LACK A VALID LEGAL OR FACTUAL BASIS UNDER 11 U.S.C. § 557.**

Debtor objects to the claims identified on Exhibit L to the Objection because they lack a valid legal or factual basis for the asserted interest in Grain or Grain Proceeds under 11 U.S.C. § 557 (the "Exhibit L Claims"). The 557 Procedures Order further provides that "[e]ach Producer of Grain or other party that files a Grain Claim Form . . . must include all information and documents

requested by the Grain Claim Form to have its claim to the Grain or the proceeds of the Grain ("Grain Proceeds") determined by the Court pursuant to these 557 Processes and Procedures. . . ." The Exhibit L Claims either fail to assert any basis for interest in response to item 4 or assert a written response to the "other" category that does not constitute a valid legal or factual basis under 11 U.S.C. § 557. Such claims fail to allege facts sufficient to support legal liability to the claimant and therefore lack prima facie validity. Because the Exhibit L Claims do not provide a valid basis to constitute a claim under Section 557, they should be disallowed.

## XII. THE EXHIBIT M CLAIMS ATTEMPT TO EVADE THE PROPER APPLICATION OF NEBRASKA LAW.

Debtor objects to the Claims identified on Exhibit M to the Objection because they improperly seek to apply laws from jurisdictions other than Nebraska to claims that are governed by Nebraska law. Such claims assert purported rights that do not exist under Nebraska law and should be disallowed because they improperly apply state law from jurisdictions other than Nebraska. All the Exhibit M Claimants entered into a purchase contract with Debtor for the sale of their grain where each claimant agreed to arbitrate all disputes or disagreements that arise out of or relate to the contract before the NGFA *First*, the arbitration provision is mandatory and encompasses the priority claims brought by the Exhibit M Claimants. *Second*, the Court has the discretion not to enforce the arbitration provision, and under these circumstances, the Court should exercise its discretion because an arbitration award cannot be enforced against non-party creditors. *Third*, if the Court exercises its discretion not to enforce the arbitration provision, then by the express terms of the purchase contract, Nebraska law governs. Therefore, the Exhibit M Claims should be disallowed because they assert priority under state law from jurisdictions other than Nebraska, which do not exist under Nebraska law. *Fourth* and alternatively, if the Court determines Nebraska law does not apply by virtue of the purchase contract, then the Court must determine

which state's law applies between Nebraska and either Texas or North Dakota. The Court must apply the choice of law, or conflict of laws, of the forum state, and under Nebraska's choice of law, or conflict of laws by statute, Nebraska law governs the perfection, effect of perfection or nonperfection, and priority. *See* Neb. UCC § 9-301(1). Thus, the priority that the Exhibit M Claimants assert by virtue of state law outside of Nebraska does not apply.

Each of the Exhibit M Claimants in their Grain Claim Form cites to the laws of states other than Nebraska in support their claims of priority. Some of the Exhibit M Claims assert state law rights under the UCC, that in pertinent part, are substantively the same under Nebraska law. For example, Michael and Cole Bilbro (Claim No. 321), Campbell Farming (Claim No. 322), Double J Farms (Claim No. 323), and E&J Farms (Claim No. 324) assert rights under the Mississippi UCC § 2-702 which is the same as Neb. UCC § 2-702. Consequently, for those claims the result is the same under Nebraska law or the law of Mississippi and may be disposed of as otherwise set forth herein. However, there are claimants who assert priority over all other creditors by virtue of Texas or North Dakota law that does not exist under Nebraska law. In particular there are 19 claimants asserting a perfected security interest and priority pursuant to Texas Property Code § 70.4045(c) ("a lien created and perfected under this subchapter has priority over a conflicting security interest in or lien on the agricultural crop or the proceeds from the sale of the crop…regardless of the date the security interest or lien…attached."), *i.e.*, the Exhibit D Claims, and the claim of Tyler Narloch (Claim No. 284) who asserts a perfected security interest with priority over all creditors by virtue of N.D. Century Code § 4.1-58-28 ("Grain contained in a warehouse, including grain owned by the warehouseman, is subject to a first priority lien for outstanding receipt holders storing, selling, or depositing grain in the warehouse. The lien created under this section is preferred to any lien or security interest for any creditor of the warehouseman…") (the "Super Priority Claimants").

