UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | Case No. 25-81226 |
| HANSEN-MUELLER CO.,[1] | Chapter 11 |
| Debtor. | |

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO IMPLEMENT A SECOND KEY EMPLOYEE INCENTIVE PLAN AND A SECOND KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF

Hansen-Mueller Co. (the "Debtor"), debtor and debtor-in-possession in the above-referenced chapter 11 case (the "Case"), moves this Court to enter an order, authorizing the Debtor to implement the second key employee incentive plan (the "Second KEIP") and the second key employee retention plan (the "Second KERP") and (ii) granting related relief (the "Motion"). Pursuant to the Debtor's *Motion to Seal* that is being filed concurrently with this Motion, the Debtor intends to offer the Second KEIP and Second KERP agreements under seal for this Court to review and consider and will provide the same to counsel to any party that agrees to maintain the confidentiality of the same. In support of the Motion, the Debtor respectfully states as follows:

---

[1] The Debtor in this chapter 11 case, along with the last four digits of Debtor's federal tax identification number, is: Hansen-Mueller Co. (9385). Debtor's location is 13321 California Street, Suite 100, Omaha, NE 68154.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O), and the Debtor consents to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      The statutory bases for the relief requested by this Motion are sections 363(b), 363(c), and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 6003 and 6004 (the "Bankruptcy Rules"), and Rule 9013-1 of the Bankruptcy Local Rules for the District of Nebraska (the "Local Rules").

## BACKGROUND

5.      The Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code on November 17, 2025 (the "Petition Date").

6.      Since the date of the filing of its bankruptcy petition, the Debtor has remained in possession of its assets and has operated its business and managed its financial affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

7.      A detailed description of the Debtor and its business, the facts and circumstances leading up to the filing of this Case, and the facts supporting this Motion are set forth in greater detail in the *Declaration of Michael Compton, Chief Restructuring Officer of Debtor Hansen-Mueller Co., in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") (Doc. 3).

2

8. On December 3, 2025, this Court entered an *Order (I) Establishing Bidding Procedures and (II) Granting Related Relief* (Doc. No. 100) (the "Bidding Procedures Order") approving certain bidding procedures (the "Bidding Procedures"), following the hearing held on December 2, 2025.

9. Subsequently, the Debtor received timely qualified bids from purchasers and other qualified bidders and conducted an auction on December 16, 2025, as set forth in the Bidding Procedures Order.

10. On December 29, 2025, this Court entered the *Order (I) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (Doc. 232) (the "Sale Approval Order"). In the Sale Approval Order, this Court approved the sale of, among other things, certain grain (the "Sales") to West Plains LLC ("West Plains") and Redwood Group, LLC ("Redwood"). (Doc. 232-1; 232-2).

11. To facilitate the Sales, the Debtor must unload grains from its elevators in Kansas City, Missouri and Sioux City, Iowa (the "Elevators") and load the grain onto transports to be shipped at the direction of West Plains and Redwood. The Debtor anticipates that this process may take until April 14, 2026, to complete. (Doc. 262).

12. The Debtor also still possesses assets such as contracts, an interest in a joint venture in a port terminal in Houston, Texas, a limited amount of grain, and a few other assets that it intends to liquidate in this Case.

13. Further, the Debtor is currently engaged in a claims process instituted by this Court under Section 557 of the Bankruptcy Code regarding claims of alleged producers of grain ("557 Procedure").

3

14.     To facilitate, among other things, the liquidation of the remaining assets, the Sales, and the 557 Procedure, the Debtor has decided that it is necessary to adopt a Second KERP and Second KEIP for certain key employees and an existing executive/officer to incentivize and/or retain their continued performance and avoid losing the Debtor's most valued employees during the pendency of this Case at a time the Debtor needs their labor, industry expertise, and company-specific knowledge.

15.     The Second KEIP and Second KERP are designed to provide performance incentives to, and encourage the retention of the second KERP/KEIP participants, who are invaluable to the sale/liquidation process and the 557 Procedures and who will help maximize value for the benefit of all stakeholders.