As set forth above, the Court may dispose of the 19 claimants asserting priority under Texas Property Code Chapter 70, Subchapter E, because they failed to file timely UCC-1 Financing Statements in Nebraska. However, the Court may also dispose of those claims by finding that Debtors objection to the Exhibit M Claims is valid. Accordingly, Debtors argument in support of its objections to the Exhibit M Claims may only be necessary to dispose of one claim, Tyler Narloch's claim (Claim No. 284), but would also dispose of the 19 claims from Texas Claimants.

A.    **The Claimants agreed to mandatory arbitration, so they must arbitrate their claims against Debtor.**

Each of the Exhibit M Claimants entered into a purchase contract with Debtor in which the claimants agreed to arbitrate any and all claims arising out of or relating to the contract. Claimants' assertions of priority arise out of or relate to the purchase contract. Accordingly, claimants must arbitrate their claims for priority.

"Under the [Federal Arbitration Act,] a broadly worded arbitration provision will be interpreted to encompass a dispute 'as long as the underlying factual allegations simply touch matters covered by the arbitration provision.'" *Courtright v. Epic Games, Inc.*, 766 F. Supp. 3d 873, 900 (W.D. Mo. 2025) (*citing 3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008)). "Where a valid arbitration agreement exists, [a court] must liberally construe it, resolving any doubts in favor of arbitration." *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 873–74 (8th Cir. 2018) (internal quotation marks and citation omitted). "The party resisting arbitration bears the burden of showing either that the arbitration provision is invalid or that it does not encompass the claims at issue." *Triplet v. Menard, Inc.*, 42 F.4th 868, 870 (8th Cir. 2022). The Eighth Circuit Court has found that use of the phrase "any dispute" denotes a broadly worded arbitration provision. *JES Farms P'ship v. Indigo Ag Inc.*, 116 F.4th 733, 736 (8th Cir. 2024) (internal citations omitted). The Eighth Circuit has further opined that arbitration "should not be denied unless it may

be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute[.]" *H&T Fair Hills,* 76 F.4th 1093, 1099, 1100 (8th Cir. 2023) (citations and quotations omitted).

Here, each of the claimants entered into purchase contracts with Debtor that contain a broadly worded arbitration provision providing for the mandatory arbitration of "all disagreements" between Debtor and Claimant "arising from or relating to" the purchase contract and expressly includes "any statutory or tort claims arising from or relating to the relationship between parties." *Id*. *E.g.*, Doc. 348 at 19. In addition, the contract incorporates by reference the NGFA Trade Rules, which provide that where a transaction is made subject to the NGFA Trade Rules by express contractual reference, "the sole remedy for resolution of ***any and all disagreements or disputes*** arising under or related to the transaction shall be through arbitration[.]" [14](emphasis added). The statutory rights asserted by the Super Priority Claimants arise out of or are related to the grain purchase contract with Debtor because they relate to the grain Debtor purchased from them under the contract.

Notably, the property interest asserted by the Super Priority Claimants under the Texas Property Code arises by contract. Texas Property Code § 70.402 states "[a]n agricultural producer who, under a contract with a contract purchaser, is to receive consideration for selling an agricultural crop grown, produced, or harvested by the producer has a lien against that crop[.]" Thus, under Texas law, absent the purchase contract, the claimant's purported security interest does not exist, so the claim under Texas law for priority arises under the purchase contract or relates to the purchase contract. Thus, those claims fall within the scope of the arbitration provision.

---

[14] A copy of the NGFA Trade Rules applicable to grain can be found here: https://www.ngfa.org/wp-content/uploads/October-2025-Grain-Rules.pdf

Similarly, Tyler Narloch's claim only exists by virtue of his purchase contract with Debtor. N.D. Century Code § 4.1-58-28 provides "receiptholders" with a "first priority lien." A receipt is defined as "grain warehouse receipts, scale tickets, checks, or other memoranda given by a public warehouseman for, or as evidence of…the sale of grain." N.D. Cent. Code Ann. § 4.1-58-01(7). Tyler Narloch attaches his purchase contracts with Debtor to his claim, which is the only document that meets the definition of receipt attached to his claim. Thus, absent the grain purchase contract, Tyler Narloch would not be a "receiptholder" under North Dakota law. Thus, his claim for priority, to the extent it may exist, only arises by virtue of his purchase contract with Debtor.