16.     The Debtor and its advisors have determined that the Second KEIP and Second KERP are critical to the Debtor's sale/liquidation process.

17.     Prior to the Petition Date, the Debtor's Board of Directors (the "Board") engaged Silverman Consulting, Inc. as its financial advisor and Michael Compton as its Chief Restructuring Officer to evaluate the need for and assist in developing a key employee retention plan and to provide a recommendation relating to the same.

18.     Mr. Compton has analyzed the employees' and officer's respective institutional knowledge and expected contributions during this remainder of this Case and has considered a range of outcomes that could occur without these key employees and officer.

19.     After such analysis, Mr. Compton has concluded that properly incentivizing, compensating, and rewarding the employees and officer at this critical juncture in this Case is in the best interests of the Debtor, its estate, and all parties in interest.

4

20.     Among other reasons for the Second KERP/KEIP, Mr. Compton believes that adopting such a program will allow the Debtor to maximize the value of its assets by performing under its agreements with West Plains and Redwood to load out the grain associated with the Sales and perform the necessary accounting, tracing, and reconciliation under the 557 Procedure to ensure the best possible outcome for the Debtor's estate. Further, Mr. Compton believes that the Second KERP/KEIP participants have industry and Debtor-specific knowledge that would be impossible to replace on a short-term basis and if these Second KERP/KEIP participants were to leave the Debtor, the Debtor would not be able to fulfill its obligations under its agreements with West Plains and Redwood and receive as good of a sale price for its grain inventory and would not be able to compile the necessary data to complete the 557 Procedures and prepare a disclosure statement and plan.

**THE SECOND KEIP**

21.     The Second KEIP is designed to incentivize one key executive of the Debtor (the "Key Executive") to preserve and maximize the value of the Debtor's business for the benefit of all stakeholders in the Case.

22.     The Debtor relies on the Key Executive's expertise to make decisions that support the operations, drive the financial performance of the Debtor's business, and perform the actions necessary to facilitate the 557 Procedure and preparation of a disclosure statement and plan. The Key Executive has assumed the functions of the CFO who resigned and is responsible for, among other things:

      a.  the essential day-to-day business functions;

      b.  implementing the Debtor's operational goals; and

c. assisting the Debtor's sale/liquidation efforts and responding to diligence requests in connection therewith and with this Case more generally.

23.   A summary of the material terms of the KEIP is set forth below.

a.  Key Executive can receive compensation by achieving the following key metrics:

i.    Maintaining operational expenses in compliance with the approved cash collateral budget with no more than a 115% weekly variance in the aggregate;

ii.   Providing updated and timely financial reports that the CFO (who resigned pre-petition) otherwise would have prepared;

iii.  Coordinating the continued liquidation of the Debtor's assets, wind down of Debtor's operations, and reduction of expenses (office leases, facility expenses, grain, contracts, etc.);

iv.   Coordinating the tracing and accounting of grain and grain proceeds as part of the 557 Procedure and generating responses to claims submitted by producers;

v.    Assisting in the preparation of a disclosure statement and plan; and

vi.   Coordinating of tax filings and other statutory filings.

b.  If all the foregoing key metrics were achieved, the amount paid to the Key Executive under the KEIP would be $60,000, and he would be required to stay until at least May 31, 2026.

24.   The outcomes that will be influenced by the Key Executive's commitment to the Debtor's wind down process are key indicators of the Debtor's performance and the overall success

6

of the Case. Accordingly, the Second KEIP is well suited to incentivize, measure, and reward the Key Executive's performance.

## THE SECOND KERP

25.     The Second KERP is designed to help ensure that 11 non-insider employees (the "Key Employees"), who are instrumental to the Debtor's efforts to provide internal account services and facilitate the Sales related to its grain elevator located in Sioux City, Iowa, are retained and properly motivated to continue to stay within the Debtor's employ and maximize the value of the Debtor's business for the benefit of the Debtor's stakeholders in this Case.