Accordingly, the Exhibit M Claims must be arbitrated before the NGFA as provided in the purchase contract because they arise under or relate to claimants' purchase contract with Debtor.

**B.      The Court has the discretion not to enforce the arbitration provision, and under these circumstances, should not enforce it because an arbitration provision cannot be enforced against non-signatory creditors.**

The Court has discretion not to enforce the arbitration provision for the purposes of these 557 Procedures because they are core bankruptcy proceedings and enforcing the arbitration provision would undermine the objectives of the Bankruptcy Code. The Exhibit M Claims assert priority in grain over creditors who are non-parties to the purchase contract with the arbitration provision and any arbitration award would be unenforceable against those non-signatory creditors.

It is widely accepted that courts must stay proceedings and allow arbitration to proceed if the issue before it is arbitrable. *In re: EAD CONSTRUCTORS, INC.*, Debtor., No. 25-81134, 2026 WL 626514, *2 (Bankr. D. Neb. Mar. 5, 2026) (citing *In re Farmland Indus., Inc.*, 309 B.R. 14, 18 (Bankr. W.D. Mo. 2004)). Bankruptcy courts have discretion to refuse to compel arbitration of core bankruptcy matters. *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006). Where a core bankruptcy matter is implicated, the Court has discretion not to enforce the arbitration

agreement where the court finds a "severe conflict" with the objectives of the Bankruptcy Code. *See In re: EAD CONSTRUCTORS, INC.*, Debtor., No. 25-81134, 2026 WL 626514 (Bankr. D. Neb. Mar. 5, 2026) (*citing Lewallen v. Green Tree Servicing, L.L.C.,* 343 B.R. 225, 231–32 (W.D. Mo. 2006), aff'd, 487 F.3d 1085 (8th Cir. 2007)). "The objectives of the Bankruptcy Code relevant to this inquiry include: 'the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.'" *Id*. (*citing Lewallen v. Green Tree Servicing, L.L.C.,* 343 B.R. 225, 231–32 (W.D. Mo. 2006), *aff'd*, 487 F.3d 1085 (8th Cir. 2007) (*quoting MBNA Am. Bank, N.A. v. Hill,* 436 F.3d 104, 108 (2d Cir. 2006))). If a severe conflict is found, the court has the discretion not to enforce the arbitration provision, otherwise it must enforce the arbitration provision. *Id*.

"[W]here the issues to be arbitrated involve exclusively bankruptcy matters, such as the determination of claim priority, such issues should ***not*** be submitted to arbitration because they are core bankruptcy matters." *In re Slipped Disc Inc*., 245 B.R. 342, 345 (Bankr. N.D. Iowa 2000) (emphasis added).

In determining whether to exercise discretion not to enforce arbitration, the following factors may be considered, "(1) whether the issue can be resolved more expeditiously by the bankruptcy judge as opposed to through the arbitration process; (2) Whether or not special expertise is necessary in deciding the issue; (3) The impact on creditors of the debtor who were never parties to the agreement containing the arbitration clause; [and] (4) Whether arbitration threatens the assets of the estate." *In re Slipped Disc*, 245 B.R. 342, 346 (Bankr. N.D. Iowa 2000).

Here, these 557 Procedures are a "core" proceeding because they involve the determination of claim priority among competing creditors, which ultimately will affect all of Debtor's other

creditors. The last two factors, the impact on creditors who are non-parties to the arbitration clause and whether arbitration threatens the assets of the estate, weigh strongly in favor of the Court exercising its discretion not to enforce the arbitration provision. The Exhibit M claims assert priority in the assets of estate. However, if the Exhibit M Claims have priority in the assets of the estate it would affect the assets of the bankruptcy estate and will potentially impact the claims of all other creditors who otherwise may have received some portion of the proceeds from the grain. However, none of those creditors are parties to the agreement containing the arbitration clause, and thus, any decision rendered by the arbitrator will be unenforceable as against those parties. *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 194 (3d Cir. 2001) (stating "there is no dispute that a non-signatory cannot be bound to arbitrate unless it is bound 'under traditional principles of contract and agency law' to be akin to a signatory of the underlying agreement.'") (internal citations omitted); *In re F & T Contractors, Inc.*, 649 F.2d 1229, 1232 (6th Cir. 1981) (finding the bankruptcy judge did not abuse his discretion in refusing to enforce an arbitration provision "because the claims of other creditors would have been affected by the decision of the arbitration board but those creditors would not have been allowed to participate in the proceeding.").