26.     The Debtor seeks to provide incentives to the Key Employees to commit to this goal. The Second KERP will help ensure that these Key Employees, whom the Debtor has identified as important to the success of the Case, remain with the Debtor through the post-sale distribution process, as well as help manage the Debtor's ongoing operations and the administration of the Debtor's estate during grain load out process. Without payments under the Second KERP, the Debtor believes that the Key Employees are likely to pursue alternative employment, harming the value of the Debtor's estate and negatively affecting the Debtor's ongoing efforts to administer the Debtor's estate and meet its obligations under its agreements with West Plains and Redwood.

27.     The Second KERP is effectively a roll-up of bonuses that have accrued for Key Employees who have not voluntarily left the Debtor's employ or been terminated for cause before the proposed payout dates while the Debtor completes the sale/liquidation process in the Case.

28.     If all of the Key Employees were retained through the time period set forth in the Second KERP the aggregate cost of the Second KERP would be approximately $69,000.

7

29.     While Key Employees may have titles that include words that may suggest officer status, none of the Key Employees is, in reality, an "insider" as defined by the Bankruptcy Code or under applicable law. Although the Key Employees are valuable to the Debtor's business and are particularly vital during the Case, their titles do not reflect that such Employees control the Debtor's operations. Each Key Employee reports to more senior employees of the Debtor and must obtain approval from appropriate senior personnel before taking any significant action with respect to, among other things, the Debtor's corporate policies or the disposition of significant assets.

30.     In addition, no Key Employee is a member of the Board, was appointed by, or reports to, the Board, and no Key Employee regularly attends, or participates at, Board meetings. Further, the Key Employees' duties do not extend to the Debtor's business operations as a whole, but rather, are restricted to particular aspects or segments of the Debtor's business, and no Key Employee has authority to make company-wide decisions on the Debtor's behalf.

31.     The Debtor believes that the award opportunities provided under the Second KERP are consistent with market practice for similarly situated employers and are, both individually and collectively, reasonable under the circumstances of the Case. Further, the Debtor believes the proposed Second KERP fairly addresses its need to preserve and maintain operational and workforce stability with a reasonable, retention-based program.

## **RELIEF REQUESTED**

32.     Pursuant to sections 363(b), 363(c), and 503(c) of the Bankruptcy Code, the Debtor seeks entry of an order approving the Second KEIP and the Second KERP.

## **BASIS FOR RELIEF**

**I.      THE SECOND KEIP**

**A. Authorization of the Second KEIP is Appropriate Pursuant to Sections 363(b)(1)
and 503(c)(3) of the Bankruptcy Code.**

33.     Sections 363(b) and 503(c) of the Bankruptcy Code govern court approval of non-ordinary course of business employee incentive and retention plans. 11 U.S.C. §§ 363(b), 503(c). Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor must demonstrate that "a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999). Under section 363(b), a debtor has the burden to establish it has a valid business purpose for using estate property outside the ordinary course of business. *In re Lionel Corp*., 722 F.2d 1063, 1070–71 (2d Cir. 1983). Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief that the action was in the debtor's best interest. *In re Integrated Resources, Inc*., 147 B.R. 650, 656 (S.D.N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." *Montgomery Ward*, 242 B.R. at 155.

34.     Section 503(c)(3) prohibits "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(3). Section 503(c)(3) prohibits non-ordinary course of business transactions that are not justified by the facts and circumstances of the case. Many courts have noted that the section 503(c)(3) test is akin to the business judgment test of section 363. "Most bankruptcy courts that have considered the issue have concluded that section 503(c) adds nothing to the preexisting business judgment standard, and therefore regardless of

Section 503(c)(3), the business judgment standard controls." *In re FirstEnergy Sols. Corp.*, 591

B.R. 688, 695 (Bankr. N.D. Ohio 2018); *In re Borders Grp., Inc.*, 453 B.R. 459, 474 (Bankr.