Even a favorable arbitration award would be of no value to the Super Priority Claimants because it could not be enforceable against non-parties to the agreement. Accordingly, the last two factors strongly weigh in favor of the Court exercising its discretion not to enforce the arbitration provision for the purposes of these 557 Procedures. Thus, the Court has the discretion not to enforce the arbitration provision and should exercise it here.

> **C.**    **If the Court exercises its discretion not to enforce the arbitration provision, then by the express terms of the purchase contract, Nebraska law governs.**

If the Court uses its discretion not to enforce the arbitration provision, then by the express

terms of the contract Nebraska law governs the parties' relationship. The Exhibit M Claims assert rights created under non-Nebraska law, and thus, those claims should be denied. Specifically, the Super Priority Claimants assert property interests and priority rights under North Dakota and Texas statutes that do not exist under Nebraska law. Thus, those claims should be disallowed.

The purchase contract between Debtor and the claimants states "[i]f, for whatever reason, the NGFA trade and arbitration rules are determined to be unenforceable by a court of competent jurisdiction, the Contract shall be governed by and construed in accordance with the laws of the state of Nebraska…" *E.g.* Doc. 348 at 19. Under NGFA Trade Rule 29, where a transaction is made subject to the NGFA Trade Rules by express contractual reference or by reason of membership in the NGFA, then "the sole remedy for resolution of any and all disagreements or disputes arising under or related to the transaction shall be through arbitration proceeding before the National Grain and Feed Association."

Here, if the Court does not enforce the arbitration provision, then Nebraska law governs by the express terms of the contract because a court of competent jurisdiction, this Court, will have determined that the NGFA trade and arbitration rules are unenforceable, which require arbitration before the NGFA, "for whatever reason." Because the arbitration provision should not be enforced, Nebraska law governs. The Super Priority Claimants do not assert property rights or priority under Nebraska law, so those claims should be disallowed and the remaining Exhibit M Claims should be disallowed to the extent they assert rights under the law of jurisdictions other than Nebraska.

**D.      Under the law of choice of law, Nebraska law governs the perfection, effect of perfection, and priority of claims.**

In the alternative, if the Court concludes that Nebraska law does not apply by virtue of the express terms of Debtor's contract with the Exhibit M Claimants, a choice of law analysis reveals that Nebraska law would govern the perfection, effect of perfection and priority of claims.

Accordingly, the Exhibit M Claims should be disallowed because they assert priority which does not exist under Nebraska law.

In a choice of law analysis, "[t]he bankruptcy court applies the choice of law rules of the state in which it sits." *In re Payless Cashways*, 203 F.3d 1081, 1084 (8th Cir. 2000) (internal citations omitted). Nebraska courts look to the Restatement (Second) of Conflict of Laws to determine which states law to apply. *Rose v. Am. Fam. Ins. Co.*, 315 Neb. 302, 307, 995 N.W.2d 650, 654 (2023) ("When considering whether a contractual choice-of-law provision is determinative, we have adopted Restatement (Second) of Conflict of Laws § 187(1) at 561 (1971)"); *Erickson v. U-Haul Int'l*, 278 Neb. 18, 25 767 N.W.2d 765, 773 (2009) (stating, "[i]n choice-of-law determinations, we often seek guidance from the Restatement (Second) of Conflict of Laws."); *Johnson v. U.S. Fid. & Guar. Co*., 269 Neb. 731, 743, 696 N.W.2d 431, 441 (2005) ("For the resolution of contract conflicts, this court has adopted the Restatement [(Second) of Conflict of Laws]"). Under the Restatement (Second ) of Conflict of Laws, a court "will follow a statutory directive of its own state on choice of law." Restatement (Second) of Conflict of Laws § 6(1). Under Neb. UCC § 9-301(1), "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral."

Here, the Debtor is formed and organized under the law of Nebraska, so it is located in the state of Nebraska. Doc. 3 at ¶ 7-8; Neb. UCC. § 9-307(e). Accordingly, under Nebraska's law of choice of law, or conflict of laws, Nebraska law will govern the perfection, effect of perfection, and priority. *See* Neb. UCC § 9-301(1).