S.D.N.Y. 2011) ("Since the legal standard under section 363(b) is no different than section

503(c)(3), the following analysis is equally applicable to both statutory provisions."). Other courts,

however, believe that section 503(c) sets forth a stricter standard. *See GT Advanced Techs., Inc. v.*

*Harrington*, 2015 U.S. Dist. LEXIS 94743 (D.N.H. July 21, 2015) ("This court is persuaded by

*Pilgrim's Pride* [*In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009)] that 11

U.S.C. § 503(c)(3) directs courts to give more scrutiny to the business judgment of debtors than is

permitted under the § 363(b)(1) business judgment test").

35.     In assessing whether the debtor has demonstrated sound business judgments, courts

look to the following factors set forth in *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y.

2006):

a) Is there a reasonable relationship between the plan proposed and the results to be obtained (i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance)?

b) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

c) Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

d) Is the plan or proposal consistent with industry standards?

e) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

f) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).

10

36.    The Court should approve the KEIP pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code because the KEIP is justified by the facts and circumstances of this Case and satisfies the business judgment test (even under the stricter standard).

37.    The factors cited by the court in *Dana*, weighs heavily in favor of Court approval of the Second KEIP.

**B.    The Second KEIP is an Exercise of Sound Business Judgment under the Dana Factors**

*a) The Second KEIP is Calculated to Achieve the Desired Performance*

38.    The Second KEIP provides incentives for one key executive to achieve targets that will enhance the value of the estate for the benefit of the Debtor's stakeholders. The awards are tied to performance metrics. Achieving the targets will be difficult, and to do so, the Key Executive must undertake significant efforts towards related metrics.

*b) The Debtor's CRO Engaged in Due Diligence with the Assistance of Independent Counsel in Creating the Second KEIP*

39.    In formulating the Second KEIP, the Debtor worked with third-party advisors (the "Advisors") including, but not limited to Silverman Consulting, Inc. and the Chief Restructuring Officer, Michael Compton, to develop the Second KEIP. The Advisors reviewed incentive plans among other chapter 11 debtors and companies similar to the Debtor and, informed by this market review, the Debtor and the Advisors structured the Second KEIP to use appropriate incentives and benchmarks for the circumstances presented in this Case.

*c) The Cost of the Second KEIP is Reasonable and Consistent with Market Practice*

40.    If all key metrics were achieved, the aggregate cost of the Second KEIP is $60,000. This cost is reasonable given the size and nature of the Debtor's business and the expected value

retained by the bankruptcy estate in retaining the Key Executive through the bankruptcy administration process.

### d) The Second KEIP is Fair and Reasonable

41.     The Key Executive is an individual whose skills and performance are needed for the Debtor to achieve the performance targets. The Debtor and its advisors devised the Second KEIP to properly motivate the executive.

42.     In light of the above facts, the implementation of the Second KEIP is a sound exercise of the Debtor's business judgment and should be approved by the Court.

**C.     The Second KEIP is an Exercise of Sound Business Judgment under the *Dana* Factors**

43.     The Court should approve the Second KEIP pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code. Based on the factors described in *Dana*, the Second KEIP is an exercise of sound business judgment and is justified by the facts and circumstances of the case.

**D.     Section 503(c)(1) of the Bankruptcy Code Does Not Apply to the Second KEIP**

### a) The Second KEIP is Not a Retention Plan Under Section 503(c)(1) of the Bankruptcy Code

44.     Section 503(c)(1) imposes restrictions on payments to insiders for the purpose of inducing such persons to remain with a debtor's business. Section 503(c)(1) applies to retention plans, and not incentive plans. This is the case even if the incentive plan may have some retentive effect. *See In re Velo Holdings, Inc.*, 472 B.R. 201, 209-10 (Bankr. S.D.N.Y. 2012) ("Although a purported KEIP may contain some retentive effect, that does not mean that the plan, overall, is retentive rather than incentivizing in nature.") (internal quotation marks omitted); *In re Glob. Home Prods.*, LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact, as Debtors pointed out,

12

that all compensation has a retention element does not reduce the Court's conviction that Debtors' primary goal is to create value by motivating performance.").