The Exhibit M Claimants assert priority in reliance upon the laws of states other than Nebraska that differ from Nebraska. In particular, the Super Priority Claimants assert that Texas

state law and North Dakota state law grant them super priority over all other claimants. The claimants relying on Texas law point to Texas Property Code § 70.4045(c), which provides "a lien created and perfected under this subchapter has priority over a conflicting security interest in or lien on the agricultural crop or the proceeds from the sale of the crop…regardless of the date the security interest or lien…attached." Tyler Narloch (Claim No. 284) argues that he has a super priority lien by virtue of N.D. Century Code § 4.1-58-28, which states in pertinent part:

> ***Grain contained in a warehouse, including grain owned by the warehouseman***, is subject to a first priority lien for outstanding receiptholders storing, selling, or depositing grain in the warehouse. ***The lien created under this section is preferred to any lien or security interest for any creditor of the warehouseman regardless of the time when the creditor's lien or security interest attached to the grain. Notice of the lien created under this section need not be filed to perfect the lien. The lien created by this section is discharged as to grain sold by the warehouseman to a buyer in the ordinary course of business.*** The sale does not discharge the lien for an individual receiptholder in the remaining grain in the warehouse.

(emphasis added). Texas Property Code § 70.4045(c) and N.D. Century Code § 4.1-58-28 bear on perfection, the effect of perfection, and the priority of security interests and liens. Nebraska law applies on those issues and the Super Priority Claimants fail to cite to any Nebraska law that gives them the priority that they claim. Thus, the Exhibit M Claims, and in particular the Super Priority Claimant's claims, should be disallowed because they assert priority that does not exist under Nebraska law.

Even if Texas and North Dakota law apply to create the property interest claimed by the Super Priority Claimants, Nebraska law would still govern perfection, the effect of perfection, and priority of those claimed property interest. *See In re SemCrude, L.P.,* 407 B.R. 112, 137 (Bankr. D. Del. 2009). In *In Re SemCrude, L.P.*, the bankruptcy court dealt with a different Texas statue, which was a non-uniform amendment to the Texas UCC, that is analogous to both the North Dakota statute at issue and Texas statutes at issue. *See id*. at 125-129; Texas UCC § 9.343 (2021). The statute created a perfected security interest but "does not require an actual written security

agreement or the filing of an actual financing statement; rather, the perfected security interest arises upon: 1) a writing which gives the interest holder a right under real estate law (i.e., a deed, oil and gas lease, mineral assignment, etc.); and 2) the act of the first purchaser making a voluntary communication to the interest owner acknowledging his or her rights to the oil and/or gas property or its proceeds." *In re SemCrude, L.P.,* 407 B.R. at 127. (internal quotations and citations omitted). In addition, Texas UCC § 9.343(f)(1)(2021) gives the security interest in oil and gas the same priority as a purchase money security interest. *See id.* at 128.

The court in *In re SemCrude, L.P.*, applied Delaware's UCC § 9-301, which provides for filing of a financing statement in the location of debtor to the Texas statute. *See In re SemCrude, L.P.,* 407 B.R. at 134. The Court held that:

> *[t]he fact that these security interests may be entitled to automatic perfection under Texas Law is not dispositive, because Texas law does not govern perfection of the Texas Producers' claims against the defendants in this adversary proceeding.* In order to be perfected under Delaware and Oklahoma law, the Texas Producers must have filed UCC–1 financing statements in those states…the Court holds that a security interest perfected only in Texas by virtue of the automatic perfection in Texas § 9.343[(2021)] will be subordinate to a security interest that was duly perfected against the Debtors in the appropriate state.

*Id*. at 138-139 (emphasis added).

Here, just as in *In re SemCrude*, Texas and North Dakota laws providing for automatic perfection is not dispositive, because Nebraska law governs perfection. Neb UCC § 9-301(1). Accordingly, even if Texas and North Dakota law applies to create the claimed property interest under a choice of law analysis those claims would still not have the priority the Super Priority Claimants assert because Nebraska law governs those issues and does not provide for automatic perfection without filing a financing statement and does not provide for priority over prior perfected secured parties. *See* Neb UCC § 9-310(a) (stating "a financing statement must be filed to perfect all security interests and agricultural liens"); Neb UCC § 9-322(a)(1) (stating

44

"[c]onflicting perfected security interest and agricultural liens rank according to priority in time of filing or perfection."). Accordingly the Exhibit M Claims should be disallowed because they assert priority rights that do not exist under Nebraska law.