45.      However, calling a plan an "incentive plan" does not automatically take the plan outside the scope of section 503(c)(1). *See In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 357 (Bankr. E.D. Va. 2016) ("A Court cannot defer to the labels used by a debtor when determining whether a KEIP's true purpose is to either incent or retain."). It is the debtor's burden to demonstrate that the plan is primarily incentivizing rather than primarily retentive. *See In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012). If the targets are readily achievable, the plan may be retentive in nature. *See In re Residential Capital, LLC*, 491 B.R. 73, 86 (Bankr. S.D.N.Y. 2013); In re Hawker Beechcraft, Inc., 479 B.R. 308, 315 (Bankr. S.D.N.Y. 2012).

46.      In this case, the Second KEIP is an incentive plan, and not a "pay to stay" retention plan. The payments are tied to performance metrics. No payments are made if the thresholds are not met. Thus, the Key Executive does not receive payment under the Second KEIP merely for remaining employed with the Debtor on a certain date or upon the occurrence of a certain event. Accordingly, section 503(c)(1) is inapplicable.

## II.      THE SECOND KERP

### A.   Authorization of the Second KERP is Appropriate Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

47.      As set forth above, sections 363(b) and 503(c) of the Bankruptcy Code govern court approval of non-ordinary course of business employee incentive and retention plans and in assessing whether the debtor has demonstrated sound business judgments, courts look to the following factors set forth in *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006):

48.      Based on the factors described in *Dana*, the Second KERP is an exercise of sound business judgment and is justified by the facts and circumstances of the case.

**B.** **The Second KERP is an Exercise of Sound Business Judgment under the *Dana* Factors**

*i.* *The Second KERP is Calculated to Achieve the Desired Performance*

49. The Second KERP is designed to encourage the Key Employees to remain with the Debtor through this Case. The payments are designed to compensate such employees for their additional responsibilities during the Case. If a Key Employee voluntarily leaves (or is terminated for cause), the employee will not receive the corresponding Second KERP payments. Thus, the Second KERP is calculated to encourage employees to stay for the desired period.

*ii.* *The Debtor Engaged in Due Diligence with the Assistance of Independent Counsel in Creating the Second KERP*

50. In formulating the Second KERP, the Debtor worked with the Advisors including, but not limited to Silverman Consulting, Inc. and its counsel, to develop the Second KERP. The Advisors reviewed incentive plans among other chapter 11 debtors and companies similar to the Debtor and, informed by this market review, the Debtor and the Advisors structured the Second KERP. The Debtor also worked with the Advisors to ensure that there were no insiders selected as Key Employees and that each Key Employee was essential to this Case

*iii.* *The Cost of the Second KERP is Reasonable and Consistent with Market Practice*

51. As discussed above, the Advisors reviewed various retention plans in the formation of the Second KERP.

52. If all of the Key Employees were retained through the time period set forth in the Second KERP the aggregate cost of the Second KERP is approximately $69,000. This cost is reasonable given the size and nature of the Debtor's business and the expected value retained by the bankruptcy estate in retaining the Key Employees through the sale and liquidation process.

14

*iv.*     *The Second KERP is Fair and Reasonable*

53.     The Key Employees are a select group whose skills and performance are needed for the Debtor to achieve its operational goals. The Debtor and its advisors devised the Second KERP to encourage these employees to remain with the Debtor during this critical time.

54.     In light of the above facts, the implementation of the Second KERP is a sound exercise of the Debtor's business judgment and should be approved by the Court.