## XIII. DEBTOR OBJECTS TO CLAIMS FILED AFTER THE GRAIN CLAIM BAR DATE.

Debtor objects to the claims identified on Exhibit N to the Objection, on the basis that they were filed after the Grain Claim Bar Date of February 2, 2026. As expressly set forth in the 557 Procedures Order, the deadline for filing the Grain Claim Form with the U.S. Bankruptcy Clerk was 11:59 p.m. on February 2, 2026 (the "Grain Claim Bar Date"). The 557 Procedures Order provides that "[a] Grain Producer's failure to timely file a Grain Claim Form by such deadline *shall* result in expungement and disallowance of such Grain Producer's claim(s) under these 557 Processes and Procedures without further order of the Court" (emphasis added). The Exhibit N Claims were filed after the Grain Claim Bar Date. Thus, the Exhibit N Claims should be disallowed as untimely pursuant to the express terms of the 557 Procedures Order.

## XIV. THE EXHIBIT O CLAIM IS NOT FOR "GRAIN" UNDER 11 U.S.C. § 557(B)(1)

Debtor objects to the claim listed on Exhibit O to the Objection because it asserts a claim that does not constitute "grain" as defined by 11 U.S.C. § 557(b)(1) (the "Exhibit O Claim"). Section 557(b)(1) defines "grain" as "wheat, corn, flaxseed, grain sorghum, barley, oats, rye, soybeans, other dry edible beans, or rice." Green Plains Trade Group, LLC (Claim No. 375) asserts a claim for "DDGs," which is not wheat, corn, flaxseed, grain sorghum, barley, oats, rye, soybeans, other dry edible beans, or rice. The Exhibit O Claim is not entitled to the protections afforded to grain producers under Section 557 of the Bankruptcy Code, and it should be disallowed.

**CONCLUSION**

The Objected Claims fail as a matter of law. The claimants have failed to carry their burden to establish ownership interests, perfected security interests, or priority rights in the Grain or Grain Proceeds. The evidence—including the claimants' own attached purchase contracts, settlement sheets, and financing statement searches—compels these conclusions.

The 41 Exhibit B Claims assert ownership of grain they sold to Debtor. Their own documents prove title passed to Debtor. The Exhibit C Claims fail to attach the requisite documentation to support their asserted interests. The 19 Exhibit D Claims assert unperfected security interests under Texas law because they failed to file UCC-1 Financing Statements in Nebraska, where perfection is required. The Exhibit E Claims seek priority under § 507(a)(6) for grain they sold—not stored—contrary to the statute's purpose and legislative history. The Exhibit F Claims assert reclamation rights but failed to make timely written demands within ten days as § 546(d) requires.

Beyond these substantive failures, the Objected Claims suffer from procedural defects that independently warrant disallowance. The Exhibit G Claims lack standing to assert third-party rights. The Exhibit H Claims fail to demonstrate compliance with the Food Security Act. The Exhibit I Claims are filed by non-producers. The Exhibit J Claims are duplicates. The Exhibit K Claim asserts a lapsed lien. The Exhibit L Claims lack any valid legal or factual basis. The Exhibit M Claims improperly invoke non-Nebraska law. The Exhibit N Claims were filed after the bar date. The Exhibit O Claim does not involve "grain" as defined by the Bankruptcy Code.

For the foregoing reasons, the Debtor respectfully requests that this Court enter an order sustaining the Objection in its entirety and disallowing and expunging each of the Objected Claims identified on Exhibits A through O to the Objection.

DATED this 10th day of March 2026.

HANSEN-MUELLER CO., Debtor,

By: */s/ Brian J. Koenig*
    Brian J. Koenig, #23807
    Donald L. Swanson, #16385
    Trevor J Lee, #27063
    KOLEY JESSEN P.C., L.L.O.
    1125 South 103rd Street, Suite 800
    Omaha, NE 68124
    (402) 390-9500
    (402) 390-9005 (fax)
    Brian.Koenig@koleyjessen.com
    Don.Swanson@koleyjessen.com
    Trevor.Lee@koleyjessen.com