**C.  The Second KERP is an Exercise of Sound Business Judgment under the *Dana* Factors**

55.     The Court should approve the Second KERP pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code. Based on the factors described in *Dana*, the KERP is an exercise of sound business judgment and is justified by the facts and circumstances of the case.

**D.  Section 503(c)(1) is Not Applicable to the Second KERP.**

56.     The Debtor did not select any insiders to participate in the Second KERP, and thus, section 503(c)(1) is not applicable.

57.     Insiders are defined in section 101(31) of the Bankruptcy Code. If the debtor is a corporation, insiders include any director, officer, or person in control of the debtor, or a relative of any such person. 11 U.S.C. § 101(31)(B). Insiders are also persons who directly or indirectly own, control, or hold with the power to vote at least 20% of the voting securities of the debtor-corporation. 11 U.S.C. §§ 101(2) and 101(31)(E).

58.     A person's job title generally is not outcome determinative. *In re Borders Grp., Inc.,* 453 B.R. 459, 468-69 (Bankr. S.D.N.Y. 2011) ("An individual's title, by itself, is insufficient to establish that an individual is a director or officer."). Rather, courts look to the totality of the circumstances, including the person's involvement in the debtor's affairs. *Id.* However, once a

15

person is found to be a director or officer of the corporation (such as one who serves on the governing board or was elected or appointed by the board of directors), that person is an insider. *Office of the U.S. Tr. v. Fieldstone Mortg. Co.*, 2008 U.S. Dist. LEXIS 91479 (D. Md. Nov. 5, 2008); *see also Borders Grp.*, 453 B.R. at 468-70.

59. The lack of a title does not preclude a person from being an insider. Employees who have sufficient authority to make company-wide or strategic decisions, or to dictate corporate policy and the disposition of assets, may be insiders even if they lack an officer or director title. *See In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 150 (Bankr. E.D.N.Y. 2012).

60. Here, none of the Key Employees is an insider. No Key Employee has been appointed or elected by the board of directors, nor does any serve on the board. None of the Key Employees has the authority to make company-wide or strategic decisions. Nor can any Key Employee take significant actions with respect to corporate policies or dispose of significant assets without approval from a senior manager.

## **WAIVER OF BANKRUPTCY RULE 6004**

61. The Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004 and that the Debtor has established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004, which is necessary to implement the relief requested in this Motion.

## **NOTICE**

62. The Debtor will provide notice of this Motion to (a) the Office of the United States Trustee for the District of Nebraska; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the Debtor's prepetition secured lenders, BMO Bank N.A., Farm Credit Services of America, PCA, Farm Credit Mid-America, PCA, and CoBank, FCB; (d) the United States

Attorney's Office for the District of Nebraska; (e) the Internal Revenue Service; (e) counsel to the official committee of unsecured creditors appointed in this chapter 11 case; (f) the Nebraska Department of Revenue; (g) the Iowa Department of Revenue; and (h) all parties on the Rule 2002 Notice list.

63.    Contemporaneously herewith, the Debtor filed a *Motion to Shorten Notice for Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Implement a Second Key Employee Incentive Plan and a Second Key Employee Retention Plan and (II)Granting Related Relief* pursuant to Local Rule 9006-1, seeking for this Court to shorten the resistance deadline to not more than seven (7) days and set an expedited hearing because the Debtor fears that without a Second KERP/KEIP program, employees will leave quickly.

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an Order providing the relief set forth herein and such other, further and different relief as the Court deems just and equitable.

DATED this 20th day of March, 2026.

HANSEN-MUELLER CO., Debtor,

By: */s/ Brian J. Koenig*
    Brian J. Koenig, #23807
    Donald L. Swanson, #16385
    Trevor J Lee, #27063
    KOLEY JESSEN P.C., L.L.O.
    1125 South 103rd Street, Suite 800
    Omaha, NE 68124
    (402) 390-9500
    (402) 390-9005 (fax)
    Brian.Koenig@koleyjessen.com
    Don.Swanson@koleyjessen.com
    Trevor.Lee@koleyjessen.com